# 20-1809

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

MCCONNELL DORCE, individually and on behalf of all others similarly situated, CECILIA JONES, individually and on behalf of all others similarly situated, SHERLIVIA THOMAS-MURCHISON, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

—against—

CITY OF NEW YORK, NEIGHBORHOOD RESTORE HOUSING DEVELOPMENT FUND CO. INC., BSDC KINGS COVENANT HOUSING DEVELOPMENT FUND COMPANY, INC., MARIA TORRES-SPRINGER, COMMISSIONER OF THE NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, JOHN DOE 1 to 10, JANE DOE 1 to 10,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS MCCONNELL DORCE, SHERLIVIA THOMAS-MURCHISON AND CECILIA JONES

ROBERT J. VALLI, JR.
MATTHEW BERMAN
VALLI KANE & VAGNINI
600 Old Country Road
Garden City, New York 11530
(516) 203-7180

*Attorneys for Plaintiffs-Appellants
McConnell Dorce, Cecilia Jones,
and Sherlivia Thomas-Murchison*

KEITH H. WOFFORD
GREGG L. WEINER
ALEXANDER B. SIMKIN
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 596-9000

DOUGLAS HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4600

*Attorneys for Plaintiffs-Appellants
McConnell Dorce and Sherlivia
Thomas-Murchison*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF THE ISSUES.............................................................................5

STATEMENT OF THE CASE.................................................................................5

JURISDICTIONAL STATEMENT ......................................................................16

STANDARD OF REVIEW ...................................................................................17

SUMMARY OF THE ARGUMENT ....................................................................18

ARGUMENT .........................................................................................................19

I.     THE DISTRICT COURT ERRED IN HOLDING THAT THE TAX INJUNCTION ACT AND DOCTRINE OF COMITY BAR SUBJECT MATTER JURISDICTION..........................................................................19

     A.     The District Court Misapplied the TIA and Doctrine of Comity Because the Seizure of Appellants' Excess Value Cannot, by Definition, Be a Tax and Appellants Do Not Challenge the Validity or Amount of any Tax. .......................................................20

          1.     Appellants' Challenge to Municipal Defendants' Seizure of the *Excess Value* in Appellants' Homes Cannot be Barred by the TIA and comity. .................................................21

          2.     Appellants Do Not Dispute the Validity or Amount of any Tax........................................................................24

     B.     The District Court Misapplied the TIA and Doctrine of Comity Because Municipal Defendants' Use of the TPT Program to Seize Subject Properties Is Not a Tool of Tax Collection. .................25

1. The TPT Program Does Not Generate Tax Revenue and Therefore Is Not a Tool of Tax Collection. ..............................26

2. The Purpose of the TPT Program Is Unrelated to Tax Revenue and Therefore It Is Not a Tool of Tax Collection. ..................................................................................30

C. The District Court's Holding that the TIA and Comity Bars Jurisdiction Over Takings Claims Is Irreconcilable with the Supreme Court's Holding in *Knick v. Township of Scott*. ..................35

II. THE DISTRICT COURT MISAPPLIED AND EXPANDED THE *ROOKER-FELDMAN* DOCTRINE TO BAR FEDERAL PLAINTIFFS FROM ASSERTING CLAIMS THAT WERE NEVER LITIGATED IN STATE COURT ................................................................37

A. The *Rooker-Feldman* Factors Do Not Apply Here and the District Court Erred in Concluding Otherwise. ..................................38

1. The District Court Erred in Holding that Appellants Are State Court Losers Based on Default *In Rem* Foreclosure Judgments in Proceedings in Which They Were Neither Parties nor Participants. ............................................39

2. The District Court Erred in Applying *Rooker-Feldman* Even Though the Foreclosure Judgments Merely Ratified Appellants' Injuries. ..................................................42

3. The District Court Erred by Finding that Appellants' Sought Rejection of a State Court Judgment. ............................46

B. The District Court Failed to Meaningfully Address *Knick* Which Necessarily Narrowed the Potential Applicability of *Rooker-Feldman* in the Context of Takings Claims. ..................................50

III. THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANTS FAILED TO ADEQUATELY ALLEGE STANDING TO SEEK PROSPECTIVE INJUNCTIVE AND DECLARATORY RELIEF ............................................................................................52

A.     The District Court Erred in Failing to Consider Appellants' Likely Recurring Injuries as a Basis for Standing. ..............................53

B.     The District Court Erred in Failing to Consider Appellants' Ongoing Harms as a Basis for Standing. ............................................55

CONCLUSION ..............................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuzaid v. Mattox*,
726 F.3d 311 (2d Cir. 2013) ...............................................................19, 30, 36

*Adkins v. Rumsfeld*,
464 F.3d 456 (4th Cir. 2006) ...............................................................44

*America's Health Ins. Plans v. Hudgens*,
915 F. Supp. 2d 1340 (N.D. Ga. 2012), *aff'd*, 742 F.3d 1319 (11th
Cir. 2014) ...............................................................29

*An v. City of New York*,
No. 16 CIV. 5381 (LGS), 2017 WL 2376576 (S.D.N.Y. June 1,
2017) ...............................................................53

*Anderton v. Bannock Cty.*,
2015 WL 428069 (D. Idaho Feb. 2, 2015) ...............................................................21

*Bolden v. City of Topeka, Kan.*,
441 F.3d 1129 (10th Cir. 2006) ...............................................................42

*Burlington Ins. Co. v. NYC Transit Auth.*,
29 N.Y.3d 313 (N.Y. 2017) ...............................................................43

*Bynum v. Conn. Comm'n on Forfeited Rights*,
410 F.2d 173 (2d Cir. 1969) ...............................................................31

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist.
Comm'n*,
768 F.3d 183 (2d Cir. 2014) ...............................................................17

*Chamber of Commerce of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ...............................................................29

*Charles v. Levitt*,
716 F. App'x 18 (2d Cir. 2017) ...............................................................46

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)...........................................................................55

*Coleman v. D.C.*,
70 F. Supp. 3d 58 (D.D.C. 2014)......................................21, 27, 29, 47

*Department of Revenue of Montana v. Kurth Ranch*,
511 U.S. 767 (1994)........................................................................33

*Deshawn E. v. Safir*,
156 F.3d 340 (2d Cir. 1998) .......................................................53, 54, 55

*Direct Mktg. Ass'n v. Brohl*,
575 U.S. 1 (2015)...........................................................................25

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005)..................................................................*passim*

*Gonzalez v. Deutsche Bank National Trust Company*,
632 F. App'x 32 (2d Cir. 2016) ..............................................................49

*Green v. Mattingly*,
585 F.3d 97 (2d Cir. 2009) .....................................................................17

*Harper v. Va. Bd. of Elections*,
383 U.S. 663 (1966)........................................................................31

*Hibbs v. Winn*,
542 U.S. 88 (2004)........................................................20, 24, 27, 31

*Hoblock v. Albany Cty. Bd. of Elections*,
422 F.3d 77 (2d Cir. 2005) ..........................................37, 38, 44, 45

*Johnson v. De Grandy*,
512 U.S. 997 (1994).........................................................................39

*Jones v. DeSantis*,
No. 4:19CV300-RH/MJF, 2020 WL 2618062 (N.D. Fla. May 24, 2020) ...........................................................................................31

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
302 F. Supp. 3d 541 (S.D.N.Y. 2018) .........................................................55

*Knick v. Township of Scott*,
139 S. Ct. 2162 (2019) ..............................................................*passim*

*Kraebel v. New York City Dep't of Hous. Pres. & Dev.*,
959 F.2d 395 (2d Cir. 1992) ...............................................27

*In re Lampe*,
665 F.3d 506 (3d Cir. 2011) ...............................................42

*Lance v. Dennis*,
546 U.S. 459 (2006) ............................................................39

*In re Lehman Bros. Holdings Inc.*,
855 F.3d 459 (2d Cir. 2017) ...............................................43

*Levin v. Commerce Energy, Inc.*,
560 U.S. 413 (2010) ............................................................24

*Luessenhop v. Clinton Cty.*,
466 F.3d 259 (2d Cir. 2006) ....................................17, 21, 24, 25

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000) ...............................................17

*McKithen v. Brown*,
481 F.3d 89 (2d Cir. 2007) .................................................44

*Merritt v. Shuttle, Inc.*,
245 F.3d 182 (2d Cir. 2001) ...............................................17

*Mielo v. Steak 'n Shake Operations, Inc.*,
897 F.3d 467 (3d Cir. 2018) ...............................................56

*Mobil Oil Corp. v. Dubno*,
639 F.2d 919 (2d Cir. 1981) ...............................................26

*Mobil Oil Corp. v. Tully*,
639 F.2d 912 (2d Cir. 1981) ...................................30, 32, 34

*Nelson v. City of New York*,
352 U.S. 103 (1956) ......................................................... 22, 23

*New York v. United Parcel Serv., Inc.*,
    942 F.3d 554 (2d Cir. 2019) ........................................................................33

*Patane v. Nestle Waters N. Am., Inc.*,
    314 F. Supp. 3d 375 (D. Conn. 2018)..............................................................45

*In re Philadelphia Entertainment & Development Partners,*
    879 F.3d 492 (3d Cir. 2018) ..........................................................................48

*Pickell v. Sands*,
    2012 WL 6047286 (E.D. Cal. Dec. 5, 2012) ..................................................29

*Rafaeli, LLC v. Oakland Cty.*,
    No. 156849, 2020 WL 4037642 (Mich. July 17, 2020) ..................................22

*Riley v. City of New York*,
    14 CIV. 4482, 2014 WL 11460471 (E.D.N.Y. Oct. 29, 2014), *aff'd*
    *sub nom. Riley v. Commr. of Fin. of City of New York*, 618 F.
    App'x 16 (2d Cir. 2015) ................................................................................40

*Riley v. Comm'r of Fin. of City of New York*,
    618 F. App'x 16 (2d Cir. 2015) .....................................................................40

*Riley v. Sunshine et. al*,
    13-CV-9171-LAP, slip op. (S.D.N.Y. Feb. 20, 2014).....................................40

*Saglioccolo v. New York City Mun. Corp. Dep't of Fin. Bureau of Tax
    Collection*,
    101 F.3d 108 (2d Cir. 1996) ..........................................................................30

*In re Sept. 11 Litig.*,
    751 F.3d 86 (2d Cir. 2014) ..............................................................................9

*Simpson v. Caruso*,
    No. 1:09-CV-245, 2009 WL 1010973 (W.D. Mich. Apr. 14, 2009).................33

*Skinner v. Switzer*,
    131 S. Ct. 1289 (2011)...................................................................................48

*Sung Cho v. City of New York*,
    910 F.3d 639 (2d Cir. 2018) ..........................................................................44

*Swiatkowski v. Citibank*,
745 F. Supp. 2d 150 (E.D.N.Y. 2010), aff'd, 446 F. App'x 360 (2d Cir. 2011) ..................................................................................51

*In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn*,
Index No. 8700/2015, 2019 WL 1431423 (Sup. Ct. Kings Cty. Mar. 28, 2019)..................................................................*passim*

*Taylor v. Sturgell*,
553 U.S. 880 (2008)..................................................................41

*Tewinkle v. Capital One, N.A.*, No. 19CV1002V, 2019 WL 8918731 (W.D.N.Y. Dec. 11, 2019), *report and recommendation adopted* 19-CV-1002-JLS-HBS, 2020 WL 2812519 (W.D.N.Y. May 29, 2020) ..................................................................9

*Union Pac. R.R. Co. v. Pub. Util. Com'n of State of Or.*,
899 F.2d 854 (9th Cir. 1990) ..........................................23, 26

*United States v. Gonzalez*,
442 F.2d 698 (2d Cir. 1970) ..........................................9

*Vossbrinck v. Accredited Home Lenders, Inc.*,
773 F.3d 423 (2d Cir. 2014) ..........................................46

*W.J.F. Realty Corp. v. Town of Southampton*,
220 F. Supp. 2d 140 (E.D.N.Y. 2002) ..........................................47

*Warren v. Pataki*,
823 F.3d 125 (2d Cir. 2016) ..........................................49

*Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.*,
122 F. Supp. 3d 44 (S.D.N.Y. 2015) ..........................................43

*Wells v. Malloy*,
510 F.2d 74 (2d Cir. 1975) ..........................................19, 22, 26, 29

*Wik v. City of Rochester*,
632 F. App'x 661 (2d Cir. 2015) ..........................................40

*Wik v. City of Rochester*,
No. 07-CV-6541, 2008 WL 4911805 (W.D.N.Y. Nov. 13, 2008), *aff'd* 632 F. App'x 661 (2d Cir. 2015)..........................................40

*Zervos v. Verizon New York, Inc.*,
  252 F.3d 163 (2d Cir. 2001) ...............................................................18

**Statutes**

28 U.S.C. § 1291 .................................................................................17

28 U.S.C. § 1331 .................................................................................16

28 U.S.C. § 1341 .............................................................................19, 36

28 U.S.C. § 1343 .................................................................................17

42 U.S.C. § 1983 ...........................................................................*passim*

N.Y.C. Admin. Code § 11-319 ...........................................................34

N.Y.C. Admin. Code § 11-401.4 ......................................................8, 11

N.Y.C. Admin. Code § 11-406(a) ........................................................9

N.Y.C. Admin. Code § 11-412.1(c).....................................................10

**Other Authorities**

Comms. on Oversight and Investigations and Housing and Buildings
  of the New York City Council, *Oversight—Taking Stock: A Look
  into the Third Party Transfer Program in Modern Day New York*
  (July 22, 2019) ............................................................................*passim*

Kings County, New York, Deed Records of the City of New York,
  Office of City Register, Doc. Id. 2018091701276001,
  https://on.nyc.gov/30j7UL7 ..............................................................7

Kings County, New York, Deed Records of the City of New York,
  Office of City Register, Doc. Id. 2018092001169001,
  https://on.nyc.gov/2Pfxjz5 ............................................................7, 13

Kings County, New York, Deed Records of the City of New York,
  Office of City Register, Doc. Id. 2012120500101005,
  https://on.nyc.gov/30hlwGW..............................................................8

Joe Mauceri, *New Yorkers in debt losing their homes as part of program designed to preserve quality affordable housing*, PIX11 (December 12, 2018), https://bit.ly/30lKUvc .......................................................16

*Missions & Board*, Neighborhood Restore, http://www.neighborhoodrestore.org/about/ (last visited Aug. 26, 2020) ................................................................................................................11

New York City Census Data 2010, NYC Department of Health, https://on.nyc.gov/3i2y3E7 (last visited Aug. 2, 2020).......................................15

Sarissa Phillips-Singletary, *City Council Housing Chair Expresses Concern Over Mayor's Plan to Expand Seizure of Private Residential Properties*, New York City Council (Jan. 10, 2019), https://on.nyc.gov/33mIEG3................................................................................2

Testimony of Public Advocate Jumaane D. Williams, *Oversight and Investigations and Housing and Buildings of the New York City Council* (July 22, 2019), https://on.nyc.gov/3i2Bgn9 .......................................16

<u>**PRELIMINARY STATEMENT**</u>

Appellants, McConnell Dorce, Cecelia Jones and Sherlivia Thomas-Murchison (collectively "<u>Appellants</u>") had their homes taken by Defendants City of New York (the "<u>City</u>"), Neighborhood Restore Housing Development Fund Co. Inc. ("<u>Neighborhood Restore</u>"), BSDC Kings Covenant Housing Development Fund Company, Inc. ("<u>BSDC</u>"), and Maria Torres-Springer (collectively "<u>Defendants</u>"), through an unconstitutional and fundamentally unfair process concocted to seize property owned largely by elderly persons of color, divesting them of the value and long-term security inherent in their property ownership. Appellants bring this lawsuit to put a stop to, and seek redress for, this unconstitutional and discriminatory conduct.

Appellants challenge the City's Third Party Transfer program ("<u>TPT Program</u>") whereby the City and its HPD commissioner (collectively "<u>Municipal Defendants</u>") seize private property, through *in rem* foreclosure proceedings, and convey the property *for free* to real estate developers that are hand-picked by the City, such as Neighborhood Restore and BSDC (collectively "<u>TPT Defendants</u>"). Municipal Defendants argue that they can take anybody's property so long as, allegedly, (i) the property owner owes *any* taxes (even $1) and (ii) the property is *physically near* a statutorily "distressed" property (*i.e.* a property that has accrued at least 15% of its value in taxes and has five or more housing code violations).

The tax debt is a pretext for taking the properties because Municipal Defendants collect no taxes from the TPT Program's seizures. For example, if Municipal Defendants seize a $2 million property with $3,000 in tax debt, under the TPT Program, the City receives no payment of the $3,000 tax debt and does not retain the property, while the TPT Defendants receive an unencumbered $2 million property in exchange for a promise to provide "affordable" housing. The property owner receives nothing.[1]

Municipal Defendants' exploitation of the TPT Program has gotten worse in recent years. Municipal Defendants have seized dozens of properties at a time in mass *in rem* foreclosure proceedings directed against the properties themselves—so that the property owners are not party to, and do not get notice of, the foreclosure proceedings or, at most, receive an opaque notice referencing dozens of properties subject to seizure. If a property owner objected to the inclusion of his property, Municipal Defendants dropped that property from the list and proceeded to obtain default judgments against the remaining properties without opposition. Last year,

---

[1] This is no mere hypothetical. *See* Sarissa Phillips-Singletary, *City Council Housing Chair Expresses Concern Over Mayor's Plan to Expand Seizure of Private Residential Properties*, New York City Council (Jan. 10, 2019), https://on.nyc.gov/33mIEG3 (Robert E. Cornegy, Jr., New York City Council Member and Chair of the Council's Committee on Housing and Buildings, acknowledging that "the home of a black senior in my community valued at over $2 million was transferred for outstanding municipal arrears of only $3,000, which turned out to be a record-keeping error on the part of the City.").

one state court judge who had previously granted Municipal Defendants' request for a default judgment against 66 properties subsequently reversed his decision after receiving evidence that the City misrepresented the facts, describing the City's conduct in a detailed opinion as "unconscionable and shocking to the conscience of the court." *In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn*, Index No. 8700/2015, 2019 WL 1431423, at *23 (Sup. Ct. Kings Cty. Mar. 28, 2019) (hereafter "*In Rem No. 53*") (also at A-256).[2]

The United States District Court for the Southern District of New York (the "District Court") did not address the merits of Appellants' claims and instead dismissed Appellants' class action Complaint, A-13 (the "Complaint"), without prejudice for lack of subject matter jurisdiction. SPA-1 (the "Order"). The District Court made three clear errors of law in dismissing the case.

*First*, the District Court misapplied and expanded the Tax Injunction Act ("TIA") and doctrine of comity to conclude that all of Appellants' claims should be dismissed as interfering with state tax collection, even though (i) the seizure of the value in excess of the taxes owed cannot, by definition, be a tax and Appellants' claims do not challenge the validity or amount of any tax; (ii) the TPT Program is not a tool of tax collection – *i.e.*, the TPT Program seizures do not raise tax revenue, and their actual purpose is to advance Mayor Bill de Blasio's (the "Mayor") public

---

[2] "A" refers to the Joint Appendix. "SPA" refers to the Special Appendix.

policy objectives; and (iii) the Order is irreconcilable with the recent Supreme Court decision in *Knick v. Township of Scott* guaranteeing a federal forum to property owners bringing substantively identical claims under 42 U.S.C. § 1983 ("Section 1983"). *See* 139 S. Ct. 2162, 2170 (2019) ("If a local government takes private property without paying for it, that government has violated the Fifth Amendment . . . [a]nd the property owner may sue the government at that time in federal court. . . .").

*Second*, the District Court misapplied and dramatically expanded the *Rooker-Feldman* doctrine by dismissing certain of Appellants' claims pursuant thereto even though three of the four mandatory *Rooker-Feldman* elements are not present here. In all events, *Knick* makes clear that Appellants may access federal courts for their takings claims notwithstanding any state court exhaustion requirement like *Rooker-Feldman*.

*Third*, the District Court erred in *sua sponte* holding that Appellants lack standing to pursue claims seeking declaratory or injunctive relief based on an overly narrow construction of standing doctrine. In reaching this holding, the District Court failed to consider that Appellants adequately alleged recurring and ongoing harms sufficient to confer standing to seek declaratory and injunctive relief.

Accordingly, and for the reasons set forth below, the Court should reverse the Order and remand this case for proceedings on the merits.

## STATEMENT OF THE ISSUES

1.      Did the District Court err in dismissing all claims pursuant to the TIA and comity where Appellants (i) do not challenge the validity or amount of any tax, (ii) do not challenge any tool of tax collection, and (iii) the Supreme Court has recently ruled in *Knick* that similarly-situated parties may properly access the federal courts?

2.      Did the District Court err in dismissing certain claims for money damages pursuant to *Rooker-Feldman* even though three of the four mandatory *Rooker-Feldman* elements are not present here and Appellants are entitled to access federal courts for their takings claims pursuant to *Knick*?

3.      Did the District Court err by *sua sponte* dismissing Appellants' claims for injunctive and declaratory relief pursuant to the standing doctrine, where Appellants assert recurring and ongoing harms sufficient to entitle them to seek injunctive and declaratory relief?

## STATEMENT OF THE CASE

*FACTUAL BACKGROUND[3]*

## I.      Appellants and the Subject Properties.

---

[3] The Factual Background includes allegations in the Complaint, which are required to be accepted as true by the District Court and this Court for purposes of this appeal.

Appellants are former property owners whose properties were taken, without any compensation, by Defendants through the TPT Program. Appellant McConnell Dorce owned property located at 373 Rockaway Boulevard, Brooklyn, New York free and clear of any mortgage. A-38-39 ¶¶ 79, 81. Appellants Cecelia Jones and Sherlivia Thomas-Murchison owned shares in Housing Development Fund Corporation ("HDFC") cooperatives that, in turn, owned properties located at 1197 Dean Street, Brooklyn, New York and 248 Madison Street,[4] Brooklyn, New York, respectively (together with Mr. Dorce's property, the "Subject Properties"). A-40 ¶ 96; A-42 ¶ 113. Mr. Dorce paid all real property taxes and related charges on his property to the City until at least 2012, when he incurred purported water and sewage charges on the property, and subsequently entered into a written installment agreement with the City to pay all outstanding charges. A-39 ¶¶ 82, 83. Moreover, at all relevant times, Mr. Dorce was current on his installment agreement with the City. A-39 ¶¶ 83; *see also* A-32 ¶ 52; A-36 ¶ 67. At all relevant times, Ms. Jones and Ms. Thomas-Murchison paid maintenance fees to the HDFC, which in turn paid real estate taxes and water/sewage charges assessed by the City on their respective properties. A-41 ¶ 98; A-43 ¶ 116.

---

[4] The Complaint mistakenly refers to this address as 248 Madison Dean Street. A-42 ¶ 113.

As discussed below, the Subject Properties were included in the TPT Program by Defendants even though they were not statutorily "distressed," Appellants did not receive notice that the Subject Properties were designated for seizure in the TPT Program, and Appellants did not receive any compensation after the Subject Properties were taken through the TPT Program.

## II.    The Defendants.

The City, through its agents, including Maria Torres-Springer—the former Commissioner of the New York City Department of Housing Preservation and Development ("HPD")—and Department of Finance ("DOF"), operates the TPT Program whereby it seizes numerous properties, including the Subject Properties, pursuant to *in rem* foreclosure proceedings.  A-16 ¶ 9; A-34-35 ¶¶ 59-65.  TPT Defendants are real estate developers to whom the City conveys the properties it seizes through the TPT Program.  A-34-35 ¶¶ 60-65.  As discussed below, Municipal Defendants used the TPT Program to give Ms. Jones's and Ms. Thomas-Murchison's properties to BSDC, and Mr. Dorce's property to Neighborhood Restore, in each case for free.  *See* A-39 ¶ 84 (Mr. Dorce); A-41 ¶ 99 (Ms. Jones); A-43 ¶ 117 (Ms. Thomas-Murchison).[5]

---

[5] The deeds executed by the City transferring Subject Properties to TPT Defendants each reflect that TPT Defendants paid $0.00 in exchange for the Subject Properties. *See* Kings County, New York, Deed Records of the City of New York, Office of City Register, Doc. Id. 2018091701276001, https://on.nyc.gov/30j7UL7; Kings

### III. The City Abused the TPT Program.

Chapter 4 of Title 11 of the N.Y.C. Administrative Code ("Admin. Code") codifies the TPT Program and the procedures for the City to seize properties – ostensibly to collect on tax liens. However, Defendants unlawfully abuse this statutory grant for purposes completely unrelated to the collection of tax revenue.

Pursuant to the TPT Program, the City, and its agents HPD and DOF, purport to select properties that are either "distressed,"[6] or are near "distressed" properties. A-16 ¶ 9. In practice, Municipal Defendants routinely and knowingly target valuable properties within communities of color for seizure with little (or no) tax debt relative to their property value. *See* A-27 ¶ 41; A-30 ¶¶ 47, 49; A-36-37 ¶¶ 69, 72. The City Council's Committee on Oversight and Investigations and Committee on Housing and Buildings recently issued a joint report confirming, among other things, that in the latest round of the TPT Program, "*half* of the properties selected" were not statutorily "distressed" and *had an average tax to value ratio of 3%*. Comms. on Oversight and Investigations and Housing and Buildings of the New York City

---

County, New York, Deed Records of the City of New York, Office of City Register, Doc. Id. 2018092001169001, https://on.nyc.gov/2Pfxjz5; Kings County, New York, Deed Records of the City of New York, Office of City Register, Doc. Id. 2012120500101005, https://on.nyc.gov/30hlwGW.

[6] A property is "distressed" if it has a lien to value ratio of 15% or more, and either an average of five or more serious housing violations per dwelling unit or $1000 or more in emergency repair liens. *See* Admin. Code § 11-401.4.

Council, *Oversight—Taking Stock: A Look into the Third Party Transfer Program in Modern Day New York* (July 22, 2019) (the "Government Report") at 9.[7]

Appellants did not receive *any* notice that their properties had been targeted for seizure through the TPT Program. A-36-37 ¶¶ 68-71; A-39 ¶ 85; A-41 ¶ 102; A-44 ¶ 120. This is consistent with the experience of at least six additional property owners who received no notice before Municipal Defendants seized their properties through the TPT Program. *In Rem No. 53*, 2019 WL 1431423, at *1, *3-4, *9, *16, *21, *25. Where the City does provide notice, the notice is intentionally opaque so that property owners cannot discern that their rights are imperiled by it. *See* Admin. Code § 11-406(a) (notice by publication).

As a result, property owners regularly fail to appear in the foreclosure proceedings, and the City proceeds with obtaining a default judgment resulting in

---

[7] The Government Report is available at https://on.nyc.gov/30hWJm7. The Government Report is subject to judicial notice for the indisputable facts which are not contested herein and reflect admissions by City officials and statistical data gathered by Appellee HPD. *See e.g., In re Sept. 11 Litig.*, 751 F.3d 86, 90 n.1 (2d Cir. 2014) (taking judicial notice of facts asserted in the 9/11 Commission Report "because they are not subject to reasonable dispute"); *United States v. Gonzalez*, 442 F.2d 698, 709 n.11 (2d Cir. 1970) (figures contained within "[t]he Department of Narcotics and Dangerous Drugs reports . . . are a matter of public record, and we accordingly take judicial notice of them."); *Tewinkle v. Capital One, N.A.*, No. 19CV1002V, 2019 WL 8918731, at *1 (W.D.N.Y. Dec. 11, 2019), *report and recommendation adopted* 19-CV-1002-JLS-HBS, 2020 WL 2812519 (W.D.N.Y. May 29, 2020) (taking judicial notice of Senate Report).

foreclosure against their properties ("<u>Foreclosure Judgment</u>") in one fell swoop.[8]

For example, in 2017, the City obtained a Foreclosure Judgment against 66

properties located in Brooklyn in a single court proceeding. A-35 ¶ 65; A-86.[9]

The Foreclosure Judgment grants the DOF the ability to execute a deed

transferring title to either the City or third parties within eight months following the

judgment. *See* Admin. Code § 11-412.1(c); *In Rem No. 53*, 2019 WL 1431423, at

*11 ("Notably, the City did not acquire title by the Judgment of Foreclosure."). This

post-judgment transfer then completely divests the original homeowner of his or her

property ownership, and the homeowner receives no compensation for the property

taken. A-40 ¶ 93; A-42 ¶ 110; A-44 ¶ 128. The City selects real estate developers

such as the TPT Defendants who then receive these valuable properties for free. *See*

A-39 ¶ 84; A-41 ¶ 99; A-43 ¶ 117. These fortunate real estate developers are selected

by politicians in a non-competitive and conflicted process used to reward political

allies. *See* A-23-24 ¶¶ 32-33; *In Rem No. 53*, 2019 WL 1431423, at *5. For example,

---

[8] Where a property owner challenges the foreclosure, the City removes the property from the TPT Program so that the City can obtain the default judgment without opposition. *See, e.g.*, A-88 (removing 952 St. Marks Ave. from *in rem* foreclosure judgment because property owner objected).

[9] The court subsequently restored many of the properties to the original owners after being presented with evidence of the City's improper abuse of the TPT Program. *See In Rem No. 53*, 2019 WL 1431423, at *1, *6-7, *10-11, *17-18, *22, *25. The judge in that case described the City's conduct as not only illegal, but "unconscionable and shocking to the conscience." *Id.* at *9.

Neighborhood Restore's Board of Directors includes Elizabeth Oakley, Deputy Director of HPD.[10]  Because these real estate developers pay nothing for the properties they receive, the TPT Program generates no revenue.  A-24 ¶ 33 n.4.[11]

Although Defendants argue that the TPT Program "keep[s] . . . housing affordable for residents of the[] [seized] buildings" and the Mayor attempts to use TPT seizures to claim his administration has increased affordable housing stock,  A-29 ¶ 46, the TPT Program does not actually construct any housing, let alone affordable housing.  A-38 ¶ 76.  Indeed, once seized, the TPT Defendants often charge residents higher rent than before, in addition to asking property owners like Appellants to pay rent to live in their own homes.  A-41 ¶ 100; A-43 ¶ 118; Government Report at 12.

As discussed below, the TPT Program violated Appellants' constitutional rights and resulted in the uncompensated seizure of the Subject Properties.

## IV.  Defendants Targeted the Subject Properties through the TPT Program.

At no time prior to the City's takings did the Subject Properties meet the statutory definition of "distressed."  A-39 ¶¶ 82-86; A-41 ¶ 103; A-44 ¶ 121; Admin. Code § 11-401.4.

---

[10]*See* *Missions* *&* *Board*, Neighborhood Restore, http://www.neighborhoodrestore.org/about/ (last visited Aug. 26, 2020).

[11] In contrast, outside of the TPT Program, the City addresses tax liens by selling the "lien to a trust, which, in turn, uses the liens as collateral to issue bonds, whose proceeds pay off the City's liens." *In Rem No. 53*, 2019 WL 1431423, at *3.

Nonetheless, Municipal Defendants included the properties of Mr. Dorce and Ms. Jones in a foreclosure proceeding "entitled *In Rem Tax Foreclosure No. 53, Borough of Brooklyn*, Index No. 8700/2015," and included the property of Ms. Thomas-Murchison in a foreclosure proceeding "entitled *In Rem Tax Foreclosure No. 51, Borough of Brooklyn*, Index No. 8700/2007" (collectively referred to herein as the "*in rem* Foreclosure Proceedings").[12] SPA-7-8.[13] The City purportedly targeted the Subject Properties for seizure not because they were statutorily "distressed," but because they were *near* other properties that were deemed statutorily "distressed" by the Municipal Defendants. *See, e.g.*, A-30 ¶ 48; A-35 ¶ 66.

**V. Appellants' Did Not Receive Notice Regarding, or Participate in, the *In Rem* Foreclosure Proceedings Concerning the Subject Properties**.

After including the Subject Properties in the TPT Program, Municipal Defendants failed to provide Appellants with notice of the *in rem* Foreclosure Proceedings targeting such properties. A-39 ¶ 85; A-41 ¶ 102; A-44 ¶ 120. Instead, Mr. Dorce did not learn that his Subject Property had been included in an *in rem*

_____

[12] Ms. Jones's property was also originally subject to a Foreclosure Judgment in *In Rem Tax Foreclosure Action No. 51 Borough of Brooklyn*, Index No. 8700/07 (Sup. Ct. Kings Cty. Feb. 26, 2013), but the Department of Finance never executed a deed, so the HDFC in which Ms. Jones owned shares retained ownership.

[13] The Foreclosure Judgments in the *in rem* Foreclosure Proceedings are available at A-77 (*In Rem* No. 51) and A-86 (*In Rem* No. 53).

Foreclosure Proceeding until on or about September 24, 2018,—*i.e.*, nearly one year

*after* a Foreclosure Judgment was entered in December, 2017, SPA-7—when his

property was transferred to a TPT Defendant, A-39 ¶ 84. Similarly, Ms. Jones and

Ms. Thomas-Murchison did not learn that their properties had been included in *in*

*rem* Foreclosure Proceedings until *after* ownership of their properties was

transferred to a TPT Defendant. A-41 ¶ 99; A-43 ¶ 117; SPA-8.[14] As Appellants

did not have actual or constructive notice of the *in rem* Foreclosure Proceedings,

they were deprived of an opportunity to participate in the proceedings and redeem

the Subject Properties. A-41 ¶ 105; A-44 ¶ 123.

**VI.    The Subject Properties Were Transferred For Free to TPT Defendants**.

Because Appellants did not know about the Foreclosure Judgments, they were

unable to exercise their right to seek redemption of the properties by paying any

accrued taxes within four months of the judgment. A-39 ¶ 85; A-41 ¶ 102; A-44 ¶

120.

After Municipal Defendants obtained the Foreclosure Judgments—granting

the City the right to transfer title in the properties after the four-month redemption

---

[14] The Complaint includes a typographical error and refers to October 2017 rather than October 2018. A-33 ¶ 57; *See* Kings County, New York, Deed Records of the City of New York, Office of City Register, Doc. Id. 2018092001169001, https://on.nyc.gov/2Pfxjz5 (Deed transferring Ms. Jones' property to Neighborhood Restore recorded on September 21, 2018).

period expired—they proceeded to seize the Subject Properties by executing deeds transferring those properties to third parties.  SPA-9; A-83.

Specifically, in or about September 2018, the Municipal Defendants executed deeds transferring Mr. Dorce's and Ms. Jones's properties to Neighborhood Restore and BSDC, respectively, for free.  A-39 ¶ 84; A-41 ¶ 99.  Likewise, on or about August 8, 2012, Municipal Defendants executed a deed transferring the property of Ms. Thomas-Murchison to BSDC for free.  A-43 ¶ 117.

Appellants received no compensation at any point after the Foreclosure Judgments for the transfer of the Subject Properties to TPT Defendants.  A-40 ¶ 93; A-42 ¶ 110; A-44 ¶ 128.  Instead, even after the City effectuated its seizure of Mr. Dorce's property, it continued to collect taxes from Mr. Dorce as if he still owned the property.  A-40 ¶ 95.

## VII.    The City's Abuse of the TPT Program Becomes Apparent.

After the Foreclosure Judgment in *In Rem Tax Foreclosure No. 53* was entered, six property owners filed proposed orders to show cause challenging the judgment, all claiming they had no notice of the proceeding.  *In Rem No. 53*, 2019 WL 1431423, at *2.  The justice overseeing the case reversed his judgment as to those properties, and issued a decision highly critical of the City's misconduct holding that the City had effected an unconstitutional taking of property without just compensation.  *See id*.  Among other things, Justice Partnow highlighted the City's

misconduct with respect to multiple properties, including one where the City affirmatively misled the property owner into making continued property tax payments even after the property had already been transferred, like the City did to Mr. Dorce. *Id.* at \*23.

Likewise, the Government Report highlights numerous deficiencies associated with the TPT Program, and confirms the allegations contained in the Complaint. For example, the Government Report reaffirms the marginal lien-to-value ratio of the properties included in the TPT Program, as "the total market value of the 210 non-statutorily distressed properties was nearly $152 million," whereas "the total amount of arrears owed on such properties was just over $4.5 million." Government Report at 10-11. In other words, the City abused its power to transfer $147.5 million in *excess* value from homeowners to the TPT Defendants—without collecting any tax revenue, and without providing any compensation to the rightful owners. This taking of private property was predominately directed at people of color as "approximately 50%" of the properties included in the TPT Program are located in "just 11 neighborhoods," which are communities of color. Government Report at 14; *see also* New York City Census Data 2010, NYC Department of Health, https://on.nyc.gov/3i2y3E7 (last visited Aug. 2, 2020). The TPT Program was also administered in a negligent manner as "the City admitted that it accepted

approximately $72,000 in payments from [a property owner] after a foreclosure judgment was issued against the property." Government Report at 16.

Public officials have also criticized the TPT Program. For example, in December 2018, Eric L. Adams, Brooklyn Borough President, observed that the TPT Program is effectively attempting to "balance the affordable housing crisis on the back of those small homeowners" and that by taking "a million dollar home from them because they have a $3,000 water bill" the City is "feeding the homeless crisis." Joe Mauceri, *New Yorkers in debt losing their homes as part of program designed to preserve quality affordable housing*, PIX11 (December 12, 2018), https://bit.ly/30lKUvc; *see also* Testimony of Public Advocate Jumaane D. Williams at 7, *Taking Stock: A Look Into the Third Party Transfer Program in Modern Day New York: Hearing Before the Comms. on Oversight and Investigations and Housing and Buildings of the New York City Council* (July 22, 2019), https://on.nyc.gov/3i2Bgn9 (explaining that the TPT Program "has catalyzed gentrification in areas like Canarsie and East New York, where Black and Hispanic New Yorkers have disproportionately lost their homes" to private developers, most of which "have close connections to local political campaigns.").

## JURISDICTIONAL STATEMENT

Original jurisdiction over this case was vested in the District Court pursuant to 28 U.S.C. § 1331, because Appellants' claims arise under the Constitution of the

United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), because Appellants seek damages, equitable relief, and to redress the deprivation of equal rights under 42 U.S.C. § 1983.

Appellate jurisdiction is proper pursuant to 28 U.S.C. § 1291 as Appellants appeal an order and final judgment issued without the benefit of oral argument. SPA-2; SPA-33.  Appellants timely filed the Notice of Appeal on June 11, 2020.  A-547.

## **STANDARD OF REVIEW**

In reviewing the Order granting Defendants' motions to dismiss, this Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor."  *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 186 (2d Cir. 2001).

A district court's determination of its own subject-matter jurisdiction is reviewed *de novo*.  *See Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). A trial court's determination of whether it possesses subject matter jurisdiction under TIA, comity, and the *Rooker-Feldman* doctrine is likewise reviewed *de novo*.  *See, e.g., Luessenhop v. Clinton Cty.*, 466 F.3d 259, 264 (2d Cir. 2006) (TIA and comity); *Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009) (*Rooker-Feldman*).  Whether a plaintiff has standing is also reviewed *de novo*.  *See Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n,* 768 F.3d 183, 191 (2d Cir. 2014).  *De*

*novo* review is "independent and plenary" and the Court "look[s] at the matter anew, as though it had come to the courts for the first time." *Zervos v. Verizon New York, Inc.,* 252 F.3d 163, 168 (2d Cir. 2001).

<u>**SUMMARY OF THE ARGUMENT**</u>

The District Court incorrectly applied (i) the TIA and comity, (ii) *Rooker-Feldman*, and (iii) standing.

***TIA and comity***. TIA and comity prevent federal courts from interfering with the collection of state taxes. Neither doctrine applies here because (i) Appellants do not challenge the validity or amount of any tax, (ii) the TPT Program seizures are not a tool of tax collection and do not raise tax revenue or have a tax purpose, and (iii) *Knick* guarantees a Section 1983 takings plaintiff access to federal court.

***Rooker-Feldman***. *Rooker-Feldman* prevents a state court loser from circumventing state appellate courts by asking a federal court to overrule a state court. *Rooker-Feldman* has no application here because (i) Appellants did not lose (or even appear) in state court (ii) do not assert injuries caused by a state court judgment, (iii) and do not seek to reverse any state court decision. In addition, the *Knick* decision abrogates any requirement that takings plaintiffs exhaust state court remedies such as would be required by *Rooker-Feldman*.

***Standing***. Standing requirements ensure that the party seeking relief has suffered a distinct and concrete injury, caused by the challenged activity, and that

their injury can be redressed.  Appellants have standing to bring claims for injunctive and declaratory relief because they allege (i) harms that are likely to reoccur because there is an unconscionable official policy and the real threat of its future enforcement and (ii) ongoing harms in the form of their continued deprivation of secure property rights based on where they live.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN HOLDING THAT THE TAX INJUNCTION ACT AND DOCTRINE OF COMITY BAR SUBJECT MATTER JURISDICTION

The District Court erred in dismissing "all claims" pursuant to the TIA and the doctrine of comity.  SPA-24.  The TIA states that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law."  28 U.S.C. § 1341.  The TIA only applies to claims interfering with "methods similar to assessment and levy. . . that would produce money or other property *directly*, rather than indirectly through a more general use of coercive power." *Wells v. Malloy*, 510 F.2d 74, 77 (2d Cir. 1975) (emphasis added).  Similarly, the comity doctrine allows a federal court to decline to exercise jurisdiction when the relief sought "would necessarily interfere with state tax administration," and when adequate state remedies exist. *Abuzaid v. Mattox*, 726 F.3d 311, 320 (2d Cir. 2013).  Neither applies here because: (A) Defendants' seizure of the "excess value" in the Subject Properties cannot, by definition, be a tax, and Appellants' do not challenge

the validity or amount of any tax; (B) the TPT Program seizures do not raise tax revenue and are instead intended to serve the non-tax purpose of advancing the Mayor's public policy objectives; and (C) the *Knick* decision guarantees a takings plaintiff access to federal court notwithstanding potential state court remedies.

**A.** **The District Court Misapplied the TIA and Doctrine of Comity Because the Seizure of Appellants' Excess Value Cannot, by Definition, Be a Tax and Appellants Do Not Challenge the Validity or Amount of any Tax.**

The District Court erred by disregarding Appellants' undisputed factual allegations that the TPT Program does not collect taxes generally and did not collect taxes in connection with the Subject Properties. But even if the TPT Program were designed to and did collect taxes, Appellants' claims still survive the TIA and comity because Appellants do not "seek federal-court orders enabling them to avoid paying state taxes," *Hibbs v. Winn,* 542 U.S. 88, 107 (2004), for two reasons. *First*, Municipal Defendants' seizure of the excess value *above* any purported tax debt cannot, by definition, be a tax. *Second*, Appellants' claims neither seek to avoid the payment of state taxes nor dispute the amounts owed. In other words, assuming the Subject Properties were worth $100 with $5 in taxes, Appellants' challenge to Municipal Defendants' seizure of the $95 in excess value cannot implicate any taxes and Appellants do not challenge the $5 owed in taxes.

### 1. Appellants' Challenge to Municipal Defendants' Seizure of the *Excess Value* in Appellants' Homes Cannot be Barred by the TIA and comity.

The District Court erroneously held that the TIA and comity doctrine bar jurisdiction even though Municipal Defendants seized value *exceeding* any purported tax liabilities.  SPA-24.  To the extent certain Appellants owed taxes at the time Municipal Defendants took their properties through the TPT Program, the amounts owed were for charges that did not exceed 15% of the value of the properties (and in most cases were not even close to 15%).  A-39 ¶¶ 82-83; A-41 ¶ 103; A-44 ¶ 121; *see also* Government Report at 9 (average claimed tax debt was 3% of property value).  Municipal Defendants' foreclosure on Appellants' properties has thus seized all value owned by Appellants above and beyond any purported tax liabilities.

In other words, if Municipal Defendants' seize a $100 property to satisfy a $5 tax debt, a challenge to the seizure of the $95 in excess value does not interfere with collection of a "tax."  *See, e.g.*, *Luessenhop*, 466 F.3d at 268 (2d Cir. 2006) (due process claims challenging county's taking of plaintiffs' properties to pay overdue taxes not barred); *Coleman v. D.C.,* 70 F. Supp. 3d 58, 68–69 (D.D.C. 2014) ("[C]hallenge to . . . taking of" property "beyond the amounts the District has defined as the 'tax,' is not barred by the [TIA]."); *Anderton v. Bannock Cty.*, 2015 WL

428069, at *5 (D. Idaho Feb. 2, 2015) ("[T]heory that defendants wrongfully took surplus equity in [plaintiff's] property" not barred under the TIA).

The TIA and comity doctrine cannot, and do not, apply where the government uses coercive force to extract property that exceeds any tax liabilities, or where plaintiff has not incurred any tax liabilities. To the extent Defendants have *any* basis to keep the value of the Subject Properties *in excess of* any charge or tax owed to the City, Appellants request for damages for such amount would still be permissible as a challenge to "an unusual sanction for non-payment of a tax admittedly due [that] violated [Appellants'] constitutional rights" that this Circuit has held is properly challenged in federal court. *Wells*, 510 F.2d at 77.

Indeed, the Michigan Supreme Court recently and unanimously held that Oakland County, Michigan, through the operation of a substantively identical foreclosure program, effected a taking of property unconstitutional under the Michigan constitution when it foreclosed upon private property and retained the sale proceeds in excess of the taxes. *Rafaeli, LLC v. Oakland Cty.*, No. 156849, 2020 WL 4037642 (Mich. July 17, 2020). The *Rafaeli* court held that "[t]he purpose of taxation is to assess and collect taxes *owed*, not appropriate property *in excess of what is owed*" and the same is, of course, true here as well. *Id.* at *23.

Defendants argued below that, pursuant to *Nelson v. City of New York*, 352 U.S. 103 (1956), the TPT Program did not effect an unconstitutional taking because

"there is no requirement that a former owner receive surplus funds following *in rem* tax foreclosures." A-151. *Nelson* is distinguishable because it concerned a foreclosure program where there was an express process for the property owner to claim the surplus value. *Nelson*, 352 U.S. at 110. The TPT Program contains no such process. Regardless, *Nelson* does not apply because Appellants did not have actual notice of the *in rem* proceedings, and thus any mechanism to reclaim value would be illusory. A-36-37 ¶¶ 68-71; A-39 ¶ 85; A-40 ¶ 90; A-41 ¶ 102; A-44 ¶ 120. *See In Rem No. 53*, 2019 WL 1431423, at *13 (distinguishing *Nelson* on the same grounds).

Finally, the liabilities pursuant to which the City foreclosed upon the Subject Properties included purported liabilities that are not taxes, and thus the TIA does not apply. For example, with respect to Mr. Dorce specifically, the City entered into a payment agreement with him giving him time to pay certain purported water and sewer charges. A-36 ¶ 67; A-39 ¶ 83. He was current on his payment obligations and yet Municipal Defendants took his home anyway. A-40 ¶ 95. Even if he was not current on such obligations, they would not be considered taxes under the TIA and comity.[15] Likewise, Ms. Jones and Ms. Thomas-Murchison are alleged to have

---

[15] Certain liabilities and debts, such as water-liens, do not constitute taxes for the purposes of the TIA and comity. *See, e.g.*, *Union Pac. R.R. Co. v. Pub. Util. Com'n of State of Or.,* 899 F.2d 854, 856 (9th Cir. 1990) (holding that Public Utilities Commission's assessment was a "fee," not a "tax," because it helped "defray the cost of performing the regulatory duties imposed" on the Commission).

owed, among other things, water liens, *see* A-103-105, which are not considered taxes and did not otherwise ripen into tax liens, A-27 ¶ 40, A-41 ¶ 98; A-43 ¶ 116. Because Appellants did not owe taxes and/or their liabilities had not ripened into tax liens, their claims cannot possibly be construed as falling within the TIA or the comity doctrine. *See Luessenhop*, 466 F.3d at 268.

**2. Appellants Do Not Dispute the Validity or Amount of any Tax.**

The TIA does not bar federal jurisdiction over claims brought by claimants "whose own tax liability [is] not a relevant factor." *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 430 (2010); *see also Hibbs,* 542 U.S. at 107 (the TIA only applies in "cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes."). For that reason, TIA and comity do not bar claims that seek, for example, to vacate default judgments against properties with overdue taxes, because they were "not attempting to avoid paying state taxes" or "dispute the assessments or amounts owed." *Luessenhop*, 466 F.3d at 268.

The District Court contravened this authority by holding that Appellants would "enjoin[] the City's use of its discretion to initiate its foreclosure actions and to dispose of properties foreclosed on [and thus] violate the TIA." SPA-26. However, Appellants' request to enjoin Municipal Defendants' use of the TPT Program's foreclosure proceedings disputes neither the existence nor amount of any tax. In other words, Appellants owe whatever taxes they owe and Appellants'

liabilities are not relevant to the determination of their claims. By way of a single example, Appellants' claims seeking damages for Municipal Defendants' failure to provide sufficient notice in advance of commencing foreclosure proceedings, A-36-37 ¶¶ 70-71, is viable because "the TIA does not deprive the district courts of jurisdiction to determine the constitutionality of the notice [of a pending foreclosure] provided to . . . taxpayers . . . ." *Luessenhop*, 466 F.3d at 272; *see also Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 11–12 (2015) (there is federal court jurisdiction over the enforcement of the notice and reporting requirements of a Colorado law). Likewise, the existence of tax liabilities is irrelevant to the adjudication of Appellants' other claims, such as their equal protection claims, which the Order does not expressly address.

### B. The District Court Misapplied the TIA and Doctrine of Comity Because Municipal Defendants' Use of the TPT Program to Seize Subject Properties Is Not a Tool of Tax Collection.

The subject matter of Appellants' claims—*i.e.*, Municipal Defendants' use of the TPT Program to seize the Subject Properties—also does not implicate the TIA or comity because the TPT Program is not a tool of tax collection for two reasons, either of which is sufficient to reverse the Order. *First*, the City does not actually raise tax revenue through the TPT Program. *Second*, the actual purpose of the TPT Program (as applied) is to advance the Mayor's public policy objectives and any taxing component is merely ancillary to that primary goal.

### 1. The TPT Program Does Not Generate Tax Revenue and Therefore Is Not a Tool of Tax Collection.

The TIA and comity do not apply to claims challenging programs, such as the TPT Program, that do not collect tax revenue.  While not all revenue qualifies as "tax revenue" for the purpose of the TIA and comity,[16] it is axiomatic that the TIA and comity cannot apply to protect a program that does not raise *any* revenue, much less tax revenue.  *See, e.g.*, *Mobil Oil Corp. v. Dubno*, 639 F.2d 919, 922 (2d Cir. 1981) (the TIA does not bar challenge to statute that "create[s] a price control system" that does not directly raise tax revenue).  The TIA and comity simply do not apply to "*anything* that a state has determined to be a likely method of securing payment."  *Wells*, 510 F.2d at 77 (emphasis added).  Instead, the TIA narrowly bars claims challenging tax collection "methods . . . that would produce money or other property *directly*, rather than indirectly through a more general use of coercive power."  *Id*. (emphasis added).

In *Coleman*, the court expressly analyzed the application of the TIA to substantively identical municipal misconduct, holding that the TIA did not apply to a property owner's challenge to the total seizure of his $200,000 home to satisfy a $133.88 tax bill because "forfeiting the equity is an extra incentive for the payment

---

[16] *See, e.g.*, *Union Pac. R.R. Co.*, 899 F.2d at 856 (TIA does not bar claims challenging a "fee" that helped "defray the cost of performing the regulatory duties imposed" on agency).

of taxes" and the TIA does not bar "challenges to such independent incentives." 70 F. Supp. 3d at 68.

Disregarding this authority, the District Court incorrectly held that the TIA and comity barred all of Appellants' claims "regardless of whether the *in rem* proceedings . . . results in the collection of taxes" because "the City's authority to initiate such proceedings is a tool . . . to administer its tax collection." SPA-26-27. The District Court relied primarily on one authority—*Kraebel v. New York City Dep't of Hous. Pres. & Dev.*—which is distinguishable from the facts of the instant case. 959 F.2d 395 (2d Cir. 1992). In *Kraebel*, this Court affirmed dismissal of claims challenging a statute that provided landlords with "exemptions from and abatements to real property taxes." *Id.* at 400. Because the abatement program at issue in *Kraebel* directly affected the *amount* of taxes owed, challenges to that program can implicate the TIA and comity. *Id.* As the Supreme Court put it, *Kraebel* is distinguishable because the petitioner there sought "relief aimed at lightening their own tax burdens." *Hibbs*, 542 U.S. at 109 n.11.

By contrast, Appellants' challenge to the TPT Program does not implicate the TIA or comity because the TPT Program neither raises revenue nor has any impact on the *amount* of property tax owed. The tax debt—the pretext for the judgment— is never paid. A-24 ¶ 33. Upon gaining ownership of the property, Municipal

Defendants extinguish any and all outstanding tax liens, and do not collect any payment owed on the respective property. A-24 ¶ 33 n.4.

If Municipal Defendants use the TPT Program to seize the property of a person who owes $3,000 in taxes, the City does not receive that $3,000 (or even a penny) because they give away the property for free rather than sell it to the highest bidder (or anyone). Municipal Defendants simply deem the $3,000 in taxes satisfied. Thus, Municipal Defendants do not use the TPT Program to generate any tax revenue or manage tax liabilities through abatements. A-24 ¶ 33.[17]

Defendants realize the difficulty in arguing that the TPT Program is a tax collection tool when it collects no taxes, so rely on an even stranger argument—that the TPT Program is a tax collection tool because the threat of stealing someone's home is so scary that it indirectly causes some people to pay their taxes. A-337 ("Plainly, the TPT program is a chosen method to administer tax delinquencies . . . which will encourage many taxpayers to pay delinquencies. . . ."). This, of course, does not transform the TPT Program into a tax collection statute.

---

[17] To the extent the City argues it is free to use property seized based on delinquent taxes to support its other policy goals, like affordable housing, that is an admission that the TPT Program is being motivated by other policy goals and thus subject to challenge in federal court since affordable housing programs are not protected by the TIA. While the government is free to use its resources to promote affordable housing, the government certainly has no right to seize the *excess value* in someone's property to promote affordable housing, which is equivalent to the government taking $2 million out of a taxpayer's bank account to cover $3,000 in taxes because doing so helps affordable housing.

First, Defendants' argument is undercut by the fact that they do not provide property owners with notice of the TPT seizures. A-39 ¶ 85; A-41 ¶ 102; A-44 ¶ 120.

Second, Defendants' argument proves too much. Under Municipal Defendants' logic, they could throw people in jail for failing to pay their taxes on time and Municipal Defendants' conduct would be immune from suit under the TIA because the "go to jail" program indirectly incentivizes people into paying their taxes.

Third, courts have rejected similar arguments in many prior cases. *See Coleman*, 70 F. Supp. 3d at 68 ("Courts have rejected the argument that the Tax Injunction Act bars challenges to such independent incentives.") (citing *Wells*, 510 F.2d at 76-77); *see also, e.g.*, *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 763 (10th Cir. 2010) (holding that the TIA did not bar a challenge to statute that "on pain of financial assessment, encourages employers to verify the employment authorization of their independent contractors."); *America's Health Ins. Plans v. Hudgens*, 915 F. Supp. 2d 1340, 1353 (N.D. Ga. 2012), *aff'd*, 742 F.3d 1319 (11th Cir. 2014) (same with respect to statute imposing monetary punishments to compel insurance companies to pay medical claims); *Pickell v. Sands*, 2012 WL

6047286, at *5 (E.D. Cal. Dec. 5, 2012) (same with respect to law authorizing revocation of contractors' license for failure to pay business taxes).[18]

Finally, Appellants claim that the City's inclusion of the Subject Properties in the TPT Program, even though they were not distressed, constituted *ultra vires* conduct beyond the taxing authority granted to the City.  A-31 ¶ 50; A-49 ¶¶ 160-161.  It is beyond dispute that neither the TIA nor comity apply where "the [City] has gone beyond its taxing powers."  *Mobile Oil Corp. v. Tully*, 639 F.2d 912, 918 (2d Cir. 1981).

### 2.    The Purpose of the TPT Program Is Unrelated to Tax Revenue and Therefore It Is Not a Tool of Tax Collection.

The District Court wrongly concluded that the nontax purposes of the TPT Program are legally irrelevant, in contravention of decades of consistent precedent to the contrary.  SPA-27.  The law is clear that a local government cannot use the

---

[18] The District Court cites to the unpublished decision *Saglioccolo v. New York City Mun. Corp. Dep't of Fin. Bureau of Tax Collection*, 101 F.3d 108 (2d Cir. 1996) for the proposition that it cannot enjoin the City's use of its discretion to initiate foreclosure actions.  SPA-26.  *Saglioccolo* held, without any analysis and in a single summary paragraph, that the TIA and comity could bar challenges to foreclosure proceedings to the extent they "interfer[e] with state tax collection."  101 F.3d 108.  By contrast, the "foreclosures" Appellants' seek to enjoin are not done for the purpose of, and do not have the effect of, collecting any taxes.  The District Court also cited to *Abuzaid*, 726 F.3d at 312-14, for the proposition that the comity doctrine bars challenges to "assessments brought under the New York Tax Law, regardless of whether such assessments were penalties to encourage payment of taxes rather than taxes themselves."  SPA-28.  But, like *Saglioccolo,* the *Abuzaid* court is clear that comity only applies to challenges that actually "disrupt[] and interfere[] with the state's administration of its tax system," which is not the case here.  726 F.3d at 315.

TIA or comity to immunize itself from a challenge to its illegal conduct by cloaking its misconduct as a "tax." As the Supreme Court has said, the TIA applies "***only*** in cases Congress wrote the statute to address, *i.e.*, cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Hibbs* 542 U.S. at 91 (emphasis added). Thus, even if the TPT Program actually collected some tax revenue, because the primary *purpose* of the TPT Program seizures is not to generate tax revenue, TIA and comity still do not apply. The TPT Program is, at best, tangentially related to taxes, as it is primarily a method of advancing the Mayor's political agenda by taking equity and handing it to third parties in order to effect housing policy and reward political allies.

The Supreme Court held in 1966 that state poll taxes violated the Constitution's Equal Protection Clause even though the poll tax surely generated some tax revenue for the state. *Harper v. Va. Bd. of Elections*, 383 U.S. 663 (1966). Indeed, the state government in that case did not even attempt to argue that the TIA and comity precluded federal jurisdiction. *Id.* In the more than 50 years since, federal courts have consistently addressed the merits of challenges to various "taxes" and "fees' that are alleged to be motivated by reasons other than revenue-generation. *See, e.g.*, *Bynum v. Conn. Comm'n on Forfeited Rights*, 410 F.2d 173, 175-77 (2d Cir. 1969) (challenge to Connecticut fee charged only to ex-felons to regain voting rights raised a "substantial issue" of equal protection); *Jones v. DeSantis*, No.

4:19CV300-RH/MJF, 2020 WL 2618062, at *14 (N.D. Fla. May 24, 2020) (requirement that felons pay court fines and fees before they can register to vote violates Equal Protection).

If the District Court's broad interpretation of TIA and comity were correct, then all of these cases should not have even been decided because, under the holding of the Order, federal courts have no jurisdiction over a challenge to anything labeled a tool of tax collection. SPA-26-27. The Order runs contrary to decades of federal jurisprudence where the Supreme Court, this Court, and numerous other federal courts have routinely addressed the merits of actions challenging state programs that are related to taxes (or, as here, allegedly related to taxes) so long as they did not directly and meaningfully challenge the collection of tax revenue.

For example, this Court has held that the TIA and comity do not preclude challenges to a provision **within the New York Tax Laws** restricting oil companies from passing the cost of taxes to consumers. *Tully*, 639 F.2d at 918. This is so because "the **purpose** of the [provision] was not to raise taxes but . . . to prevent such gross receipts tax from fueling inflation." *Id.* at 918 (emphasis added). While "the State has the right to place the legal incidence of the tax upon the oil companies," and the inability to shield consumers might frustrate collection of that tax, the state was nonetheless acting beyond their taxing powers by seeking to restrict oil companies from passing the cost of that tax to state consumers. *Id.*

Likewise, in *Department of Revenue of Montana v. Kurth Ranch*, the Supreme Court addressed the merits of whether a statute violated the Fifth Amendment bar on double jeopardy by imposing a tax on the possession and storage of dangerous drugs in addition to state fines. 511 U.S. 767, 769 (1994). Numerous other federal courts have also reached the merits of challenges to state programs that at least tangentially relate to taxes. *See, e.g., New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 560 (2d Cir. 2019) (addressing the merits of a challenge to taxes and fees a state imposed on the United Parcel Service for its delivery of tobacco to certain Indian reservations); *Simpson v. Caruso*, No. 1:09-CV-245, 2009 WL 1010973, at *1 (W.D. Mich. Apr. 14, 2009) (assessing whether tax on inmates violated prisoner's Eighth Amendment right against cruel and unusual punishment).

Consistent with decades of federal court jurisprudence, the conduct challenged here does not implicate the TIA and comity because the purpose (and practice) of the TPT Program is not to collect tax revenue but rather to advance public policy agendas. *See* Government Report at 3. Municipal Defendants and their agents have frequently admitted to the non-tax purpose of the TPT Program. For example, on October 11, 2018, Margaret DeVoe, Esq., assistant Corporation Counsel, averred in sworn testimony that the purpose of the TPT Program "is to create and maintain affordable housing" rather than collect taxes. A-29 ¶ 45. Similarly, a HPD representative affirmed that the true purpose of the TPT Program

is to "keep the housing affordable for the residents of [seized] buildings."  A-30 ¶ 46.

Moreover, as detailed in the Government Report, Municipal Defendants do not use the TPT Program to pursue any options short of foreclosure even though "[a] large portion of the properties selected . . . were worth far more than the amounts owed to the City . . . ."  Government Report at 9-10, 12.  Ordinarily, the City sells tax liens, which generates "proceeds [used to] pay off the City's liens." *In Rem No. 53*, 2019 WL 1431423, at *11 (citing Admin. Code § 11-319).  Municipal Defendants' argument that they can proceed immediately to TPT foreclosure and disregard all other less-abusive means of tax collection is also conclusive evidence that Municipal Defendants' use of the TPT Program is motivated by non-tax purposes.

The TPT Program's veneer of tax collection is not sufficient to immunize it from review under the TIA and comity.  As in *Tully*, the TPT Program is designed to direct the Appellants' hard-earned property value to the benefit of the politicians controlling the program, and to advance unrelated policy ideas, without paying the property-owners a dime.  The explicit non-tax purpose of the government program renders it susceptible to federal adjudication.  Likewise, as in *Tully*, an injunction on the nontax portion of a tax statute is acceptable even if it would have the collateral effect of impacting the City's alleged collection of certain taxes.

**C. The District Court's Holding that the TIA and Comity Bars Jurisdiction Over Takings Claims Is Irreconcilable with the Supreme Court's Holding in *Knick v. Township of Scott*.**

The Supreme Court's 2019 holding in *Knick* prevents the TIA and comity from barring federal jurisdiction with respect to Appellants' takings claim because Knick **guarantees** Appellants a federal forum. In *Knick*, the Supreme Court held that

> [A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it. . . . If a local government takes private property without paying for it, that government has violated the Fifth Amendment—just as the Takings Clause says—without regard to subsequent state court proceedings. And the property owner may sue the government ***at that time in federal court*** for the 'deprivation' of a right 'secured by the Constitution.'

*See* 139 S. Ct. at 2170 (emphasis added) (citing Section 1983).

The District Court erred by holding in a footnote that "*Knick* is not directly relevant in this case because it concerned the issue of whether exhaustion was required" and "did not address the issues of . . . the Tax Injunction Act, or comity." SPA-21 n.11. Not so. *Knick* broadly guaranteed that plaintiffs may access federal courts to assert a takings claim immediately upon the taking. *See* 139 S. Ct. at 2170. The District Court's holding that the TIA precludes federal adjudication of Appellants' takings claims functionally prevents all takings-plaintiffs from accessing federal courts provided that a government entity seizes property pursuant

to purported taxing authority.  This is irreconcilable with *Knick*, which provides victims of state or municipal takings a right to go to federal court regardless of whether the purported authority to take property is based upon a state tax statute as opposed to any other government power.

Moreover, the TIA and comity do not apply to Appellants' takings claims even if *Knick* merely eliminated state-court exhaustion requirements as a barrier to asserting takings claims in federal court because the TIA and comity are, at their core, state-court exhaustion requirements.  Both the TIA and comity *only* apply to the extent a litigant can assert his claims in state court.  *See* 28 U.S.C. § 1341 ("[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy ***may be had in the courts of such State***.") (emphasis added); *Abuzaid* 726 F.3d  at 315  (comity only applies "so long as the plaintiffs ***have access to state remedies*** that are plain, adequate, and complete, and may ultimately seek review of the state decisions in the Supreme Court.") (emphasis added).  Thus, under any reading, *Knick* necessarily abrogates the exhaustion requirement inherent in both the TIA and comity, and permits federal adjudication of Appellants' takings claims.

**II. THE DISTRICT COURT MISAPPLIED AND EXPANDED THE *ROOKER-FELDMAN* DOCTRINE TO BAR FEDERAL PLAINTIFFS FROM ASSERTING CLAIMS THAT WERE NEVER LITIGATED IN STATE COURT**

*Rooker-Feldman* is a "narrow" and "limited" doctrine preventing a party who lost in state court from appealing directly to a federal district court. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see also Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 84-85 (2d Cir. 2005) ("[T]he Supreme Court pared back the *Rooker-Feldman* doctrine to its core[,]" which is that "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments"). The District Court dismissed two categories of Appellants' claims pursuant to *Rooker-Feldman*: (i) each of Appellants' claims that "seek relief in the form of damages equal to their property values"; and (ii) Appellants' takings claim based on Defendants' "violation of the Administrative Code," *i.e.*, that the Subject Properties were included in the TPT Program even though they were not statutorily "distressed" (referred to herein as "Administrative Code Taking Claim") (collectively, the "*Rooker-Feldman* Dismissed Claims"). SPA-15-18.[19]

---

[19] The District Court's holding that *Rooker-Feldman*'s substantive requirements were met "[t]o the extent that plaintiffs seek relief in the form of damages equal to their property values," SPA-15, appears to be limited to Appellants' procedural due process claim because it is within a subsection exclusively addressing Appellants' procedural due process claim, *see* SPA-14-18. In an abundance of caution, Appellants' address why the District Court erred if the Order is interpreted to hold that *each* of Appellants' claims met the substantive requirements of *Rooker-Feldman* to the extent they seek damages equal to the value of the Subject Properties.

The District Court erred in dismissing the *Rooker-Feldman* Dismissed Claims for two reasons. ***First***, *Rooker-Feldman* does not apply to any of Appellants' claims because Appellants did not lose in state court, do not assert injuries caused by a state court judgment, and do not seek to reverse any state court decision. ***Second***, the Supreme Court's 2019 decision in *Knick v. Township of Scott* guarantees a federal forum to a person who has their private property taken by a local government without paying just compensation for it notwithstanding the *Rooker-Feldman* doctrine.

### A. The *Rooker-Feldman* Factors Do Not Apply Here and the District Court Erred in Concluding Otherwise.

A federal court lacks subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine where: (1) the federal-court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a state court judgment; (3) the plaintiff invites review and rejection of that judgment; ***and*** (4) the state judgment was rendered before the district court proceedings commenced. *See Hoblock,* 422 F.3d at 85. The first and fourth factors are generally referred to as the "procedural" factors and the second and third factors are generally referred to as the "substantive" factors. *Id.* The absence of one of these four factors is sufficient to defeat application of the *Rooker-Feldman* doctrine and, here, the first, second, and third factors are not met, and the District Court erred in concluding otherwise.

**1. The District Court Erred in Holding that Appellants Are State Court Losers Based on Default *In Rem* Foreclosure Judgments in Proceedings in Which They Were Neither Parties nor Participants.**

The District Court erroneously held that Appellants "can be said to have lost in state court" simply because they "had property interests in properties that were subject to the state court foreclosure proceedings." SPA-13. This is contrary to binding Supreme Court precedent, is not supported by the authority relied upon by the District Court, and serves no legitimate purpose.

Supreme Court precedent is clear that *Rooker-Feldman* only applies to **parties** of an earlier state suit. *See Lance v. Dennis*, 546 U.S. 459, 464-66 (2006) ("[W]e have held *Rooker-Feldman* inapplicable where the party against whom the doctrine is invoked was not **a party** to the underlying state-court proceeding.") (emphasis added); *Exxon Mobil Corp.*, 544 U.S. at 284 (same); *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994) (same). Here, Municipal Defendants brought the *in rem* Foreclosure Proceedings *ex parte* against property, and Appellants were neither party to nor even aware of the actions. A-36 ¶¶ 68-70; SPA-13 ("[P]laintiffs . . . were not named in the state court actions.").

The Order relies exclusively on two unpublished decisions in *pro se* cases (*Riley* and *Wik*) raised for the first time in Appellee's reply papers to reach the unprecedented conclusion that *Rooker-Feldman* applies to anyone with an "interest" in a state court lawsuit rather than merely those who are "party to" a state court

lawsuit.  SPA-12-13; *see also Riley v. Comm'r of Fin. of City of New York*, 618 F.

App'x 16 (2d Cir. 2015); *Wik v. City of Rochester*, 632 F. App'x 661 (2d Cir. 2015).

Neither decision supports such a dramatic expansion of *Rooker-Feldman*.[20]

*Riley* and *Wik* are clearly distinguishable from this case because, unlike here,

the property owners in those cases ***actually participated in the underlying state***

***court in rem foreclosure proceedings***.  *See Riley v. City of New York*, 14 CIV. 4482,

2014 WL 11460471, at *2 (E.D.N.Y. Oct. 29, 2014), *aff'd sub nom. Riley v. Commr.*

*of Fin. of City of New York*, 618 Fed App'x 16 (2d Cir. 2015) (Plaintiff filed multiple

motions in state court including a motion to vacate the foreclosure judgment);[21] *Wik*

*v. City of Rochester*, No. 07-CV-6541, 2008 WL 4911805, at *4, *6 (W.D.N.Y. Nov.

13, 2008), *aff'd* 632 F. App'x 661 (2d Cir. 2015) (Plaintiff was physically present at

the foreclosure hearing and specifically objected to the court's direction that he had

to pay back-taxes by check or money order rather than metal currency).

Here, Appellants only learned about the *in rem* Foreclosure Proceedings at

least nine months *after* Foreclosure Judgments were entered.  *See* A-39 ¶¶ 84-85; A-

---

[20] Defendants improperly raised *Riley* and *Wik* for the first time in their reply briefs. *See* A-335; A-499-502.  Because the District Court issued the Order without the benefit of oral argument, Appellants did not have an opportunity to address Defendants' arguments about *Riley* and *Wik*.

[21] In a related federal case, Ms. Riley affirmatively *alleged* that she challenged an adverse state court judgment.  *See Riley v. Sunshine et. al*, 13-CV-9171-LAP, slip op. at 6 (S.D.N.Y. Feb. 20, 2014).

41 ¶ 99; A-43 ¶ 117.  Likewise, Appellants have never appeared in state court to challenge any aspect of those proceedings, and thus could not have appealed the judgment to a state appellate court.  *See In Rem Tax Foreclosure No. 53*, Index No. 8700/2015 (Sup. Ct. Kings Cty.) (no filing by any Appellant); *In Rem Tax Foreclosure No. 51*, Index No. 8700/2007 (Sup. Ct. Kings Cty.) (same).  Given the stark factual distinctions between the instant appeal and *Riley* and *Wik*, the Order represents an unprecedented expansion of *Rooker-Feldman* to federal court plaintiffs who were neither parties to, nor participated in, any prior state court proceeding.

The District Court's broad expansion of *Rooker-Feldman* is contrary to the limited purpose of the *Rooker-Feldman* doctrine, which is to ensure that state court losers do not seek to circumvent the state court appellate process by asking federal courts to effectively exercise appellate jurisdiction over state courts.  *See Exxon Mobil Corp.*, 544 U.S. at 283-84.  This purpose is not served by punishing innocent persons who have never had their day in court (either state or federal) by denying them access to their selected forum.  Instead, by allowing defendants to invoke *Rooker-Feldman* where federal claimants did not appear in state court due to defendants' conduct, the Order encourages state and local governments to engage in mischief in order to obtain default judgments.  Such a holding also goes against settled law in preclusion jurisprudence.  *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880,

-41-

904 (2008) (rejecting "virtual representation" doctrine as a basis for nonparty preclusion).

### 2. The District Court Erred in Applying *Rooker-Feldman* Even Though the Foreclosure Judgments Merely Ratified Appellants' Injuries.

In dismissing the *Rooker-Feldman* Dismissed Claims, the District Court did not properly analyze whether Appellants' **injuries** were **caused by** a state court judgment. Instead, the District Court erred by, first, applying the wrong legal standard and then, as a result, reaching the wrong conclusion.

#### a. *The District Court applied the wrong test.*

The District Court applied the second prong of *Rooker-Feldman* test incorrectly in two ways.

*First,* the Supreme Court has held that *Rooker-Feldman* does not apply unless a plaintiff complains about an injury "**caused by**" a state court judgment. *Exxon Mobil Corp.*, 544 U.S. at 284 (emphasis added). Injuries are "caused by" a state court judgment if plaintiff asserts a "violation of his rights that turn[s] on the correctness of a state-court judgment," *In re Lampe*, 665 F.3d 506, 518 n.15 (3d Cir. 2011), or a claim that could not exist "had there been no state-court judgment," *Bolden v. City of Topeka, Kan.*, 441 F.3d 1129, 1145 (10th Cir. 2006).

The District Court found this prong of the *Rooker-Feldman* test satisfied by a less demanding form of causality—*i.e.*, that "[P]laintiffs' injuries **arise from** the

state court's judgment of foreclosure." SPA-16 (emphasis added); *see also* SPA-18 ("[P]laintiffs' damages . . . ultimately ***arise from*** the loss of property resulting from the state court judgments of foreclosure.") (emphasis added); SPA-15 (Appellants' "monetary damages ***derive from*** the plaintiffs' loss of their property."). This is the wrong test. "[W]hether an injury was legally ***caused by*** a party's actions is a much more demanding question than whether the injury ***arose out of*** those actions." *Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.*, 122 F. Supp. 3d 44, 52 (S.D.N.Y. 2015) (emphasis added). In other words, "arise[s] from" refers to "part of the causal link leading to the injury," *In re Lehman Bros. Holdings Inc.*, 855 F.3d 459, 478 (2d Cir. 2017), whereas "caused by" is akin to proximate cause, *see Burlington Ins. Co. v. NYC Transit Auth.*, 29 N.Y.3d 313, 324 (N.Y. 2017).

*Second*, the District Court conflated the *form of relief* that Appellants seek with the *injuries* that Appellants allege. Appellants seek the same form of relief (money damages in an amount equal to the value of their property) as a result of multiple different independent injuries, some of which predate the Foreclosure Judgment and others post-date it. For example, Appellants were injured when Defendants violated their equal protection rights by targeting properties located in communities of color for inclusion in the TPT Program. This happened before and independent of the Foreclosure Judgment. The fact that Appellants' measure of damages for this claim is the value of their property does not substitute for an

analysis concerning whether this *injury* was *caused by* the Foreclosure Judgment. *See Adkins v. Rumsfeld*, 464 F.3d 456, 463–464 (4th Cir. 2006) ("[T]he test is not whether the relief sought … 'would certainly upset' the enforcement of a state court decree ….").  *Rooker-Feldman* does not bar claims based solely on the amount of monetary relief requested, and the Order cites no case in support of such a proposition.

### b.     *The District Court reached the wrong conclusion.*

Applying the wrong test, the District Court reached the wrong result. Appellants' injuries are not categorically within the scope of *Rooker-Feldman* because Appellants' injuries plainly were not all "caused by" the Foreclosure Judgments; at most, the Foreclosure Judgments merely "ratifie[d]" or "acquiesce[d] in" Defendants' misconduct.  *Hoblock*, 422 F.3d at 88; *see also See Sung Cho v. City of New York,* 910 F.3d 639, 645-46 (2d Cir. 2018) (*Rooker-Feldman* does not apply where plaintiffs bring claims that "speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that defendants pursued in obtaining such judgments").

For example, the Foreclosure Judgments cannot have "caused" Appellants' injuries that existed before the judgments existed. *See McKithen v. Brown*, 481 F.3d 89, 98 (2d Cir. 2007) ("[A] party is not complaining of an injury "caused by" a state-court judgment [that] existed *prior* in time to the state-court proceedings, and so

could not have been 'caused by' those proceedings."). The Foreclosure Judgments did not retroactively cause Appellants' civil rights to be violated when Municipal Defendants targeted properties in communities of color for inclusion in the TPT Program. A-38 ¶ 78. Likewise, the Foreclosure Judgments cannot have caused Appellants' due process rights to be violated when Municipal Defendants failed to provide Appellants with adequate notice of the *in rem* Foreclosure Proceedings. A-36-37 ¶¶ 70-71.

The Foreclosure Judgments also did not cause Appellant's injuries relating to Defendants' misconduct that *post-dates* the *in rem* Foreclosure Proceedings. *See e.g.*, *Hoblock,* 422 F.3d at 86 (noting that independent claims fall outside *Rooker-Feldman*'s compass); *Patane v. Nestle Waters N. Am., Inc.*, 314 F. Supp. 3d 375, 381 (D. Conn. 2018) ("The *Rooker–Feldman* doctrine does not apply merely because there has been a prior state court action [that] . . . has not foreclosed a defendant from *continuing to engage* in the conduct that forms the basis for a later federal action.") (emphasis added). For example, Appellants were injured—after the Foreclosure Judgments—when Municipal Defendants deeded Appellants' properties to the TPT Defendants and failed to provide Appellants with just compensation for the value of the Subject Properties. A-31 ¶ 51; A-40 ¶ 93; A-42 ¶ 110; A-44 ¶ 128. Similarly, the City continued to charge Mr. Dorce for purported

property "taxes" for at least three years *after* seizing his property. A-40 ¶ 95. None

of these injuries can be said to be "caused by" the Foreclosure Judgments.[22]

### 3. The District Court Erred by Finding that Appellants' Sought Rejection of a State Court Judgment.

The District Court held without much explanation that the *Rooker-Feldman*

Dismissed Claims effectively sought reversal of the Foreclosure Judgments. *See*

SPA-16 (Appellants' request for damages equivalent to the value of the Subject

Properties "amount[s] to" a rejection of state court foreclosure judgments.); SPA-18

(Appellants' Administrative Code Takings Claim "would invite the Court to

determine whether the state court's entry of judgment was valid."). This is wrong

for at least three reasons.

First, Appellants' claims seeking damages equal to the value of the Subject

Properties do not implicate any legal matter that was considered and adjudicated in

---

[22] In reaching the opposite conclusion, the District Court relies upon inapposite authority. *See* SPA-16; SPA-18. First, the unpublished decision in *Charles v. Levitt* is distinguishable because the complaint in that matter was a "sufficiently baffling document that it is difficult to say for certain what injuries are alleged," and "provide[d] no hint at what other injury the additional money would remedy" besides his loss of property resulting from the state court judgment. 716 F. App'x 18, 21-22 (2d Cir. 2017). By contrast, Appellants' prayed-for damages would remedy distinct injuries arising from Municipal Defendants' violation of Appellants' constitutional rights. *See* A-31 ¶ 51; A-36-37 ¶¶ 70-71; A-38 ¶ 78; A-40 ¶ 93; A-42 ¶ 110; A-44 ¶ 128. Second, *Vossbrinck v. Accredited Home Lenders, Inc.*, did not reach the issue of whether *Rooker-Feldman* barred plaintiff from "seek[ing] damages from Defendants for injuries Vossbrinck suffered from their alleged fraud." 773 F.3d 423, 427 (2d Cir. 2014) (dismissing plaintiff's damages claim on other grounds).

the *in rem* Foreclosure Proceedings. As a threshold matter, the Foreclosure Judgments did not finalize the seizure of the Subject Properties. Instead, they provide, for example, that "unless and until the Commissioner of Finance executed a deed conveying the parcels of real property . . . to the City or to a third party deemed qualified and designated by the Commissioner of Housing Preservation and Development, the owners of the land would continue to have all of the rights of an owner." *In Rem No. 53*, 2019 WL 1431423, at *1. Even if the Foreclosure Judgments reflect a holding that the City was statutorily entitled to seize Appellants' properties, those judgments did not address whether the Constitution requires Defendants to provide compensation for the taking, procedural due process violation, or equal rights violation, much less the proper amount of compensation. *See Coleman,* 70 F. Supp. 3d at 74 ("[C]laim for compensation for the taking of [] surplus equity in the property [through tax sale] survives *Rooker–Feldman* because [it] does not challenge the Foreclosure Judgment, but the . . . unconstitutional . . . taking of his surplus equity."); *W.J.F. Realty Corp. v. Town of Southampton*, 220 F. Supp. 2d 140, 150 (E.D.N.Y. 2002) (noting that the doctrine does not bar review of claims not considered in state court).

Second, even if certain issues in this case are the "same" or "relate to" a state court proceeding, the Supreme Court has held that "[i]t is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired

between the parties in state court." *Skinner v. Switzer*, 131 S. Ct. 1289, 1297 (2011). Even if Appellants' claim for money damages involves consideration of the same or a related question as was considered in the *in rem* Foreclosure Proceedings, *Rooker-Feldman* does not apply because Appellants are not seeking a reversal of the state court proceeding. The decision in *In re Philadelphia Entertainment & Development Partners* is illustrative. 879 F.3d 492 (3d Cir. 2018). In *Philadelphia Entertainment* a gambling operator had its gaming license revocation affirmed in state court. *Id.* at 495-96. The gambling operator then sued in federal court seeking to recover $50 million in gaming license fees. *Id.* at 496. Even though the issue of whether the state should return the licensing fee was clearly at least related to the question of whether the state was entitled to revoke the license, the Third Circuit concluded the federal case was not barred by *Rooker-Feldman* because the plaintiff did not ask the court to make an appellate review of the revocation order. *Id.* at 501-02. The same is true here. Even if Appellants claim for money damages based on Defendants' constitutional violates relates to the state court foreclosure proceeding, Appellants do not ask the court to make an appellate review of the foreclosure order. Accordingly, Appellants' takings claim is outside the scope of *Rooker-Feldman*.

Third, to the extent that the *in rem* Foreclosure Proceedings are relevant, they are helpful for Appellants Mr. Dorce and Ms. Jones, and not something Appellants ask the Court to "review and reject." Both Mr. Dorce and Ms. Jones had properties

included in *In Rem No. 53*, and subsequent litigation in that matter makes clear that the taking of property pursuant to that proceeding violated Appellants constitutional rights. After initially granting the City's *ex parte* foreclosure request, Justice Partnow learned about Defendants' misrepresentations concerning the TPT Program and reversed his judgment in part, describing Defendants' misconduct as "unconscionable and shocking to the conscience of the court." *In Rem No. 53*, 2019 WL 1431423, at *9, *23. Indeed, Justice Partnow specifically concluded that, had he not reversed the City's seizures for the property owners who sought such relief, "the transfer of [private property] pursuant to the Third Party Transfer Program, would constitute an unlawful taking of private property without just compensation in violation of [the owner's] constitutional rights under the Takings Clause of the Fifth Amendment to the United States Constitution and article I, section 7, of the New York State Constitution." *Id.* at *13, *29. This is precisely the argument Appellants advance here. *See, e.g.*, A-17 ¶ 14.[23]

---

[23] The Order cites to two inapposite cases. SPA-16-17. *Warren v. Pataki* simply did not address *Rooker-Feldman* at all. 823 F.3d 125, 143 (2d Cir. 2016). *Gonzalez v. Deutsche Bank National Trust Company* supports Appellants by holding that "[t]o the extent plaintiffs' complaint can be liberally construed to allege injury stemming from the same transaction but not directly *caused* by the foreclosure judgment, their claims are not barred by *Rooker–Feldman*." 632 F. App'x 32, 34 (2d Cir. 2016).

**B.    The District Court Failed to Meaningfully Address *Knick* Which Necessarily Narrowed the Potential Applicability of *Rooker-Feldman* in the Context of Takings Claims.**

The Order cannot be reconciled with the Supreme Court's 2019 holding in *Knick* that victims of a government taking, such as Appellants, have an immediate right to proceed to federal court under Section 1983 without regard to any possible state court remedies, and the District Court did not attempt to do so. *See* 139 S. Ct. 2162, 2170 (2019).  The District Court briefly attempted to distinguish *Knick* from the instant case in a footnote that "*Knick* . . . concerned the issue of whether exhaustion was required before bringing a takings claim in federal court.  It did not address the issues of *Rooker-Feldman* . . . ." SPA-21 n.11.

First, this interpretation is wrong because *Knick* broadly guarantees takings-plaintiffs immediate access to federal court, and the Order functionally deprives plaintiffs from *ever* challenging takings accomplished through foreclosure proceedings.  Appellants did not have a ripe takings claim *until* their property rights were taken, which was accomplished through the *in rem* Foreclosure Proceeding.  Accordingly, the District Court's holding that, pursuant to *Rooker-Feldman*, the *in rem* Foreclosure Proceeding itself automatically bars federal court subject matter jurisdiction means that Appellants can functionally *never* access the federal forum guaranteed to them by *Knick*.  Indeed, under the logic of the Order, a local government can continually take private property without paying for it and can *never*

be sued in federal court so long as it obtains a state court order blessing its seizure even where, as is the case here, the state court order was obtained *ex parte* without any involvement of the property owner.[24]  This is the exact opposite of what the Supreme Court held in *Knick*.  139 S. Ct. at 2170.

Second, the *Rooker-Feldman* doctrine is, at core, a state-court exhaustion requirement because it requires a litigant to exhaust the state-court appellate process before accessing federal courts.  *See Exxon Mobil Corp.*, 544 U.S. at 283; *Swiatkowski v. Citibank*, 745 F. Supp. 2d 150, 167 (E.D.N.Y. 2010), aff'd, 446 F. App'x 360 (2d Cir. 2011) (*Rooker-Feldman* requires that "to the extent [a] plaintiff claims she was aggrieved by the state court's ruling, the proper venue to challenge that decision [i]s by appeal in state court . . . .").  Accordingly, even if *Knick* only abrogated state court exhaustion requirements in connection with federal takings claims, that holding would still apply to *Rooker-Feldman*.

Thus, to the extent that *Rooker-Feldman* ever stood for the proposition that federal courts lack subject matter jurisdiction over Section 1983 takings claims

---

[24] Even though the District Court states "plaintiffs' takings claims are not barred by *Rooker-Feldman*," SPA-22, it erred by restricting Appellants from seeking relief "in the form of damages equal to their property values," SPA-15.  The portion of the order barring Appellants from seeking compensation in federal court for their takings claim is irreconcilable with *Knick* because it requires state court adjudication of a takings claim to the extent it seeks traditional damages sought in takings claims—*i.e.*, money damages equivalent to the uncompensated value of properties. 139 S. Ct. at 2169-70.

seeking just compensation for property seized through a state court judicial process, such as Appellants' claims here, it has been overruled by *Knick*.

## III.   THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANTS FAILED TO ADEQUATELY ALLEGE STANDING TO SEEK PROSPECTIVE INJUNCTIVE AND DECLARATORY RELIEF

The District Court's *sua sponte*[25] holding that Appellants lack standing to seek injunctive and declaratory relief because the likelihood of future harm is remote where Appellants have already lost their rights in the Subject Property, SPA-23-24, is mistaken for two reasons. *First*, Appellants have standing because their alleged harms are likely to recur given the existence of an unconscionable official policy and a real threat of future enforcement. *Second*, Appellants have standing to seek prospective relief because they experience ongoing harms, *i.e.*, their continued inability to enjoy property rights.[26]

---

[25] TPT Defendants argued that Appellants Jones and Thomas-Murchison lacked standing to assert claims for loss of property because they were co-op shareholders. *See* A-211-212.  However, no defendant argued that Appellants lacked standing to seek declaratory or injunctive relief.

[26] The Order appears to be limited to Appellants' Procedural Due Process claim, as the Order does not assess the potential future harms associated with Appellants' other claims, including Appellants' Equal Protection and Takings claims.  To the extent the Order holds that Appellants' lacked standing for prospective relief premised on Appellants' other claims, this holding would, too, be in error for the reasons set forth below.

### A. The District Court Erred in Failing to Consider Appellants' Likely Recurring Injuries as a Basis for Standing.

The District Court erred by disregarding Appellants' risk of recurring harms as a basis to find standing for prospective relief—*i.e.*, that Municipal Defendants will, through the use of insufficient notice provisions, discriminatory targeting, and the refusal to provide just compensation, again deprive Appellants of their property interests. An injury is likely to recur when a plaintiff alleges "both [1] a likelihood of future harm and [2] the existence of an official policy or its equivalent." *An v. City of New York*, No. 16 CIV. 5381 (LGS), 2017 WL 2376576, at *2 (S.D.N.Y. June 1, 2017). Thus, for example, in *Deshawn E. v. Safir*, this Court found that plaintiffs had standing to challenge allegedly unconstitutional interrogation tactics that were "officially endorsed policies" with a likelihood of recurring injury because the tactics were "authorized by a written memorandum of understanding between the [City] and the Police Commissioner," and where the New York Police Department was in the process of implementing the tactics further throughout the City. 156 F.3d 340, 345 (2d Cir. 1998).

Here, there is an official policy that is likely to harm Appellants in the future because (1) the TPT Program is an officially endorsed City policy, A-16-17 ¶ 9; A-20-24 ¶¶ 24-32, (2) Appellants are residents of the neighborhoods targeted by the TPT Program, A-33 ¶¶ 56-58; A-38 ¶ 78, and (3) the City has announced its intention to expand the TPT Program in those neighborhoods, A-30-31 ¶ 49. The City has

already implemented this policy in a manner that has harmed Appellants, *i.e.*, by discriminatorily targeting Appellants' neighborhoods and including their non-distressed properties in the TPT Program, failing to provide sufficient notice of the *in rem* proceeding and subsequent judgments, and refusing to provide just compensation. A-31 ¶ 51; A-36-37 ¶¶ 70-71; A-38 ¶ 78; A-40 ¶ 93; A-42 ¶ 110; A-44 ¶ 128; A-49 ¶¶ 160-161.

The District Court nevertheless reached the conclusion, without citation to authority, that the City's intent to "seize an additional 40 properties" means that Appellants' future injury "is too remote," SPA-24. In so holding, the District Court disregarded that Municipal Defendants "ha[ve] plans to and [are] in the process of instituting" an expanded TPT Program, and that the City has "ordered or authorized [Municipal Defendants] to act in such manner" that deprives Appellants' of their legal rights. *Safir*, 156 F.3d at 345. The likelihood that Appellants' will experience future harm is bolstered by the fact that Appellants reside in the very neighborhoods that Municipal Defendants are targeting for future seizures, and thus are at heightened risk of recurring harm sufficient to assert standing. A-33 ¶¶ 56-58; A-38 ¶ 78. As in *Safir,* where this Court held that plaintiffs were likely to experience future harm in part because the challenged interrogation tactics were to be used "in the Family Court buildings in the Bronx, Brooklyn, and Queens," 156 F.3d at 345,

Appellants will be harmed by the TPT Program because it will be implemented in the neighborhoods in which Appellants live, or will live in the future.

**B.      The District Court Erred in Failing to Consider Appellants' Ongoing Harms as a Basis for Standing.**

In holding that Appellants failed to allege a likely *future* harm, SPA-23-24, the District Court failed to consider Appellants' clear *ongoing* harms as a basis for standing—*i.e.*, that Appellants continue to be deprived of their property and continue to face the risk that any property they own or plan to acquire in their neighborhoods might be taken without notice. An *ongoing* injury—that is, an injury where the challenged actions of the defendant are accompanied by "continuing, present adverse effects," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)—is sufficient to establish standing. *See also Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 558 (S.D.N.Y. 2018) (holding that plaintiff-Twitter users alleged an ongoing harm where "the individual plaintiffs ***continue*** to be blocked" from posting content on Twitter) (emphasis added); *see also Safir*, 156 F.3d at 344 ("[P]laintiffs in this case allegedly ***continue*** to suffer harm from the challenged conduct because the information secured [] [was] used to enhance their cases and to obtain plea bargains") (emphasis added).

Appellants suffer two clear ongoing harms. First, they suffer a continuing denial of the ability to enjoy their property or equivalent property as a result of Defendants' illegal taking without just compensation. For example, Named Plaintiff

Thomas-Murchison used to live in an apartment that she owned. A-42 ¶ 113. But as a result of the TPT Program, and since the filing of the Complaint, she is now homeless, left without the financial means to purchase another home. Lacking a place to live is undoubtedly an ongoing harm. Likewise, Appellants may no longer profit from leasing their property.

Second, Appellants suffer an ongoing harm whereby they have inferior property rights on an ongoing basis because of Defendants' illegal and discriminatory conduct. Appellants live in neighborhoods where they suffer an unreasonable risk that, even if they were able to save their money and purchase another property, the City may take it away again without notice. Moreover, Appellants are more likely to live near individuals with statutorily distressed properties, thereby again subjecting their properties to seizure under the TPT Program. The risk that Defendants will seize Appellants properties serves to deter Appellants from purchasing property, which is sufficient to confer standing. *See Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 480 n.15 (3d Cir. 2018) (finding standing where plaintiffs were "deterred from returning to [Defendant's] facilities" and noting plaintiffs' injury was "*actual*, in that this allegedly unlawful deterrence is something that Plaintiffs are currently suffering").

## **CONCLUSION**

The District Court erred in dismissing Appellants' Complaint for lack of subject matter jurisdiction. The Order should be reversed and the case remanded to the District Court for further proceedings.

Dated:       August 27, 2020
             New York, New York

                          Respectfully submitted,


**VALLI KANE & VAGNINI LLP**       **ROPES & GRAY LLP**


By: /s/ *Matthew L. Berman*        By: /s/ *Keith H. Wofford*
Matthew L. Berman                  Keith H. Wofford
Robert J. Valli, Jr.               Gregg L. Weiner
600 Old Country Road               Alexander B. Simkin
Garden City, New York 11530        1211 Avenue of the Americas
Tel: (516) 203-7180                New York, New York 10036
Fax: (516) 706-0248                Tel: (212) 596-9000
                                   Fax: (212) 596-9090

*Attorneys for Plaintiffs-Appellants*   Douglas Hallward-Driemeier
                                   2099 Pennsylvania Avenue
                                   NW Washington, DC 20006
                                   Tel:  (202) 508-4600

                                   *Attorneys for Plaintiffs-Appellants*
                                   *McConnell Dorce and Sherlivia*
                                   *Thomas-Murchison*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)(7)(C)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

Dated:     August 27, 2020     By: */s/ Keith H. Wofford*
Keith H. Wofford
1211 Avenue of the Americas
New York, New York 10036
Tel: (212) 596-9000
Fax: (212) 596-9090

## **CERTIFICATE OF SERVICE**

I, Keith H. Wofford, hereby certify that on August 27, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court for the Second Circuit Court of Appeals by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/  Keith H. Wofford*
Keith H. Wofford, Esq.

# SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable John G. Koeltl,
dated May 16, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-1

Judgment, dated May 19, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-33

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
─────────────────────────────────

MCCONNELL DORCE, ET AL.,

                    Plaintiffs,          19-cv-2216 (JGK)

        - against -             <u>OPINION AND ORDER</u>

CITY OF NEW YORK, ET AL.,

                    Defendants.
─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

The plaintiffs, McConnell Dorce, Cecilia Jones, and Sherlivia Thomas-Murchison,[1] bring this putative class action against the defendants, the City of New York and Maria Torres-Springer, Commissioner of the New York City Department of Housing Preservation and Development (the "City Defendants"), the Neighborhood Restore Housing Development Fund Co. Inc. ("Neighborhood Restore"), and the BSDC Kings Covenant Housing Development Fund Company, Inc. ("Bridge Street").[2] The plaintiffs claim that the City Defendants used <u>in rem</u> proceedings to seize buildings for the non-payment of taxes and transferred ownership of the property to Neighborhood Restore or Bridge Street in violation of the plaintiffs' rights under the United States

─────────────

[1] The plaintiffs advise that Sherlivia Thomas-Murchison's name was inadvertently spelled incorrectly, as "Sherlivia Thomas-Murchinson," in the complaint. <u>See</u> Mem. Opp'n at 1.

[2] The complaint was also brought against Jacques Jiha, Commissioner of the New York City Department of Finance, John Does #1-#10, and Jane Does #1-#10. The docket sheet reflects that Jiha was never served with the complaint and the John and Jane Does were never identified.

Constitution, the New York State Constitution, and various New York State statutes. Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the defendants move to dismiss the plaintiffs' claims for lack of subject matter jurisdiction and for failure to state a claim.[3] For the reasons explained below, the motions are **granted**.

## I.

When presented with motions under both Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the first issue is whether the Court has the subject matter jurisdiction necessary to consider the merits of the action. See Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990); Abrahams v. App. Div. of the Sup. Ct., 473 F. Supp. 2d 550, 554 (S.D.N.Y. 2007), aff'd on other grounds, 311 F. App'x 474 (2d Cir. 2009); see also S.E.C. v. Rorech, 673 F. Supp. 2d 217, 220–21 (S.D.N.Y. 2009).

To prevail against a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence.

---

[3] The City Defendants moved to dismiss only under Rule 12(b)(6), but also argued that this Court lacks subject matter jurisdiction over the plaintiffs' claims. A motion that argues that the Court lacks subject matter jurisdiction to hear the claims is analyzed as a motion pursuant to Rule 12(b)(1).

Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true. See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). The Court does not, however, draw all reasonable inferences in the plaintiff's favor. Id.; Graubart v. Jazz Images, Inc., No. 02-CV-4645, 2006 WL 1140724, at *2 (S.D.N.Y. Apr. 27, 2006). Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. See APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the Court is guided by that body of decisional law that has developed under Federal Rule of Civil Procedure 56. Kamen, 791 F.2d at 1011; see also McKevitt v. Mueller, 689 F. Supp. 2d 661, 664-65 (S.D.N.Y. 2010); Rorech, 673 F. Supp. 2d at 220-21; Graham v. Select Portfolio Servicing, Inc., 156 F. Supp. 3d 491, 499-500 (S.D.N.Y. 2016).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to

weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

**II.**

The following facts are taken from the Complaint and are undisputed unless otherwise noted.

In New York State, after a certain period, unpaid property taxes become "tax liens," upon which "tax districts" may collect. Compl. ¶ 5.[4] In 1939, the New York State Legislature passed a law ("Tax Law § 165"), which granted tax districts the power to collect tax liens using in rem proceedings. Id. at ¶ 4. Tax Law § 165 is presently codified as Section 1120 of the Real Property Tax Law of New York Consolidated Laws. Id. In 1948, the City enacted its own in rem foreclosure provisions to collect on tax liens within New York City. Id. at ¶ 6. In 1996, the New York City Council enacted Local Law No. 37, which

---

[4] A "tax district," as described in the New York Real Property Tax Law includes "a county, city, town, village, school district or special district, having the power to levy, assess and enforce the collection of taxes, special ad valorem levies, special assessments or other charges imposed upon real property by or on behalf of a municipal corporation or special district." N.Y. Real Prop. Tax Law § 910.

created the Third Party Transfer Program ("TPT Program"). Id. at ¶ 7. The purposes of Local Law 37 were to improve tax collection and to address more effectively the risk of abandonment of New York City's housing stock. Id. at ¶ 25. Under the TPT Program, when the City obtains a judgment of foreclosure and sale, the City transfers ownership of the property to organizations that are authorized by the New York City Housing, Preservation, and Development Corporation to participate in the TPT Program. Id. at ¶ 32. Under Section 11-412.1(c) of the Administrative Code, these third parties may receive title of the property in fee simple absolute after the expiration of a statutory four-month redemption period following the award of judgment. Id. The City's authority to use in rem foreclosure proceedings to collect tax liens and to administer the TPT Program is currently codified in Title 11, Chapter 4 of the Administrative Code of the City of New York. Id. at ¶ 6; Admin. Code § 11-401 et seq.

The plaintiffs allege that in recent years, the City has used its in rem powers and the TPT Program to deprive owners of their property rights in order to advance the TPT Program. They argue that the City has commenced in rem proceedings under Administrative Code Section 11-404(a) against properties targeted for seizure and sought judgments of foreclosure. Id. at ¶ 31. Upon obtaining a judgement of foreclosure, the City has transferred ownership of the properties under the TPT Program,

to a TPT Program partner ("TPT partner") like the defendants Neighborhood Restore and Bridge Street. Id. at ¶ 32. In exchange for this transfer of ownership, the TPT partner paid the City a nominal amount and made no payment towards the underlying tax lien for which the City initiated the in rem proceeding. Id. at ¶ 33. Accordingly, the plaintiffs argue that the City Defendants use Title 11, Chapter 4 of the Administrative Code for purposes other than to collect tax liens.

The plaintiff, McConnell Dorce, was the owner of the property located at 373 Rockaway Boulevard, Brooklyn, New York (Kings County Block #4672, Lot #56). Id. at ¶ 79. Dorce had owned the property free and clear of any mortgage since 2012. Id. at ¶ 80. Sometime after 2012, Dorce incurred water and sewer charges for the property and entered into a written installment agreement with the City to pay the outstanding charges. Id. at ¶ 83. Dorce made each of the installment payments at the City's Department of Environmental Protection's office in Brooklyn. Id. Following the entry of a foreclosure judgment in the in rem proceeding the City brought against his property-a proceeding that Dorce was unaware of-Dorce tendered payments to the City and the City accepted those payments without notifying Dorce that his property had been foreclosed upon. Id. at ¶¶ 84, 95. On or about September 24, 2018, Dorce learned that his property had been transferred to one of the City's TPT partners as a result

of an in rem proceeding commenced by the City around July 2015. Id. at ¶ 84. The proceeding against Dorce's property, located at Block 4672, Lot 56, was entitled In Rem Tax Foreclosure No. 53, Borough of Brooklyn, Index No. 8700/2015 (Sup. Ct. Nov. 27, 2017). Feller Decl., Dkt. No 32-2. A final judgment was granted to the City of New York with respect to Dorce's property in December, 2017. Id.

The plaintiff, Cecilia Jones, owned shares in a housing development fund corporation (HDFC), located at 1197 Dean Street, Brooklyn, New York 11216, also known as 585 Nostrand Avenue (Kings County Block #1207, Lot #72). Id. at ¶ 96. An HDFC is a type of co-operative corporation organized under New York State Housing Finance Law to improve housing and homeownership and keep units affordable to working families. Id. at ¶ 20. Jones owned shares in the HDFC and lived in an apartment unit pursuant to a proprietary lease appurtenant to her shares in the HDFC. Id. at ¶ 96. Shareholders paid maintenance fees to the HDFC, which used those fees to pay real estate taxes and water and sewage charges assessed by the City. Id. at ¶ 98. Around October, 2017, Jones learned that the ownership of the property had been transferred from the HDFC to Bridge Street after the City had filed an in rem proceeding. Id. at ¶ 99. Jones was subsequently converted into a renter of her apartment. Id. at ¶ 100. The proceeding against Jones's property, located at Block

1207, Lot 72, was entitled In Rem Tax Foreclosure No. 51, Borough of Brooklyn, Index No. 8700/2007 (Sup. Ct. Oct. 26, 2011). Feller Decl., Dkt. No 32-2. A final judgment was granted to the City of New York with respect to Jones's property in October, 2011. Id.

The plaintiff, Sherlivia Thomas-Murchison, owned shares in a HDFC located at 248 Madison Dean Street, Brooklyn, New York (Kings County Block #1823, Lot #29). Id. at ¶ 113. Her extended family lived in an apartment unit pursuant to a proprietary lease appurtenant to her shares in the HDFC. Id. Thomas-Murchison's parents also owned shares in an HDFC that owned property at 248 Madison Dean Street, and Thomas-Murchison lived in an apartment unit pursuant to a proprietary lease appurtenant to her parents' shares in the HDFC; Thomas-Murchison lived with her parents in their apartment before they passed away. Id. at ¶ 115. Shareholders paid maintenance fees to the HDFC, which used those fees to pay real estate taxes and water and sewage charges assessed by the City. Id. at ¶ 116. Around April, 2016, Thomas-Murchison learned that the ownership of the property had been transferred from the HDFC to Bridge Street after the City had initiated an in rem proceeding. Id. at ¶ 117. Thomas-Murchison was subsequently converted into a renter of her apartment. Id. at ¶ 118. The proceeding against Thomas-Murchison's property, located at Block 1823, Lot 29, was

entitled In Rem Tax Foreclosure No. 51, Borough of Brooklyn, Index No. 8700/2007 (Sup. Ct. Oct. 26, 2011). Feller Decl., Dkt. No 32-2. A final judgment was granted to the City of New York with respect to Thomas-Murchison's property in October, 2011. Id.

All three plaintiffs allege that they did not receive actual or constructive notice of the in rem proceedings against their properties. Id. at ¶¶ 85, 102, 120. All plaintiffs also allege that their properties were not "distressed," as defined under the New York City Administrative Code, Compl. ¶¶ 86, 103, 121, and that they were deprived of an opportunity to redeem the property by exercising their owner's right to the "equity of redemption," id. at ¶¶ 88, 105, 123. Each plaintiff alleges that his or her property was transferred for nominal consideration by the City to a TPT partner, which include Neighborhood Restore and Bridge Street, and that the property was taken for the public purpose of preserving affordable housing. Id. at ¶¶ 89-92, 106-10, 124-27. None of the plaintiffs received any compensation for their property. Id. at ¶¶ 93, 110, 128.

The plaintiffs bring claims against the defendants under the United States and New York State Constitutions. First, the plaintiffs bring an as-applied constitutional challenge that the defendants' actions (a) violated due process because the plaintiffs did not have notice of the in rem proceedings against

the plaintiffs' property; (b) constituted unconstitutional takings without just compensation by depriving the plaintiffs of substantial equity in their property; and (c) violated equal protection, by disproportionately affecting property owners in communities of color.[5] Second, the plaintiffs allege that the notice provisions of the TPT Program, as codified in the Administrative Code, are facially unconstitutional because the Code falls short of what is required by constitutional due process. The plaintiffs also bring claims under New York State law on the ground that the City's use of in rem proceedings constitutes ultra vires activity in violation of Article II, Section 10-11 of the New York State Municipal Home Rule Law and that the defendants engaged in deceptive practices in violation of New York General Business Law Section 349.

The plaintiffs seek prospective equitable relief, in the form of (1) a declaratory judgment that the TPT Program and portions of the New York City Administrative Code are unconstitutional, that the defendants may no longer initiate in rem proceedings pursuant to the TPT Program, and that Section

---

[5] The plaintiffs also bring a separate cause of action under 28 U.S.C. § 1983. Section 1983 is not a separate cause of action, but rather, is the basis for the plaintiffs' federal constitutional claims. See Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) ("Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source.").

11-401 et seq. of the Administrative Code is unconstitutional; and (2) an injunction permanently enjoining the defendants from initiating future in rem proceedings pursuant to the TPT program. They also seek various types of damages arising from the defendants' conduct.

The defendants have moved to dismiss[6] for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

### III.

### A.

The defendants move to dismiss for lack of jurisdiction under the Rooker-Feldman doctrine. The Rooker-Feldman doctrine provides that "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." Hoblock v. Albany Cty. Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005). The doctrine has four requirements:

> (1) the federal-court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a state court judgment; (3) the plaintiff invites . . . review and rejection of that judgment; and (4) the state judgment was rendered before the district court proceedings commenced.

Vossbrinck v. Accredited Home Lenders, Inc., 773 F.3d 423, 426 (2d Cir. 2014) (per curiam) (internal quotation marks, citation,

---

[6] Two separate motions to dismiss were filed in this case—the first by the City Defendants and the second by Neighborhood Restore and Bridge Street.

11

and alterations omitted). The Court of Appeals for the Second Circuit has classified the first and fourth requirements as procedural and the second and third as substantive. Hoblock, 422 F.3d at 85. The second requirement is the "core requirement" from which the other requirements derive. Id. at 87. "[A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." Id. at 88.

## 1.

In this case, the procedural requirements are met. The Rooker-Feldman doctrine can apply to federal court plaintiffs who were not personally named as parties in the state court action but who were deprived of a property interest by a judgment in state court. In Riley v. Comm'r of Fin. of City of New York, 618 F. App'x 16, 17 (2d Cir. 2015), the Court of Appeals affirmed the district court's dismissal of an action on Rooker-Feldman grounds, when the plaintiff sought to remove clouds on his claimed title to property and sought a declaratory judgment of free-and-clear ownership. The plaintiff's ownership of the property had already been adjudicated and rejected in a state court foreclosure proceeding, entitled In Rem Tax Foreclosure Action No. 51, Borough of Brooklyn, Index No.

8700/07 (Sup. Ct. Feb. 26, 2013). See also Wik v. City of Rochester, 632 F. App'x 661, 662 (2d Cir. 2015) (affirming district court's dismissal of claims under Rooker-Feldman when state court had adjudicated in rem proceeding described in Wik v. City of Rochester, No. 07-CV-6541, 2008 WL 4911805, at *4 (W.D.N.Y. Nov. 13, 2008)). The federal court plaintiffs-Dorce, Jones, and Thomas-Murchison-were not named in the state court actions, but had property interests in properties that were subject to the state court foreclosure proceedings in In Rem Tax Foreclosure Action No. 51, Borough of Brooklyn, Index No. 8700/2007 and In Rem Tax Foreclosure Action No. 53, Borough of Brooklyn, Index No. 8700/2015.[7] Accordingly, the plaintiffs can be said to have lost in state court for purposes of the first requirement of the Rooker-Feldman doctrine. The fourth factor is also met because the state judgments at issue were entered in or before 2017, before this district court proceeding was commenced in 2019.

---

[7] The foreclosure proceedings in this case resulted in default judgments against the plaintiffs. A party against whom a default judgment is entered is also considered a party that lost in state court. See In re Wilson, 410 F. App'x 409, 410 (2d Cir. 2011) (finding that default foreclosure judgment against the plaintiff satisfied the first prong of Rooker-Feldman).

**2.**

The substantive requirements are met for only some of the plaintiffs' claims.[8]

**a.**

The plaintiffs allege that the defendants violated their rights to procedural due process under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 6 of the New York State Constitution. "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." Bryant v. New York State Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012) (citation omitted). The plaintiffs allege that they lost their interests in their property and that the defendants violated due process by not providing notice of the in rem proceedings

---

[8] The plaintiffs bring claims under the Fifth and Fourteenth Amendments of the United States Constitution, as well as Article I, Sections 6 and 7 of the New York State Constitution. The Court's analysis applies equally to federal and state constitutional claims. The due process guarantees under both constitutions are coextensive. See Coakley v. Jaffe, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999), abrogated on other grounds by Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268 (2d Cir. 1999); Febres v. City of New York, 238 F.R.D. 377, 392 (S.D.N.Y. 2006) (collecting cases). The New York Court of Appeals has considered federal and state takings claims together. See Seawall Assocs. v. City of New York, 74 N.Y.2d 92, 115-16 & n.15 (1989) (noting, however, that it was not necessary to decide "the extent to which, if at all, the protections of the 'Takings Clause' of the New York State Constitution differ from those under the Federal Constitution."); see also Singh v. Joshi, 201 F. Supp. 3d 245, 249 n.2 (E.D.N.Y. 2016) (federal takings jurisprudence applies to claims under the New York State Constitution). In any event, as discussed below, the Court declines to exercise supplemental jurisdiction over any state law claims.

against the plaintiffs' properties as required by the United States and New York State Constitutions.

**i.**

To the extent that the plaintiffs seek relief in the form of damages equal to their property values, the substantive requirements of Rooker-Feldman are met.[9] While the plaintiffs contend that they seek monetary damages only for violations of their constitutional rights and seek prospective equitable relief, this "artful pleading is insufficient to bypass Rooker-Feldman," Roberts v. Perez, No. 13-CV-5612, 2014 WL 3883418, at *3 (S.D.N.Y. Aug. 7, 2014) (citing Hoblock, 422 F.3d at 88), because it is apparent that such alleged monetary damages derive from the plaintiffs' loss of their property. Thus, the second requirement, that the injuries complained of were caused by a state court judgment, is satisfied. See Charles v. Levitt, 716 F. App'x. 18, 21-22 (2d Cir. 2017) (rejecting plaintiffs' claims of fraud, perjury, and bribery when actual injury complained of was tied to the alleged value of property lost from state court judgment). Absent the state court judgment, the plaintiffs would not have been deprived of their property and the injury-their

---

[9] The plaintiffs claim that the sixty-six properties that the City received judgment for in rem foreclosure cases in 2017 were worth in excess of sixty million dollars. Compl. ¶ 65. They allege that the City "had actual knowledge that it was not providing notice reasonably calculated to inform property owners of the proceeding" and that "Defendants' conduct has caused financial harm to Plaintiffs," who have "accordingly been damaged in the minimal sum of $66,000,000.00." Id. at ¶¶ 145, 148-49, 152, 155-56.

loss of property-for which they seek monetary relief, was caused by the state court judgment of foreclosure. Further, the fact that a plaintiff may seek prospective equitable relief does not mean that a plaintiff's claims do not stem from the injury caused by the state court judgment. See Rotering v. Amodeo, No. 07-4357-CV, 2009 WL 579138, at *2 (2d Cir. Mar. 6, 2009) (summary order) (suit seeking declaratory and prospective injunctive relief that state law was unconstitutional still complained of injury caused by state court judgment).

Because the plaintiffs' injuries arise from the state court's judgment of foreclosure, the plaintiffs' claims amount to a request that this Court review and reject the state court's judgment. In the procedural due process context, "actual damages are based on the compensation for injuries that resulted from the plaintiff's receipt of deficient process." Warren v. Pataki, 823 F.3d 125, 143 (2d Cir. 2016). When considering whether to award compensatory damages, "courts must determine whether a different outcome would have been obtained had adequate procedural protections been given. If the outcome would not have been different, the plaintiff is presumptively entitled to no more than nominal damages." Id. If the plaintiffs sought compensatory damages in the minimal amount of $66 million, this Court would have to determine if the plaintiffs had been given proper notice and whether the outcome of the proceeding would

have been different. This would require the Court to adjudicate "the validity of the foreclosure," which was "already fully adjudicated in the state-court proceeding." Gonzalez v. Deutsche Bank Nat. Tr. Co., 632 F. App'x 32, 33-34 (2d Cir. 2016).

## ii.

To the extent that the plaintiffs seek only nominal damages, and claim that their injury was the deprivation of process to which they were entitled, their procedural due process claims are not barred by Rooker-Feldman. The Supreme Court has recognized in the context of a Section 1983 claim that the right to procedural due process is "absolute" and that "the denial of procedural due process [is] actionable for nominal damages without proof of actual injury." Carey v. Piphus, 435 U.S. 247, 266 (1978).

The plaintiffs correctly argue that Rooker-Feldman does not bar their procedural due process claims for nominal damages because their injuries were caused by the City's failure to provide notice of the action when the City commenced the in rem proceedings, rather than by the state court judgments themselves. See Brody v. Vill. of Port Chester, No. 00-CV-7481, 2007 WL 704002, at *5 (S.D.N.Y. Mar. 7, 2007) (holding that due process claims alleging lack of notice of condemnation proceedings not barred by Rooker-Feldman).

**b.**

The plaintiffs allege that the defendants took their property without just compensation in violation of the Fifth Amendment and Article I, Section 7 of the New York State Constitution.

**i.**

To the extent that the plaintiffs claim that the taking is unconstitutional because the City proceeded against properties that were not distressed and against properties in parcels smaller than a "block" in violation of the Administrative Code, the plaintiffs' claims would be barred by Rooker-Feldman. The claims would require the Court to analyze whether the in rem proceeding was initiated properly under the Administrative Code's provisions and would invite the Court to determine whether the state court's entry of judgment was valid. Further, the plaintiffs' damages premised on these allegedly improper procedures ultimately arise from the loss of property resulting from the state court judgments of foreclosure. Although claims of damages directly caused by a defendant's alleged misconduct are not barred, claims of damages caused by a state court judgment that the misconduct allegedly produced are barred by Rooker-Feldman. See Charles v. Levitt, No. 15-CV-9334, 2016 WL 3982514, at *4 (S.D.N.Y. July 21, 2016), aff'd and remanded, 716 F. App'x 18 (2d Cir. 2017); see also Vossbrinck, 773 F.3d at 427

(Rooker-Feldman bars even plaintiff's claim that state court foreclosure judgment was obtained fraudulently).

**ii.**

On the other hand, to the extent that the plaintiffs claim constitutional violations based on not receiving compensation for their property that was allegedly taken for public use, the plaintiffs' claims would not be barred by Rooker-Feldman. The plaintiffs allege that the in rem foreclosure proceedings extinguished all rights that the plaintiffs had in their properties, including rights of redemption and methods to pursue surplus value, and thus the plaintiffs did not receive compensation for the substantial equity they had in their properties.

The parties disagree on whether the City's actions in this case constitute a taking.[10] It is not necessary to decide whether a taking occurred because the plaintiffs' claims that they were

---

[10] The defendants argue that the City's use of in rem proceedings to enforce taxes is not a taking for public use. See Nelson v. City of New York, 352 U.S. 103, 110 (1956) (not unconstitutional for City to foreclose on real property for delinquent taxes and retain entire proceeds in absence of timely action to redeem or recover surplus); In re Murphy, 331 B.R. 107, 128 (Bankr. S.D.N.Y. 2005) (state tax forfeiture statute did not violate Fifth Amendment when taxing authority took possession of property to satisfy tax lien) (collecting cases). However, New York state courts have held that "a taking of property of a value far in excess of a tax lien in satisfaction of the lien without affording the owner an opportunity to recover the excess value would constitute a violation of constitutional rights." Matter of In Rem Tax Foreclosure Action No. 37, 462 N.Y.S.2d 113, 114 (Sup. Ct. 1983). At least one New York State Supreme Court judge has found that the City's use of in rem proceedings may, in some factual circumstances, constitute a taking. In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn, 114 N.Y.S.3d 581, 2019 WL 1431423, at *13, *23, *29 (Sup. Ct. 2019) (hereinafter "Brooklyn 53").

19

denied the right to receive compensation do not require the Court to review and reject the state court judgment.

The City argues that under Administrative Code Section 11-412.1(d), any person claiming to have an interest in the property at issue has the right to have the foreclosure canceled within four months after the entry of a foreclosure judgment by repaying all delinquent taxes with interest and other legal charges or by entering into an installment agreement. See Admin. Code § 11-412.1. Furthermore, a defendant who timely serves a verified answer alleging substantial equity over the city's lien for taxes "may demand . . . to have the property sold with all taxes and interest to be paid out of the proceeds of such sale." Admin. Code § 11-409(d). After the four-month mandatory redemption period, but not more than eight months after the date of the final judgment, the commissioner may execute a deed, upon which the city or third party "shall be seized of an estate in fee simple absolute in such land and all persons . . . shall be barred and forever foreclosed of all such right, title, interest, claim, lien or equity of redemption[.]" Admin. Code § 11-412.1(c). The City argues that under these provisions, the plaintiffs had ample opportunity to exercise their rights of redemption or to request a surplus value sale, before the

commissioner could execute the deed transferring title.[11] In contrast, the plaintiffs argue that the Administrative Code provides no method by which a former owner of property may claim surplus value. Compl. ¶ 39.

Whether the provisions of the Administrative Code are constitutional and allow a prior owner to receive compensation after a state court has entered a judgment of foreclosure, either through any right of redemption or access to surplus value, does not require the Court to reject the state court judgment. See Nelson, 352 U.S. at 110 (analyzing the constitutionality of the Administrative Code's provisions to determine whether a plaintiff had available avenues of compensation, without reliance on the state court's entry of a foreclosure judgment); Feller Decl., Dkt. No. 52-3, In Rem Tax

---

[11] The plaintiffs argue that the Supreme Court's recent decision in Knick v. Township of Scott, PA, 139 S. Ct. 2162 (2019), does not require an individual to exhaust state court remedies before pursuing an action in federal court, and thus the plaintiffs were not required to seek compensation in state court before bringing claims in federal court. In Knick, the Supreme Court held that a property owner "has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." Id. at 2170. Knick overruled a prior Supreme Court decision in Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194-95 (1985), which had required that a property owner exhaust state remedies before pursuing a violation of the takings clause in federal court; Williamson's requirement had created a catch-22 for plaintiffs, who were required to exhaust state court remedies but had their subsequent Section 1983 claims barred from federal court by preclusion. Knick, 139 S. Ct. at 2167. In Knick, the township used its eminent domain authority to initiate proceedings to acquire title to property rather than the tax foreclosure proceedings at issue in this case. Knick is not directly relevant in this case because it concerned the issue of whether exhaustion was required before bringing a takings claim in federal court. It did not address the issues of Rooker-Feldman, the Tax Injunction Act, or comity.

# SPA-22

Case 1:19-cv-02216-JGK   Document 64   Filed 05/17/20   Page 22 of 32

<u>Foreclosure No. 47</u>, 2000/2002 (Sup. Ct. Dec. 7, 2006) (same). Accordingly, the third requirement of <u>Rooker-Feldman</u> is not met and the plaintiffs' takings claims are not barred by <u>Rooker-Feldman</u>.

<b>c.</b>

The plaintiffs also allege that the defendants violated their right to equal protection under the Fourteenth Amendment. In their opposition, the plaintiffs clarify that the equal protection violations they bring are premised on a selective enforcement theory. To state an equal protection claim based on the theory of selective enforcement, a plaintiff must demonstrate:

> (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

<u>Hu v. City of New York</u>, 927 F.3d 81, 91 (2d Cir. 2019) (citations omitted). The plaintiffs' equal protection claims premised on a theory of selective enforcement would not be barred by <u>Rooker-Feldman</u> because the injuries allegedly stem from the City's policy of initiating <u>in rem</u> proceedings disproportionately against property owners in communities of color; these claims would not be barred because they arise

22

before the state court judgments and are based on the initiation of the foreclosure proceedings rather than the judgments of foreclosure.

### d.

The plaintiffs' facial challenge to the notice provisions of the Administrative Code is not barred by Rooker-Feldman because the plaintiffs seek prospective relief that would not require this Court to overturn the state court judgments. However, the plaintiffs have failed adequately to allege standing. "To obtain prospective relief, such as a declaratory judgment or an injunction, a plaintiff . . . must demonstrate a certainly impending future injury. In establishing a certainly impending future injury, a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought." Marcavage v. City of N.Y., 689 F.3d 98, 103 (2d Cir. 2012) (internal quotation marks and citations omitted). A plaintiff may not seek declaratory relief aimed at past conduct. See H.B. v. Byram Hills Cent. Sch. Dist., 648 F. App'x 122, 125 (2d Cir. 2016) (noting that past conduct is an "impermissible target" of declaratory relief). The plaintiffs argue that Mayor de Blasio has stated an intent to expand the TPT Program to seize over forty additional buildings each year. Compl. ¶ 49. However, the plaintiffs have not alleged

that they have other property interests that would be targeted by future in rem proceedings. The prospect that their hypothetical property would be the subject of future in rem proceedings pursuant to a program that the City aims to expand to seize an additional 40 properties out of all residential buildings in New York City, is too remote to show a certainly impending future injury. The plaintiffs have thus failed to show that the plaintiffs will face a "credible threat" of another in rem proceeding under the TPT Program and do not have standing to seek prospective declaratory and injunctive relief.

**B.**

All claims, including those that are not barred by Rooker-Feldman, are barred by the Tax Injunction Act ("TIA") and the doctrine of comity. The TIA provides that a district court "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The TIA "may be best understood as but a partial codification of the federal reluctance to interfere with state taxation." Levin v. Commerce Energy, Inc., 560 U.S. 413, 424 (2010) (internal quotation marks and citation omitted). The TIA is "rooted in principles of federalism and in recognition of a state's need to administer its own fiscal operations, and was written primarily to limit federal-court interference with local

tax matters." Bernard v. Vill. of Spring Valley, N.Y., 30 F.3d 294, 297 (2d Cir. 1994).

The doctrine of comity "instructs federal courts to refrain from granting relief to taxpayer-plaintiffs in suits that contest taxpayer liability in a manner that interferes with a state's administration of its tax system." Abuzaid v. Mattox, 726 F.3d 311, 315 (2d Cir. 2013). "More embracive than the TIA, the comity doctrine applicable in state taxation cases restrains federal courts from entertaining claims for relief that risk disrupting state tax administration." Levin, 560 U.S. at 417.[12] "While it is the Tax Injunction Act that prevents federal courts from giving injunctive relief or declaratory relief as long as there is a plain, speedy and efficient remedy in state court, it is the principle of comity that prevents a taxpayer from seeking damages in a § 1983 action if a plain, adequate, and complete remedy may be had in state court." Long Island Lighting Co. v. Town of Brookhaven, 889 F.2d 428, 431 (2d Cir. 1989) (citations omitted). Under both the TIA and the comity doctrine, a state provides an adequate remedy if there is an avenue available for a full hearing and judicial determination at which a party may raise all constitutional objections to the tax. See id.

---

[12] The Court of Appeals for the Second Circuit has analyzed the TIA as a statute that bars subject matter jurisdiction. Andresakis v. Conn., 122 F.3d 1055 (2d Cir. 1997) (unpublished table opinion). In contrast, the comity doctrine "counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction." Levin, 560 U.S. at 421 (emphasis added).

A ruling from this Court enjoining the City's use of its discretion to initiate its foreclosure actions and to dispose of properties foreclosed on would violate the TIA, which "bars federal courts from interfering with state tax collection" and "applies equally to enforcement measures such as [a] foreclosure action." Saglioccolo v. New York City Mun. Corp. Dep't of Fin. Bureau of Tax Collection, 101 F.3d 108 (2d Cir. 1996) (unpublished table opinion); see also Andresakis, 122 F.3d 1055 ("The Tax Injunction Act precludes the district court from interfering in local tax matters such as the foreclosure action[s].").

The plaintiffs admit that the City's authority to use in rem foreclosure proceedings to collect tax liens is codified in Section 11-401 et seq. of the Administrative Code. Title 11 is entitled "Taxation and Finance" and chapter 4 concerns "Tax Lien Foreclosure by Action In Rem." However, the plaintiffs argue that the TIA and doctrine of comity do not apply because the method by which the City uses in rem proceedings does not result in the City collecting taxes; rather, the City transfers title of the property in fee simple absolute for nominal consideration to a TPT partner, who does not make any payment towards the underlying tax lien.

But regardless of whether the in rem proceeding that the City initiates to collect a tax lien always results in the

collection of taxes, the City's authority to initiate such proceedings is a tool at its disposal to administer its tax collection system and to attempt to collect upon its tax liens that are owed. As the plaintiffs admit, the purposes of Local Law 37 were to improve tax collection and to address more effectively the risk of abandonment of New York City's housing stock. The same chapter of the Administrative Code that establishes the in rem procedure for collecting tax liens also authorizes the establishment of the TPT Program, which "derives its authority from the City's discretion to convey eligible tax-foreclosed property to qualified third parties designated by the Commissioner of Housing Preservation and Development, pursuant to Administrative Code § 11-412.1(b)(1)." Brooklyn 53, 2019 WL 1431423 at *2.[13] "The fact that the scheme may also have significant implications for housing policies does not remove it from the scope of state actions that are insulated from challenge in federal court." Kraebel v. New York City Dep't of Hous. Pres. & Dev., 959 F.2d 395, 400 (2d Cir. 1992) (affirming dismissal of claims under the TIA and comity when program

---

[13] Section 11-412.1(b)(1) of the Administrative Code provides that a court "shall make a final judgment authorizing the award of possession of any parcel of class one or class two real property described in the list of delinquent taxes . . . and authorizing the commissioner of finance to prepare, execute and cause to be recorded a deed conveying . . . to a third party . . . full and complete title to such lands." Admin. Code. § 11-412.1.

provided property tax abatements to landowners who rehabilitated their buildings).

A ruling from this Court about the validity of the plaintiffs' claims would also disrupt the state tax administration process under the comity doctrine, which applies more broadly than the TIA and specifically counsels against providing relief in Section 1983 claims. See Long Island Lighting Co., 889 F.2d at 431. The Court of Appeals for the Second Circuit has held that the comity doctrine bars even claims about assessments brought under the New York Tax Law, regardless of whether such assessments were penalties to encourage payment of taxes rather than taxes themselves, because such assessments "are indisputably part of the state's tax system." Abuzaid, 726 F.3d at 315–16. "[C]omity precludes federal jurisdiction over § 1983 actions against the validity of state tax systems in federal courts." Bernard, 30 F.3d at 297; see also Hoffer v. Ancel, 32 F. App'x 593, 597 (2d Cir. 2002) ("[E]ven actions by state tax officials that have been held in state court to contravene state laws are not cognizable in federal court."). The City's right to use in rem foreclosure proceedings and discretion to choose what to do with properties for which it obtains judgments are necessarily part of the administration of its tax system.

Adjudicating the plaintiffs' claims is inappropriate because adequate state remedies exist for the plaintiffs to pursue their claims. The plaintiffs' contention that their federal constitutional claims can proceed only in this Court is simply incorrect. "[S]tate courts of general jurisdiction have the power to decide cases involving federal constitutional rights where . . . neither the Constitution nor statute withdraws such jurisdiction." Bos. Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 320 n.3 (1977). "The competency of New York state courts to decide questions arising under the federal Constitution, by which we are all governed, is beyond question." Erdmann v. Stevens, 458 F.2d 1205, 1211 (2d Cir. 1972). In addition, "state courts as well as federal courts are entrusted with providing a forum for the vindication of federal rights violated by state or local officials acting under color of state law [pursuant to Section 1983]." Haywood v. Drown, 556 U.S. 729, 735 (2009); see also Rosenwasser v. Fordham Univ., 772 F. App'x 1, 3 (2d Cir. 2019) (noting that state courts have concurrent jurisdiction with federal courts over Section 1983 claims).

Indeed, New York Civil Practice Law and Rule 5015 provides bases upon which a court may give a party relief from a judgment. "In addition to the grounds set forth in CPLR 5015(a), a court has the inherent authority to vacate a default judgment granted by it for sufficient reason and in the interests of

29

substantial justice." Brooklyn 53, 2019 WL 1431423, at *9 (internal quotation marks and citations omitted); see also Matter of Tax Foreclosure No. 35, 514 N.Y.S.2d 390, 395 (App. Div. 1987) (discussing court's inherent power to vacate default judgments of foreclosure). Further, under Administrative Code Section 11-412.1, individuals may also bring an action to set aside a deed transfer. See Matter of Tax Foreclosure No. 35, 514 N.Y.S.2d at 395. In these actions, the plaintiffs may raise constitutional challenges to the foreclosure judgments. Two recent Supreme Court decisions in New York, entertained motions to vacate in rem foreclosure judgments and to vacate or enjoin transfers of title to TPT partners. See Dkt. No. 52-2, In Rem Tax Foreclosure Action No. 52, No. 40000/2015 (Sup. Ct. May 31, 2019); Brooklyn 53, 2019 WL 1431423. A Section 1983 suit brought "in state court is a plain, adequate, and complete remedy." Hoffer, 32 F. App'x at 597; see also Brooklyn 53, 2019 WL 1431423 at *13, *23, *29 (addressing Fifth Amendment Takings claims under the United States and New York State Constitutions).

Accordingly, because adjudicating the plaintiffs' claims would disrupt the state's system of tax collection and administration, and because there exist adequate remedies in state court for the plaintiffs to raise their claims, the Court does not have subject matter jurisdiction under the TIA and

declines to entertain the plaintiffs' claims under the comity doctrine.

c.

The Court may decline to exercise jurisdiction over non-federal claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Whether to exercise supplemental jurisdiction "is within the sound discretion of the district court." Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 117 (2d Cir. 2013). "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998).

Having established that the Court does not have jurisdiction over some of the plaintiffs' claims under Rooker-Feldman and over all of the plaintiffs' claims for declaratory and injunctive relief under the TIA, and would decline to adjudicate the plaintiffs' claims under the comity doctrine if it did have jurisdiction, to the extent there are any state law claims remaining, the Court declines to exercise supplemental jurisdiction over the plaintiffs' state law claims. Accordingly, the plaintiffs' claims arising under the New York State Constitution, Section 10-11 of the New York State Municipal Home Rule Law, and New York General Business Law Section 349 are also dismissed.

**D.**

Because the Court does not have jurisdiction to hear the claims, it is unnecessary to address the defendants' motion to dismiss the claims under Rule 12(b)(6). "[T]he court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." Rhulen Agency, Inc., 896 F.2d at 678 (citations omitted); see also Brown v. Wells Fargo Bank, N.A., 605 F. App'x 58, 59 (2d Cir. 2015) (affirming district court's denial of motion based on 12(b)(1) grounds without considering parties' 12(b)(6) arguments).

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The defendants' motions to dismiss are **granted.** The Clerk is directed to enter Judgment dismissing this case without prejudice. The Clerk is directed to close all pending motions and to close this case.

**SO ORDERED.**


**Dated:    New York, New York**
**          May 16, 2020**

                                    /s/ John G. Koeltl
                                _____
                                    **John G. Koeltl**
                                **United States District Judge**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
MCCONNELL DORCE, ET AL.,

                     Plaintiffs,

        -against-                           19 **CIVIL** 2216 (JGK)

                                         **JUDGMENT**

CITY OF NEW YORK, ET AL.,

                     Defendants.
-----------------------------------------------------------X

       It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated May 16, 2020, the Court has considered all of the

arguments raised by the parties; to the extent not specifically addressed, the arguments are either

moot or without merit; the defendants' motions to dismiss are granted, and the case is dismissed

without prejudice; accordingly, this case is closed.


**Dated:** New York, New York

     May 19, 2020


                                  **RUBY J. KRAJICK**

                                _____

                                  **Clerk of Court**

        **BY:**

                                    **Deputy Clerk**