# 20-1809

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

MCCONNELL DORCE, individually and on behalf of all others similarly situated, CECILIA JONES, individually and on behalf of all others similarly situated, SHERLIVIA THOMAS-MURCHISON, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

—against—

CITY OF NEW YORK, NEIGHBORHOOD RESTORE HOUSING DEVELOPMENT FUND CO. INC., BSDC KINGS COVENANT HOUSING DEVELOPMENT FUND COMPANY, INC., MARIA TORRES-SPRINGER, COMMISSIONER OF THE NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, JOHN DOE 1 to 10, JANE DOE 1 to 10,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS MCCONNELL DORCE, SHERLIVIA THOMAS-MURCHISON AND CECILIA JONES

ROBERT J. VALLI, JR.
MATTHEW BERMAN
VALLI KANE & VAGNINI
600 Old Country Road
Garden City, New York 11530
(516) 203-7180

YOLANDE I. NICHOLSON
YOLANDE I. NICHOLSON, P.C.
26 Court Street, Suite 1211
Brooklyn, New York 11242
(347) 707-1212

*Attorneys for Plaintiffs-Appellants
   McConnell Dorce, Cecilia Jones,
   and Sherlivia Thomas-Murchison*

KEITH H. WOFFORD
GREGG L. WEINER
ALEXANDER B. SIMKIN
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 596-9000

DOUGLAS HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4600

*Attorneys for Plaintiffs-Appellants
   McConnell Dorce and Sherlivia
   Thomas-Murchison*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................1

STANDARD OF REVIEW ...................................................................................3

ARGUMENT .......................................................................................................4

I. THE DISTRICT COURT ERRED IN HOLDING THAT THE TAX INJUNCTION ACT AND DOCTRINE OF COMITY BAR SUBJECT MATTER JURISDICTION.................................................................................4

    A. The TIA and Comity Do Not Bar Appellants' Challenges to the Seizure of the Excess Value in Their Homes and Appellants Do Not Dispute the Validity or Amount of Any Tax Through this Lawsuit ......................................................................................5

    B. The TIA and Comity Do Not Apply to the TPT Program Because the TPT Program Is Not a Tool of Tax Collection ..............................8

        1. TPT Program Seizures Do Not Collect Taxes............................8

        2. The Purpose of the TPT Program Seizures Is Not to Collect Taxes..................................................................................12

    C. The District Court's Holding Is Irreconcilable With *Knick*................14

    D. Comity Cannot Save Defendants Where the TIA Fails ......................14

II. THE DISTRICT COURT MISAPPLIED AND EXPANDED THE *ROOKER-FELDMAN* DOCTRINE TO BAR APPELLANTS FROM ASSERTING CLAIMS THAT WERE NEVER LITIGATED IN STATE COURT.........................................................................................................17

    A. The *Rooker-Feldman* Requirements Are Not Met..............................17

        1. Appellants Are Not State Court Losers ...................................17

        2. The State Court's Foreclosure Judgments Did Not Cause Appellants' Injuries.................................................................21

        3. Appellants Do Not Seek Rejection of a State Court Judgment ..................................................................................24

i

Table of Contents (continued)

Page

B.  The District Court's *Rooker-Feldman* Holding is Contrary to
*Knick*.................................................................................................25

III.  APPELLANTS HAVE STANDING TO SEEK PROSPECTIVE
INJUNCTIVE AND DECLARATORY RELIEF.........................................26

CONCLUSION .................................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderton v. Bannock Cty.*,
2015 WL 428069 (D. Idaho Feb. 2, 2015) .........................................................5

*Association for Accessible Meds. v. James*,
No. 19-183-CV(L), 2020 WL 5507820 (2d Cir. Sept. 14, 2020).......................11

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)............................................................................................28

*Coleman v. D.C.*,
70 F. Supp. 3d 58 (D.D.C. 2014).......................................................5, 16, 24, 26

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990)............................................................................................4

*D.C. Court of Appeals v. Feldman*,
460 U.S. 462 (1983)..........................................................................................18

*Deshawn E. v. Safir,*
156 F.3d 340 (2d Cir. 1998) .............................................................................26

*Direct Mktg. Ass'n v. Brohl*,
575 U.S. 1 (2015)...........................................................................................7, 8

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005)....................................................................................17, 18

*Fair Assessment in Real Estate Ass'n, Inc. v. McNary,*
454 U.S. 100 (1981)....................................................................................15, 16

*Freed v. Thomas*,
No. 18-2312, 2020 WL 5814503 (6th Cir. Sept. 30, 2020).........................*passim*

*Glob. Network Commc'ns, Inc. v. City of New York*,
458 F.3d 150 (2d Cir. 2006) .............................................................................21

*Harper v. Va. Bd. of Elections*,
383 U.S. 663 (1966)..........................................................................................13

*Hibbs v. Winn*,
   542 U.S. 88 (2004)......................................................................................8, 13, 15

*Hoblock v. Albany Cty. Bd. of Elections*,
   422 F.3d 77 (2d Cir. 2005) ...................................................................................18

*IMS Health Inc. v. Sorrell*,
   Nos. 1:07–CV–188(L), 2008 WL 2483299 (D. Vt. June 17, 2008)...................11

*In re Ionosphere Clubs, Inc.*,
   85 F.3d 992 (2d Cir. 1996) ...................................................................................20

*Johnson v. De Grandy*,
   512 U.S. 997 (1994)..............................................................................................17

*Kathrein v. City of Evanston*,
   636 F.3d 906 (7th Cir. 2011) ..........................................................................11, 12

*Knick v. Township of Scott*,
   139 S. Ct. 2162 (2019)...................................................................................2, 14, 25

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
   302 F. Supp. 3d 541 (S.D.N.Y. 2018) .................................................................28

*Kraebel v. New York City Dep't of Hous. Pres. & Dev.*,
   959 F.2d 395 (2d Cir. 1992) .................................................................................15

*Lance v. Dennis*,
   546 U.S. 459 (2006)..............................................................................................17

*Landowners United Advocacy Found. v. Cordova*,
   No. 19-1126, 2020 WL 4382862 (10th Cir. July 31, 2020) ...............................14

*MacNaughton v. Warren Cty.*,
   123 F. App'x 425 (2d Cir. 2005) ...........................................................................4

*McCarthy v. Dim & Bradstreet Corp.*,
   482 F.3d 184 (2d Cir. 2007) .................................................................................28

*Merritt v. Shuttle, Inc.*,
   245 F.3d 182 (2d Cir. 2001) .................................................................................12

*Mielo v. Steak 'n Shake Operations, Inc.,*
  897 F.3d 467 (3d Cir. 2018) ...................................................................27

*Mobile Oil Corp. v. Tully*,
  639 F.2d 912 (2d Cir. 1981) ...................................................................12

*Nelson v. City of New York*,
  352 U.S. 103 (1956)...................................................................9, 20, 21

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ...................................................................19

*Patane v. Nestle Waters N. Am., Inc.*,
  314 F. Supp. 3d 375 (D. Conn. 2018)...................................................................27

*In re Philadelphia Entertainment & Development Partners*,
  879 F.3d 492 (3d Cir. 2018) ...................................................................24

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019) ...................................................................4

*Rafaeli, LLC v. Oakland Cty.*,
  No. 156849, 2020 WL 4037642 (Mich. July 17, 2020) ...................................5, 6, 7

*In Rem No. 53*, No. 8700/2015, 2019 WL 1431423 (Sup. Ct. Kings
  Cty. Mar. 28, 2019)...................................................................7, 20, 5, 28

*Rooker v. Fid. Tr. Co.*,
  263 U.S. 413 (1923)...................................................................18

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ...................................................................19

*Wells v. Malloy*,
  510 F.2d 74 (2d Cir. 1975) ...................................................................8

**Statutes**

42 U.S.C. § 1983...................................................................15

N.Y. Admin. Code § 11-406(c) ...................................................................21

N.Y. Admin. Code § 11-412.1...................................................................22, 23

N.Y. Admin. Code § 11-417(a) ................................................................20

**Other Authorities**

Fed. R. Evid. 201(b)(2) ........................................................................19

Appellant Br., *City of New York v. Gilmer Holding Corp.*,
    No. 2019-04473 (N.Y. App. Div. Jan. 23, 2020) ...............................19

Comms. on Oversight and Investigations and Housing and Buildings
    of the New York City Council, *Oversight—Taking Stock: A Look
    into the Third Party Transfer Program in Modern Day New York*
    (July 22, 2019) https://on.nyc.gov/30hWJm7 ("Government
    Report")...........................................................................................7, 28

# PRELIMINARY STATEMENT[1]

Defendants effectively concede that the Order was wrongly decided, with no Defendant supporting the District Court's TIA holding. Contrary to Defendants' arguments, the clear uncontroverted mistakes in the Order require reversal on each of its three main holdings.

***TIA and Comity***. The District Court dismissed all claims pursuant to the TIA and comity. No Defendant argues this is correct and TPT Defendants do not contest any aspect of Appellants' TIA and comity arguments. Multiple federal courts have expressly held that, when the government forecloses on properties for purported tax collection, the TIA and comity do not prevent challenges to the government's retention of the excess value of the properties (which, by definition, cannot be taxes). This case is even further removed from the TIA and comity because the City gave Appellants' homes away for free to TPT Defendants and did not collect *any* taxes. It is undisputed that TPT Program seizures raise no tax revenue and Defendants' representatives have admitted under oath that such seizures are motivated by non-tax purposes. As effectively conceded by TPT Defendants, the TIA and comity simply do not apply here.

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in Appellants' opening brief ("AOB"). "MDB" refers to Municipal Defendants' brief. "TPTB" refers to TPT Defendants' brief.

***Rooker-Feldman***.  The Order is the first time any court has applied *Rooker-Feldman* against a property owner based on an *in rem* judgment in a proceeding where he or she did not actually participate.  Although the Order states that "[t]he foreclosure proceedings in this case resulted in default judgments *against the plaintiffs*," it is undisputed that Appellants were not parties to any state court proceeding, did not appear or argue in any state court proceeding, and any default judgments were actually issued against property, not plaintiffs.  Under clear Supreme Court precedent, Appellants cannot be "state court losers" in this circumstance.  Appellants also do not seek to challenge the Foreclosure Judgments through this lawsuit.  As multiple federal courts have recognized, a decision that Appellants are entitled to just compensation for what Defendants took from them does not upend the property transfer pursuant to the *in rem* Foreclosure Judgments. Until the Order, no court had held otherwise.  Moreover, the Supreme Court held in *Knick v. Township of Scott* that takings plaintiffs cannot be forced to seek compensation in a state court inverse-condemnation proceeding and have a guaranteed right to proceed immediately to federal court.  139 S. Ct. 2162, 2170 (2019).  That holding applies here as Appellants likewise cannot be forced to seek compensation through what Defendants' describe as a "modified" *in rem* state court foreclosure proceeding.

***Standing***.  The standing issue is, at most, a pleading defect.  The District Court erred by reasoning that Appellants could not seek declaratory or injunctive relief unless they allege that they own additional property that Defendants could seize in the future.  Appellants adequately pled multiple recurring injuries and ongoing harms sufficient to entitle them to prospective relief.

In short, Appellants are victims of a grave injustice.  Defendants wrongly took away their homes based on minimal tax debts using an indefensible process.  The Order wrongfully denies Appellants their day in court.  This Court should allow their claims to be heard.

## STANDARD OF REVIEW

Notwithstanding Defendants' improper attempt to introduce purported evidence, Defendants do not contest that the Court should accept all material facts alleged in the Complaint as true and draw all reasonable inferences in Appellants' favor.  Defendants also do not contest that a district court's determination of its own subject-matter jurisdiction is reviewed *de novo*, except that Municipal Defendants argue that the standard of review for decisions under the doctrine of comity is abuse of discretion.  MDB 59-60.  But the single case Municipal Defendants rely upon does not address a circumstance where comity is raised in connection with the TIA.  *Id.* at 60 (citing *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 719 (2d Cir. 2010)).  In contrast, the Second Circuit, and other circuits, apply

3

*de novo* review when the comity doctrine is invoked alongside the TIA. *See, e.g., MacNaughton v. Warren Cty.*, 123 F. App'x 425, 426 (2d Cir. 2005); *Freed v. Thomas*, No. 18-2312, 2020 WL 5814503, at *2 (6th Cir. Sept. 30, 2020). And where courts do apply abuse-of-discretion review to comity dismissals, that review is "more rigorous than that which is generally employed" and "there is little practical distinction between [such] review for abuse of discretion and review *de novo*." *In re Picard*, 917 F.3d 85, 102 (2d Cir. 2019). In any event, this Court gives no deference to erroneous legal conclusions because a "district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

## ARGUMENT

**I. THE DISTRICT COURT ERRED IN HOLDING THAT THE TAX INJUNCTION ACT AND DOCTRINE OF COMITY BAR SUBJECT MATTER JURISDICTION**

All Defendants concede that the District Court's TIA ruling was incorrect. TPT Defendants do not defend the District Court's TIA and comity ruling at all (and do not adopt Municipal Defendants' arguments). Municipal Defendants effectively concede that the District Court erred in dismissing all claims other than ones for declaratory or injunctive relief pursuant to the TIA. MDB 47-48. With respect to Appellants' declaratory and injunctive-relief claims, Municipal Defendants are mistaken; the TIA does not apply. Municipal Defendants' attempt to salvage the

4

Order with a new argument that comity, but not the TIA, supports dismissal of Appellants' other claims is both inconsistent with the Order and wrong.

**A. The TIA and Comity Do Not Bar Appellants' Challenges to the Seizure of the Excess Value in Their Homes and Appellants Do Not Dispute the Validity or Amount of Any Tax Through this Lawsuit**

Numerous courts have held that the TIA and comity do not bar a homeowner's challenge to the seizure of excess value in his or her home after foreclosure pursuant to a purported tax debt. *See Freed*, 2020 WL 5814503, at * 5 ("[A]ny sale proceeds in excess of [the tax debt] are not taxes or tax proceeds within the meaning of the TIA."); *Coleman v. D.C.,* 70 F. Supp. 3d 58, 68–69 (D.D.C. 2014) (plaintiff's challenge to the "taking of the surplus equity in his home, above and beyond the amounts the [government] has defined as the 'tax,' is not barred" by the TIA or comity); *Anderton v. Bannock Cty.*, No. 4:14–cv–00114, 2015 WL 428069, at *5 (D. Idaho Feb. 2, 2015) (same); *see also Rafaeli, LLC v. Oakland Cty.*, No. 156849, 2020 WL 4037642, at *23 (Mich. July 17, 2020) ("The purpose of taxation is to assess and collect taxes *owed*, not appropriate property *in excess of what is owed*.") (emphasis in original). Defendants do not identify a single court decision to the contrary. Defendants also do not dispute that they knowingly and systematically seized properties that were not statutorily distressed, meaning that more than 85% of the property value constitutes excess value by the City's own calculations.

5

Municipal Defendants attempt to evade this unbroken line of cases by arguing that the TPT Program is distinguishable because the City gives away the seized properties for free, rather than selling them. In other words, Municipal Defendants argue that this Court should afford the TPT Program *more* deference as a tax collection program precisely because it fails to generate any tax revenue. MDB 55-56 & n.26. Municipal Defendants unsurprisingly point to no court that has adopted such a specious argument. Municipal Defendants' corollary argument—that their approach of giving away valuable property for free renders it harder to calculate the excess value—is also not a reason to immunize it from review as a tax collection program. *Id.*

Municipal Defendants also observe that Appellants do not challenge "only" the seizure of the excess value in their homes. MDB 54-55. This is a red herring. Defendants do not dispute that Appellants do, in fact, challenge Defendants' failure to provide just compensation for the seizure of the excess value in their homes. *See* A-36 ¶ 69 ("The City Defendants engaged in the act of taking properties . . . without any effort to compensate the property owners for the *value taken in excess* of the value of the tax liens.") (emphasis added). Since Municipal Defendants do not actually collect any taxes through the TPT Program seizures, whether they are permitted any setoff for the just compensation they owe Appellants is a damages question that need not be resolved at this stage.

Finally, it cannot be contested that Appellants do not dispute the amount or validity of any tax *through this lawsuit*. Municipal Defendants' observation that, as a factual matter, certain Appellants may disagree with the City's tax calculations, MDB 54-55, has no bearing on whether the District Court has jurisdiction to hear this lawsuit. Of course, Appellants have good reason to question the claimed taxes (through whatever methods may be available to them), since Municipal Defendants admit to having overcharged Appellant Dorce, MDB 36 n.20, and other courts and regulators have found similar mistakes. *See, e.g.*, Government Report[2] at 11 (City foreclosed on $6 million property that "owed $0 in arrears"); *id.* at 16 (City "accepted approximately $72,000" from owner "after a foreclosure judgment was issued against the property"); *In Rem No. 53*, Index No. 8700/2015, 2019 WL 1431423, *18-19 (Sup. Ct. Kings Cty. Mar. 28, 2019) (City asserted emergency repair liens for the wrong property). Likewise, Appellants' argument that water and sewer charges do not qualify as "taxes" for the purpose of the TIA and comity is not a challenge to the validity or amount of any tax. *See Freed*, 2020 WL 5814503, at *5 (contesting whether seizure of excess value of foreclosed property is a "tax" not barred by TIA).[3]

---

[2] The Government Report is available at https://on.nyc.gov/30hWJm7. *See also* AOB at 9 n.7 (seeking judicial notice of Government Report).

[3] Municipal Defendants also cite to *Direct Marketing Association v. Brohl*, 575 U.S. 1 (2015), to support the argument that tax collection begins with giving notice. MDB 52. First, to the extent *Brohl* is relevant, it supports Appellants as it holds that the

## B. The TIA and Comity Do Not Apply to the TPT Program Because the TPT Program Is Not a Tool of Tax Collection

The TIA and comity also do not apply to immunize TPT Program seizures because (1) TPT Program seizures do not collect any taxes, and (2) the purpose of the seizures is not to collect any taxes. Either reason is independently sufficient to reverse the Order.

### 1. TPT Program Seizures Do Not Collect Taxes

Defendants do not dispute that the TIA and comity only apply to programs that directly generate or assess tax revenue. *See Hibbs v. Winn*, 542 U.S. 88, 104-05 (2004) (TIA prohibits claims only if relief sought would disrupt "the collection of revenue" by "operat[ing] to reduce the flow of state tax revenue"). Defendants also effectively concede that the City does not directly generate any tax revenue from seizing and transferring properties pursuant to the TPT Program. *See* MDB 6-8. Municipal Defendants' only argument about tax revenue generation comes in a footnote where they argue that the TPT Program generates tax revenue in what they describe as the "most direct of ways": by coercing other homeowners into paying taxes. MDB 65 n.28. This is not the law and Municipal Defendants do not cite a single case in support. *See, e.g., Wells v. Malloy*, 510 F.2d 74, 77 (2d Cir. 1975)

---

TIA should be narrowly construed and that the TIA did not apply to the case before it. *Id.* at 10. Second, Appellants do not seek to enjoin the provision of any tax notices, but instead take issue with the City's failure to provide notice.

8

(TIA bars claims that challenge procedures "that would produce money or other property directly, *rather than indirectly through a more general use of coercive power*") (emphasis added); AOB 26-27 (collecting cases). Municipal Defendants do not address Appellants' argument in their opening brief that this logic would immunize any conduct (or misconduct) by Municipal Defendants so long as it indirectly incentivized some people to pay their taxes (*e.g.,* the "go-to-jail" program). AOB 29.

Municipal Defendants' brief contains a lengthy allegory about the purported history of the City's use of *in rem* tax foreclosures for tax purposes. This story has no support in the record and is irrelevant because the City *is not following the existing in rem tax foreclosure rules for TPT Program seizures* (such as the *in rem* foreclosure proceeding at issue in *Nelson v. City of New York*, 352 U.S. 103, 108-09 (1956)). Indeed, before the District Court, the City referred to TPT Program seizures as "modified" *in rem* proceedings, and they now present the procedure as "streamlined." *See, e.g.*, A-167 ("the City established the ***modified*** *in rem* program") (emphasis added); *see also* A-64 n.1 (contrasting "traditional *in rem* actions" with "modified *in rem* (or third party transfer)" actions); MDB 7 (the modifications are designed "to enable streamlined transfer of certain foreclosed residential properties"). These "modifications" make TPT Program seizures unconstitutional as applied.

9

Notably, every TIA and comity case that Municipal Defendants cite concerns tax procedures that directly assess or produce tax revenue and every case concerning foreclosures addresses procedures whereby the government actually sells the foreclosed-upon property. *See, e.g.*, MDB 53 (citing *Andresakis v. Connecticut*, 122 F.3d 1055 (Table), 1997 WL 383456, at \*1 (2d Cir. 1997) (TIA barred plaintiff's claims seeking to "compel the City to abide by the stipulation of dismissal and withdraw the foreclosure action")). While Municipal Defendants claim that the TPT Program is "closely analogous" to the *in rem* foreclosure procedures in several of these cases, MDB 50-51, Municipal Defendants ask the Court to disregard the key distinction, which is that the City does not receive any tax revenue.

Municipal Defendants also argue that the TPT Program should be immunized by the TIA and comity because they assert that it is similar to a hypothetical two-step program that the City *could have* created, whereby the City first takes title to the foreclosed properties and then transfers those titles for no compensation to third parties, which Municipal Defendants argue would be protected by the TIA and comity. MDB 64-65. This argument suffers from three fatal defects. First, this hypothetical two-step program would *not* be protected by the TIA and comity because, even if the program arguably raises revenue, the program would not raise *tax* revenue. Among other reasons, the properties seized would not go into any general revenue fund and would not be put to use by any government entity. *See,*

10

*e.g.*, *IMS Health Inc. v. Sorrell*, No. 1:07–CV–188(L), 2008 WL 2483299, at *3 (D. Vt. June 17, 2008) (charge assessed to pharmaceutical manufacturers was not a "tax" under TIA because it was administered and collected by regulatory agency (rather than general taxing authority), revenue was deposited into a special fund, and charge was imposed on a narrow class).[4]  Second, even if this non-existent two-step program were construed to raise tax revenue, the TIA and comity would still not apply to a taking of excess equity.  Third, even if the TIA and comity applied to this hypothetical two-step program because of the City taking title, all that does is highlight that the actual one-step TPT Program is different precisely because the City does not take title.[5]

---

[4] None of Municipal Defendants' authorities addresses a program—like their hypothetical—that transfers all proceeds or property to fund private third parties. MDB 65 (citing *Association for Accessible Meds. v. James*, No. 19-183-CV(L), 2020 WL 5507820, at *5 (2d Cir. Sept. 14, 2020) (TIA prohibited challenge to tax on opioid manufacturers that allocated proceeds to various state agencies and state-run prescription monitoring program)).  The *James* court reasoned that the proceeds at issue would be "functionally and legally maintained by the State's taxing authorities, a fact that strongly favors New York's argument that the payment is a tax."  *Id.* at *7.

[5] Courts have rejected attempts—like the one suggested by Municipal Defendants— to convert a charge into a tax under the TIA via accounting gimmicks.  *Kathrein v. City of Evanston*, 636 F.3d 906, 911 (7th Cir. 2011) ("[A] government cannot turn a user fee into a tax merely by directing the revenue to a general fund.").

### 2. The Purpose of the TPT Program Seizures Is Not to Collect Taxes

Defendants do not contest the principle that the TIA and comity do not preclude challenges to nominal tax programs if the primary *purpose* of such program is *not* to generate tax revenue (even if there is actually some tax revenue generated). *See Mobile Oil Corp. v. Tully*, 639 F.2d 912, 918 (2d Cir. 1981) (TIA did not preclude challenges to provision **within New York Tax Laws** because "the purpose of the [provision] was not to raise taxes").

Instead, Municipal Defendants argue that the Court should effectively decide credibility issues against Appellants on a motion to dismiss and without discovery or cross-examination. There is ample evidence—including sworn statements of Defendants' own representatives—that the TPT Program generally, and TPT Program seizures in particular, are motivated by non-tax purposes. *See* AOB 28 n.17, 33-34 (summarizing evidence of nontax purpose of TPT Program seizures). Municipal Defendants' citation to self-serving statements from the HPD Commissioner that are not in the record[6] creates, at best, a fact issue that cannot be resolved against Appellants without discovery. *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 186 (2d Cir. 2001). The City's self-characterization of the TPT Program's purpose is not dispositive under the TIA. *See Kathrein*, 636 F.3d at 910

---

[6] MDB 6-7 & nn.6, 8, 10.

(government's characterization of purported tax is not determinative of whether TIA applies).

Municipal Defendants also argue that "[Appellants] concede that the TPT Program was established in part to 'improve tax collection,' and that it is a 'means of tax collection.'" MDB 51 (citations omitted). This is false. *See, e.g.,* AOB 25-35 (devoting ten pages to argument that the TPT Program is *not* a tool of tax collection). The language Municipal Defendants selectively quote comes from (i) the HPD Commissioner (*i.e.,* Defendants' position) and (ii) a sentence in Appellants' opening brief that is plainly describing "Municipal Defendants' argument." A-21; AOB 34.

Municipal Defendants' response to decades of Supreme Court, Second Circuit, and other court precedent routinely deciding actions challenging state programs that are nominally related to taxes, such as the poll tax at issue in *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966), AOB 31, is to point out that these cases do not explicitly address the TIA. MDB 67. But that is precisely the point. That nobody even *argued* the TIA prevents these myriad constitutional and other challenges to scores of tax-related programs in circumstances that do not directly challenge the collection of tax revenue supports Appellants, not Defendants. *See Hibbs*, 542 U.S. at 111 n.12 (lack of TIA argument in various constitutional

challenges to state tax schemes supports conclusion that TIA does not apply to such claims).

### C.     The District Court's Holding Is Irreconcilable With *Knick*

Municipal Defendants argue that *Knick* held that takings plaintiffs may "generally," but not always, "proceed directly to federal court," and that this case should be an exception to the general rule.  MDB 69.  But the exception Defendants propose would swallow the rule by allowing local governments to require takings plaintiffs to proceed exclusively in state court if the government unilaterally classifies the taking as "tax-related."  That is irreconcilable with the logic of *Knick* and would gut its core holding.  139 S. Ct. at 2170.[7]

### D.     Comity Cannot Save Defendants Where the TIA Fails

Unable to defend the District Court's actual Order, Municipal Defendants argue that dismissal was warranted under the doctrine of comity.  But Municipal Defendants' comity arguments fail for all the same reasons as the District Court's TIA holding set forth above, and the additional reasons herein.

---

[7] Municipal Defendants cite to an unpublished, out-of-circuit authority that expressly states that the decision "is not binding precedent" and should be cabined to its particular facts.  *Landowners United Advocacy Found. v. Cordova*, No. 19-1126, 2020 WL 4382862 (10th Cir. July 31, 2020).  Unlike here, the plaintiff in *Landowners* sought to "prevent Colorado from assessing and collecting income taxes."  *Id.* at *2.

At the outset, the doctrine of comity does not apply to all disputes tangentially related to taxes—instead, the doctrine precludes federal jurisdiction only where a plaintiff seeks "to arrest or countermand state tax collection." *Hibbs*, 542 U.S. at 107 n.9; *see also Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 401 (2d Cir. 1992) (plaintiff could challenge program in federal court because, "[w]hile the [] program does involve property tax payments, it . . . has no impact on tax assessments or on the property tax scheme in general"); *Freed*, 2020 WL 5814503, at * 6.

In contrast, every comity case that Municipal Defendants cite concerns challenges to laws that collect or impact the calculation of taxes. *See* MDB 58-63 (citing, *e.g.*, *Bernard v. Village of Spring Valley*, 30 F.3d 294, 297-98 (2d Cir. 1994) (challenging method for assessing taxes barred by comity); *Piedmont Gardens, LLC v. LeBlanc*, 733 F. App'x 576, 578 (2d Cir. 2018) (summary order) (fee paid to marshals for assistance in tax-collection process was protected from challenge in federal court under doctrine of comity)). One of the principal cases on which Municipal Defendants rely made this distinction explicit. In *Fair Assessment in Real Estate Association, Inc. v. McNary*, the Supreme Court expressly stated that it was "not decid[ing] in th[at] case whether the comity spoken of would also bar a claim under § 1983 which *requires no scrutiny whatever of state tax assessment practices*, such as a facial attack *on tax laws* colorably claimed to be discriminatory as to race."

454 U.S. 100, 120 n. 4 (1981) (emphasis added). That is precisely the type of claim Appellants bring here, except that the TPT Program law is not even a "tax law."

Pivoting away from cases where plaintiffs dispute their underlying tax liabilities, Municipal Defendants next argue that comity can apply to protect "monetary penalties designed to encourage payment of taxes." MDB 62 (citing *Abuzaid v. Mottox*, 726 F.3d 311, 315-16 (2d Cir. 2002)). But the seizure of the excess value in Appellants' homes clearly is not designed to encourage payment of taxes—if it were, the City would provide adequate notice of the *in rem* Foreclosure Proceedings (and they do not). *See* AOB 9. Further, seizing excess value makes no sense as an incentive to pay taxes because the size of the "penalty" is inversely proportional to the amount of delinquent taxes. For example, a homeowner with $1 in tax debt on a $100,000 property would be "penalized" $99,999 for his transgression, but if that same homeowner instead had $99,999 in tax debt, the "penalty" would be $1. Further, to the extent seizing the excess value in Appellants' homes is a "penalty," it is an "unusual sanction" that receives no protection under principles of comity. *See Coleman*, 70 F. Supp. 3d at 68 (quoting *Wells*, 510 F.2d at 77).

Finally, Municipal Defendants argue that a particular exception to comity does not apply. MDB 63 (citing *Joseph v. Hyman*, 659 F.3d 215, 219 (2d Cir. 2011)).

16

Appellants never invoked this exception, nor need they, because comity does not apply in the first place.

**II. THE DISTRICT COURT MISAPPLIED AND EXPANDED THE *ROOKER-FELDMAN* DOCTRINE TO BAR APPELLANTS FROM ASSERTING CLAIMS THAT WERE NEVER LITIGATED IN STATE COURT**

**A. The *Rooker-Feldman* Requirements Are Not Met**

**1. Appellants Are Not State Court Losers**

The Supreme Court has repeatedly held that *Rooker-Feldman* only applies to *parties* to an earlier state suit. *See Lance v. Dennis*, 546 U.S. 459, 464-66 (2006); *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994). The Order incorrectly states that "[t]he foreclosure proceedings in this case resulted in default judgments *against the plaintiffs*," SPA-13 n.7 (emphasis added). In fact, no judgment was entered against any Appellant. A-77; A-86. Defendants concede that Appellants were not parties to—and indeed did not participate in—any state court proceeding. *See* MDB 1 ("Plaintiffs did not participate in the state court *in rem* proceedings"); TPTB 3 ("It is important to note that neither Dorce nor [Jones's HDFC] ever challenged the [Foreclosure Judgment] in the New York State Court.").

Defendants seek to escape this Supreme Court precedent by conflating two concepts. First, Defendants cite cases holding that a default judgment against a person is sufficient to trigger *Rooker-Feldman*. MDB 24; TPTB 11. Second,

17

Defendants cite two unpublished decisions holding that judgments against plaintiffs' properties were sufficient to trigger *Rooker-Feldman where the property owners actually participated in the proceedings*. MDB 23 (citing *Riley v. Comm'r of Fin. of City of New York*, 618 F. App'x 16 (2d Cir. 2015) and *Wik v. City of Rochester*, 632 F. App'x 661 (2d Cir. 2015)).[8] This does not mean that a default judgment against property with no participation by (and, in this case, no notice to) the property owners triggers *Rooker-Feldman*, which is an issue of first impression in this Circuit.

The fact that no case has previously applied *Rooker-Feldman* in these circumstances is dispositive because Supreme Court precedent prohibits expanding the doctrine. *See Exxon Mobil*, 544 U.S. at 1521 (*Rooker-Feldman* is "confined to cases of the kind from which the doctrine acquired its name"); *see also Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 414 (1923) ("The parties to the [federal action] are the same as in the litigation in the state court[.]"); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482, (1983) (plaintiffs who lost petition in state court could not seek review of state court's decision in federal court); *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 84-85 (2d Cir. 2005) ("the Supreme Court pared back the *Rooker-Feldman* doctrine to its core").

---

[8] These *pro se* cases are also in tension with other federal cases exercising jurisdiction over takings claims following state court *in rem* foreclosure proceedings. *See, e.g.*, *Freed,* 2020 WL 5814503, at *5.

Municipal Defendants suggest that, rather than bring this case, the proper procedure would have been for Appellants to seek to re-open the state court judgments. *See* MDB 24 n.18. Municipal Defendants are less than forthcoming about the fact that other property owners tried precisely that approach and Municipal Defendants argued (and are now arguing in state appellate court) that the law does not allow property owners to re-open the state court judgments after the 4-month redemption period. *See* Appellant Br., *City of New York v. Gilmer Holding Corp.*, No. 2019-04473 (N.Y. App. Div. Jan. 23, 2020) (Addendum 9-10) ("[C]ritically, once this four-month redemption period expires, no action to set aside such deed may be maintained. . . . The City retains sole discretion to release its interest in the property until it is transferred.").[9] Like the property owners the City is stonewalling in state court, Appellants did not know about the state court judgments until after the redemption period. *See* A-39 ¶ 85; A-41 ¶ 102; A-44 ¶ 120.

Defendants should not be permitted to take inconsistent positions in multiple court proceedings. *See, e.g., New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (judicial estoppel may apply to "prohibit[] parties from deliberately changing positions according to the exigencies of the moment"). If the City prevails here and

---

[9] The Court can take judicial notice of the City's state court brief as a public record, the contents of which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2); *see also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of complaint in related action filed in state court because it was a public record).

in its state court appeal, Appellants will be improperly deprived of their day in court.[10]

Indeed, Defendants' entire argument is Kafka-esque. Municipal Defendants held a *quasi*-Potemkin trial that Defendants concocted to prevent Appellants from learning about until it was too late. *See* A-23-24 ¶¶ 31-32; A-36 ¶¶ 68, 70; A-37 ¶ 71. Municipal Defendants now argue that the only place for Appellants to object to the secret trial is in the secret trial itself, and the only time for Appellants to raise this argument is before they find out. *See* MDB 24 n.18. Justice Partnow accurately described the City's conduct here as "unconscionable and shocking to the conscience of the court." *In Rem No. 53*, 2019 WL 1431423, at *9, *23.

Finally, Municipal Defendants posit that "the record"[11] shows that "the City complied with the statutory notification requirements," and claim that these provisions "were upheld as constitutional" in *Nelson*. MDB 26; *see also* TPTB 12. This is both incorrect and irrelevant. First, the procedures of the City's self-

---

[10] Defendants' argument should also be rejected under principles of equitable estoppel because "notions of fair dealing and good conscience" should prohibit Defendants' misleading and unjust conduct in this case. *See In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996).

[11] Since Defendants successfully moved to stay all discovery, Municipal Defendants appear to be referring to their self-serving and untested affidavit as "the record." *See* A-511.

described "modified" *in rem* procedures differ materially from those in *Nelson*.[12]

Second, the plaintiff in *Nelson* had received actual notice of the foreclosure, whereas Appellants did not receive actual notice. *See* A-36-37 ¶¶ 68-71; A-39 ¶ 85; A-41 ¶ 102; A-44 ¶ 120.[13] And regardless of the adequacy of the TPT Program's written procedures, there remains a factual question of whether the City complied with those procedures, which the District Court did not (and could not) resolve without discovery on a motion to dismiss. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).

### 2. The State Court's Foreclosure Judgments Did Not Cause Appellants' Injuries

Once again, no Defendant defends the Order's holding on this front. Defendants agree that *Rooker-Feldman* only applies where the state court judgment "*caused*" Appellants' injuries. *See* MDB 28; AOB 42-43. Defendants do not dispute that the Order mistakenly evaluated whether Appellants' injuries "*arise from*" or

---

[12] Among other differences, unlike the TPT Program, the notice statute upheld in *Nelson* required that notice be mailed to the last known address of the owner of the property sought to be foreclosed. *Compare Nelson*, 352 U.S. at 105 *with* Admin. Code §§ 11-406(c), 11-417(a). Further, unlike in *Nelson*, the TPT Program targets a wider range of properties than just those with tax liens. *See* A-27 ¶ 40, A-41 ¶ 98; A-43 ¶ 116.

[13] In fact, Municipal Defendants concealed the fact that properties were at risk of foreclosure. For example, Appellant Dorce did not learn that his property had been included in an *in rem* Foreclosure Proceeding until nearly one year after a Foreclosure Judgment at least in part because the City (as it now admits) continued to collect taxes from him as if he still owned the property. A-40 ¶ 95.

"*derive from*" the state court judgment.  TPT Defendants argue, without citation to any authority, that "[t]his is a distinction without a difference," TPTB 11, ignoring multiple cases cited by Appellants' holding precisely the opposite.  *See* AOB 42-43. Defendants also do not dispute that multiple different injuries can give rise to the same form of relief (*e.g.,* money damages equal to the value of Appellants' property), that *Rooker-Feldman* only applies where the state court judgment caused the particular injury at issue, and that the state court judgment cannot have caused injuries that precede the judgment (*e.g.*, the targeting of minority neighborhoods) or that do not necessarily flow from the judgment (*e.g.*, the City's decision to transfer title).  *See* MDB at 28 (*Rooker-Feldman* does not apply where injuries "occurred prior to the state court judgment or are independent of it").

Municipal Defendants argue that the state court judgments "functionally stripped plaintiffs of their property rights" and that Appellants "ceased to possess" "property rights . . . after the state court foreclosure judgment."  MDB 35, 37.  This is simply wrong, including because the City's own procedures contain a 4-month post-judgment redemption period.  *See* Admin. Code § 11-412.1(d).  The state court judgments, at most, gave the City a conditional option to take title to Appellants' property, subject to certain restrictions and limitations, but if the City took no further action following the state court judgment, Appellants would still own their properties today.  *See id.* § 11-412.1(c).  The clearest example of this is Appellant Jones, whose

property was included in the Foreclosure Judgment in *In Rem No. 51* entered in October 2011, but because the City did not enter a deed transferring within eight months of judgment, Ms. Jones retained title in the property. A-77. Ms. Jones was not deprived of her property rights until the City deeded the property in September 2018 subsequent to a different November 2017 Foreclosure Judgment in *In Rem No. 53*. A-86.

Municipal Defendants also offer a "counterfactual" that they argue "demonstrates the flaw in [Appellants'] argument." MDB 31. Defendants argue that their failure to provide notice cannot have caused Appellants any injuries because, had the state court "denied in rem foreclosure rather than granting it, the properties would not have been transferred and plaintiffs would not have suffered the multi-million dollar injuries they allege." *Id*. But Municipal Defendants' "counterfactual" "demonstrates" nothing—Appellants injuries are the product of numerous events in a causal chain, but that does not mean that a suit challenging the end result constitutes a challenge to all events in the causal chain. For example, had Appellants purchased homes in Albany (or Staten Island) instead of Brooklyn, Appellants also would not have suffered multi-million dollar injuries. This does not exempt Defendants from having to pay just compensation for their takings or otherwise immunize Defendants' misconduct.

### 3. Appellants Do Not Seek Rejection of a State Court Judgment

The Foreclosure Judgments provided a path for the City to seize Appellants' properties. But, like in *Coleman*, Appellants claims "for the taking of [the] surplus equity in [their] propert[ies] survive[] *Rooker-Feldman*" because Appellants "do[] not challenge the Foreclosure Judgment, but the [government's] allegedly unconstitutional enforcement of the statute providing for a taking of [their] surplus equity." *See* 70 F. Supp. 3d at 74.

As Appellants argued in their opening brief—and as Defendants do not dispute—the fact that the same or related questions may arise in both proceedings does not mean that Appellants seek a federal court ruling that rejects that state court judgment. AOB 47-48. Even if Appellants' claim for money damages involves consideration of the same or related questions that were considered in the *in rem* Foreclosure Proceedings, *Rooker-Feldman* does not apply because Appellants are not seeking a reversal of the state court judgment. *See In re Philadelphia Entertainment & Development Partners*, 879 F.3d 492, 500-01 (3d Cir. 2018).[14]

Indeed, in connection with the same round of seizures that resulted in Dorce's and Jones's properties being taken, Justice Partnow concluded that, had he not

---

[14] Contrary to Municipal Defendants' claim, MDB 39-40, plaintiff's argument in *Philadelphia Entertainment* closely mirrors Appellants' position here—the plaintiff did not challenge the revocation of its license (ratified by the state court), but argued in federal court that the state had to provide compensation for taking the license. 879 F.3d at 500-01. Appellants advance the same argument here. AOB 21-24.

reversed the City's seizures for the property owners who sought such relief, the transfer of those properties under the TPT Program "would constitute an unlawful taking of private property without just compensation." *In Rem No. 53*, 2019 WL 1431423, at \*13, \*29. That is what Appellants argue here. *See, e.g.*, A-17 ¶ 14. The state court has thus itself acknowledged that a property owner has a remedy to seek just compensation for the taking, as Appellants do here.

### B. The District Court's *Rooker-Feldman* Holding is Contrary to *Knick*

Municipal Defendants argue that Appellants construe *Knick* too broadly and that *Knick* stands for the narrow proposition that "takings plaintiffs" cannot be required to "first pursue[] a[] state inverse-condemnation remedy." MDB 40-41. Even this narrow reading should apply here as Municipal Defendants seek to require Appellants to first participate in a "modified" *in rem* state court proceeding the City set up. Municipal Defendants offer no explanation for why the takings plaintiffs in *Knick* cannot be forced into an inverse-condemnation proceeding but taking plaintiffs here can be forced into a "modified" *in rem* proceeding.

Indeed, Municipal Defendants concede that, under their interpretation of *Knick*, takings plaintiffs can functionally be barred from ever challenging *in rem* foreclosures (however "modified") because, by definition, the taking cannot occur until after the foreclosure judgment. MDB 42. This is the exact opposite of what *Knick* holds, *see* 139 S. Ct. at 2167-68, and is inconsistent with other federal court

25

decisions addressing the merits of takings arguments after an *in rem* judgment. *See, e.g., Freed*, 2020 WL 5814503, at * 6; *Coleman*, 70 F. Supp. 3d at 74.[15]

## III. APPELLANTS HAVE STANDING TO SEEK PROSPECTIVE INJUNCTIVE AND DECLARATORY RELIEF

The standing issue is, at most, a pleading defect that can easily be cured on remand. In any event, Defendants do not contest that Appellants have standing to seek injunctive and declaratory relief if they allege either recurring injuries or ongoing harms. AOB 52-57. But, according to Defendants, the *only* factual allegation sufficient to establish recurring injuries or ongoing harms is an allegation that "plaintiffs own other tax-delinquent properties imminently at risk of an in rem foreclosure." MDB 44. Defendants cite no supporting authority for this restrictive standard.

The *Deshawn E. v. Safir* case cited in Appellants' opening brief held that plaintiffs had standing to challenge police interrogation tactics that were "officially endorsed policies" with a likelihood of recurring injury because the tactics were "authorized by a written memorandum of understanding between the [City] and the Police Commissioner." 156 F.3d 340, 345 (2d Cir. 1998). There was no requirement that plaintiffs allege they were "imminently at risk" of a police interrogation. TPT

---

[15] TPT Defendants argue that Appellants' "reading of *Knick* would be the death knell for *Rooker-Feldman*." TPTB 14. Not so. *Rooker-Feldman* continues to apply precisely as before, *i.e.*, to takings plaintiffs (or other plaintiffs) who elect to bring claims in state court and lose.

Defendants do not address this case and Municipal Defendants' only response is a generic statement that the facts are "different."  MDB 45.

Whether Appellants currently own property in neighborhoods Defendants are targeting for TPT seizures is irrelevant.  They live in these neighborhoods.  A-33 ¶¶ 56-58; A-38 ¶ 78.  Defendants' misconduct impairs their *prospective* property rights.  *See Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 480 n.15 (3d Cir. 2018) (standing exists where plaintiffs were "deterred from returning to [Defendant's] facilities" as "this allegedly unlawful deterrence is something that Plaintiffs are currently suffering").  Moreover, Defendants' argument that Appellants will probably not be stung by the TPT Program twice rings hollow given the undisputed fact that Appellant Jones has already had her property foreclosed upon under the TPT Program ***on two separate occasions***.  A-77; A-86.  Moreover, Defendants argue (in this case) that Appellants are free to re-open the *in rem* Foreclosure Proceedings and seek to reclaim their homes.  MDB 24 n.18.  The prospect that Appellants could move to re-open the *in rem* Foreclosure Proceedings and potentially reclaim title in their homes, only to then lose their homes again in subsequent mass foreclosure proceedings, qualifies as a continuing harm.  *See Patane v. Nestle Waters N. Am., Inc.*, 314 F. Supp. 3d 375, 381 (D. Conn. 2018) (plaintiff had standing where prior state court decision "has not foreclosed a

27

defendant from continuing to engage in the conduct that forms the basis for a later federal action").

Likewise, an injury that is accompanied by "continuing, present adverse effects," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quotation omitted), is sufficient to establish standing. Appellant Thomas-Murchison used to live in an apartment that she owned. A-42 ¶ 113. She is now homeless and left without the financial means to purchase another home. AOB 56.[16] She is clearly suffering "continuing, present adverse effects." *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 558 (S.D.N.Y. 2018).[17]

---

[16] TPT Defendants devote three pages of their brief to disputing—without citation to the record and simply "[u]pon information and belief"—whether Ms. Thomas-Murchison owned property subject to a TPT Program foreclosure. TPTB 3-5. Appellants sufficiently allege Ms. Thomas-Murchison's prior ownership, and a motion to dismiss is not the appropriate stage to resolve such disputes. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

[17] Municipal Defendants argue in passing that Appellants failed to adequately plead their equal protection claim. MDB 45-46. The Order does not address this issue, and Appellants have more than adequately pled an equal protection violation— namely that Defendants are taking valuable properties from persons of color in order to transfer such properties for free to private organizations in a scheme for "redistribution of property ownership and wealth away from individuals that are of African-American and/or Hispanic American descent." A-37 ¶ 75; *see also* A-30-31 ¶ 49 (Mayor de Blasio: "We will seize their buildings"). Last year, Justice Partnow observed that the City's conduct "raises equal protection concerns" after concluding that "[t]he City has particularly targeted properties that are owned by minorities." *In Rem No. 53*, 2019 WL 1431423, at *6, *8; *see also* Government Report at 14 (concluding that 11 neighborhoods accounted for more than half of all properties selected for one round of foreclosures).

## <u>CONCLUSION</u>

The District Court erred in dismissing Appellants' Complaint for lack of subject matter jurisdiction. The Order should be reversed and the case remanded to the District Court for further proceedings.

Dated:      October 15, 2020
            New York, New York

Respectfully submitted,

**VALLI KANE & VAGNINI LLP**    **ROPES & GRAY LLP**

By: /s/ *Matthew L. Berman*
Matthew L. Berman
Robert J. Valli, Jr.
Yolande I. Nicholson, Esq. *Co-Counsel*
600 Old Country Road
Garden City, New York 11530
Tel: (516) 203-7180
Fax: (516) 706-0248

*Attorneys for Plaintiffs-Appellants*

By: /s/ *Keith H. Wofford*
Keith H. Wofford
Gregg L. Weiner
Alexander B. Simkin
1211 Avenue of the Americas
New York, New York 10036
Tel: (212) 596-9000
Fax: (212) 596-9090

Douglas Hallward-Driemeier
2099 Pennsylvania Avenue
NW Washington, DC 20006
Tel:  (202) 508-4600

*Attorneys for Plaintiffs-Appellants*
*McConnell Dorce and Sherlivia*
*Thomas-Murchison*

30

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,982 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

Dated:      October 15, 2020      By: */s/ Keith H. Wofford*
Keith H. Wofford
1211 Avenue of the Americas
New York, New York 10036
Tel: (212) 596-9000
Fax: (212) 596-9090

## CERTIFICATE OF SERVICE

I, Keith H. Wofford, hereby certify that on October 15, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court for the Second Circuit Court of Appeals by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Keith H. Wofford*
Keith H. Wofford, Esq.

# ADDENDUM

# ADD-1

Kings County Clerk's Index No. 8700/2015

# New York Supreme Court
# Appellate Division: Second Department

THE CITY OF NEW YORK
IN REM TAX FORECLOSURE ACTION NO. 53
BOROUGH OF BROOKLYN SECTIONS 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16 and 21

TAX CLASSES 1 and 2.

Docket No.
2019-04473

*Plaintiff-Appellant,*

*against*

GILMER HOLDING CORP., 1055 BERGEN STREET HDFC, SHURMA 1 CORP., MARCIA P. LEWS, 19 KINGSLAND AVENUE HDFC and 463 CLASSON AVENUE HDFC,

*Defendants-Respondents,*

*and*

NEIGHBORHOOD RESTORE HOUSING DEVELOPMENT FUND CORPORATION (HDFC)

*Nonparty-Appellant.*

## BRIEF FOR APPELLANT CITY OF NEW YORK

RICHARD DEARING
DEBORAH A. BRENNER
MELANIE T. WEST
  *of Counsel*

January 23, 2020

JAMES E. JOHNSON
*Corporation Counsel
of the City of New York*
100 Church Street
New York, New York 10007
212-356-0842 or -0826
mwest@law.nyc.gov

# ADD-2

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..........................................................iii

PRELIMINARY STATEMENT................................................... 1

QUESTIONS PRESENTED ....................................................... 3

STATEMENT OF THE CASE .................................................... 4

    A.  The City's third party transfer program and its twin goals of remedying tax delinquencies and preserving the City's affordable housing stock............ 4

    B.  The statutory procedure for notifying owners and interested parties of an in rem foreclosure action ....... 7

    C.  This in rem foreclosure TPT action and the City's undisputed compliance with statutory notice provisions held to pass constitutional muster ........... 10

        1. 315 Harman Street .............................................. 12

        2. 463 Classon HDFC............................................... 14

        3. 19 Kingsland HDFC.............................................. 15

        4. 972 Rutland Road................................................. 17

        5. 25 MacDonough Street.......................................... 19

        6. 1055 Bergen HDFC............................................... 21

    D.  Supreme Court's order vacating the judgment of foreclosure and setting aside the property transfers. 22

# ADD-3

## TABLE OF CONTENTS (cont'd)

**Page**

ARGUMENT ............................................................................ 25

POINT I .................................................................................. 25

THE PROPERTY OWNERS' MOTIONS TO VACATE
THE FORECLOSURE WERE TIME-BARRED .............. 25

POINT II ................................................................................. 32

THE OWNERS HAD NO MERITORIOUS DEFENSE
TO THE FORECLOSURES ........................................... 32

A. Supreme Court misread the statute in concluding
that only distressed properties are subject to in rem
foreclosure ............................................................... 32

B. The owners' other arguments against the
foreclosures are also unavailing ............................... 41

CONCLUSION ...................................................................... 48

PRINTING SPECIFICATIONS STATEMENT ....................... 49

# ADD-4

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alben Affiliates v. Astoria Term*,
34 Misc. 2d 246 (Sup. Ct. Queens Cty. 1962) ............................ 40

*Alonzo M. v. N.Y.C. Dept. of Probation*,
72 N.Y.2d 662 (1988) ..................................................... 36

*Cox v. Marshall*,
161 A.D.3d 1140 (2d Dep't 2018) ......................................... 31

*Diaz v. Wyckoff Hgts. Med. Ctr.*,
148 A.D.3d 778 (2d Dep't 2017) .......................................... 31

*Emporium Management Corporation v. City of New
York*,
121 A.D.3d 981 (2d Dep't 2014) ....................................... 44, 45

*Hairston v. Marcus Garvey Res. Rehab. Pavillion*,
163 A.D.3d 530 (2d Dep't 2018) .......................................... 31

*ISCA Enterprises v. City of New York*,
77 N.Y.2d 688 (1991) .................................................. *passim*

*Jones v. Flowers*,
547 U.S. 220 (2006) ...................................................... 28

*King Holding Corp. v. City of N.Y.*,
24 A.D.3d 395 (1st Dep't 2005) ........................................ 26, 43

*Kleynerman v. MJGC Home Care*,
153 A.D.3d 1246 (2d Dep't 2017) ......................................... 31

*Lubonty v U.S. Bank N.A.*,
___NY3d___, 2019 NY Slip Op. 08520 (2019) ............................... 47

# ADD-5

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Mathew v. Mathew,*
137 A.D.3d 1086 (2d Dep't 2016) ............................................... 31

*Matthew v. Thompson,*
65 A.D.3d 1095 (2d Dep't 2009) ................................................ 40

*McCann v. Scaduto,*
71 N.Y.2d 164 (1987) ............................................................... 30

*Miner v. Clinton County,*
541 F.3d 464 (2d Cir. 2008) ...................................................... 37

*Nelson v. City of New York,*
352 U.S. 103 (1956) ............................................................ 37, 38

*O'Bryan v. Stark,*
77 A.D.3d 494 (1st Dep't 2010), *lv. denied* 17 N.Y.3d
704 (2011) ...................................................................... 26, 43

*Matter of Tax Foreclosure Action No. 44, Borough of
Bronx,*
2 A.D.3d 241 (1st Dep't 2003) ............................................. 26, 28

*Tricarico v. County of Nassau,*
120 A.D.3d 658 (2d Dep't 2014) ............................................... 46

*Matter of Twenty First Point Co. v. Town of
Guilderland,*
101 A.D.2d 407 (1st Dep't 1984), *aff'd* 64 N.Y.2d 954
(1985) ................................................................................. 46

*In Re Vilca v. Village of Port Chester,*
255 A.D.2d 593 (2d Dep't 1998) ............................................... 29

*Weigner v. New York,*
852 F.2d 646 (2d Cir. 1988) ..................................................... 30

**ADD-6**

**TABLE OF AUTHORITIES (cont'd)**

Page(s)

*Wilson v. Neighborhood Restore Hous.*,
129 A.D.3d 948 (2d Dep't 2015) .................................. 25, 43, 44

**Statutes and Regulations**

N.Y.C. Administrative Code
§ 11-401 ................................................................ *passim*
§ 11-301 ........................................................... 15, 16
§ 11-404 ............................................................. 4, 33
§ 11-405 ...................................................... 5, 7 33, 34
§ 11-406 ........................................................ 7, 8, 28
§ 11-409 ................................................... 8, 23, 38, 42
§ 11-412 .................................................................. 5
§ 11-412.1 ......................................................... *passim*
§ 27-2144 .............................................................. 12
§ 27-2129 .............................................................. 46

## PRELIMINARY STATEMENT

Like all cities, New York City has a vital interest in collecting taxes and other municipal charges owed by property owners—funds that pay for the many services the City offers its over 8 million residents. Among the City's tools to address tax delinquency is its in rem law, which allows it to foreclose on buildings with significant outstanding tax liens.

For over two decades, the City has harnessed to its traditional tax enforcement efforts its tandem goal of ensuring the availability of affordable housing, through an innovative statutory program known as the third party transfer program, or "TPT." Through that program, the City can transfer foreclosed properties to a responsible third party that rehabilitates and manages the property as affordable housing. And it allows lawful tenants to remain in their homes, with leases offered at affordable rates.

The respondents in this appeal are owners of six properties that met the statutory requirements for in rem foreclosure. Each had long owed tens or hundreds of thousands of dollars in tax liens. Two of the six also had numerous serious housing code

violations. And none of the owners answered the City's duly served foreclosure notices, or timely availed themselves of the statutory remedies available to prevent foreclosure or redeem their properties promptly after foreclosure.

It was not until well after final judgment of foreclosure was entered, and after expiration of the ensuing statutory redemption period, that each of these owners moved to vacate it. Supreme Court, Kings County (Partnow, J.) granted each owner's motion based on misapprehensions of the law and the facts, concluding without a scintilla of proof that the City's in rem program unconstitutionally targeted minority owners, and substituting its own views about supposed equity for the plain language of the in rem statute.

This Court should reverse. At the threshold, once the statutory redemption period expired, these owners were time-barred in their attempts to set foreclosure aside. And the owners' claims of lack of actual notice cannot excuse their default where the City undisputedly adhered to statutory notice provisions that the Court of Appeals has held satisfy due process.

But even if the owners could overcome this barrier, they failed to establish grounds to undo or block the transfers. The statute's plain language contradicts Supreme Court's erroneous holding that only properties meeting the statutory definition of "distressed" may be subject to in rem foreclosure. Nor can the court's musings that the foreclosure procedure is inequitable, or constitutionally impermissible, survive controlling precedent holding otherwise. The foreclosure was statutorily authorized, and none of the owners had a reasonable excuse for default or a meritorious defense.

## QUESTIONS PRESENTED

1. Did Supreme Court err in entertaining the owners' various attempts to vacate the judgment of foreclosure after the four-month redemption period, where the statute expressly provides that such an action is time-barred, and where the City unquestionably complied with all statutory notice provisions?

2. Did Supreme Court err in (a) concluding that a property must meet the statutory definition of a "distressed property" in order to qualify for third party transfer in rem foreclosure, and (b)

accepting as meritorious the various other defenses raised by the owners, all of which plainly lack merit?

## STATEMENT OF THE CASE

### A. The City's third party transfer program and its twin goals of remedying tax delinquencies and preserving the City's affordable housing stock

Title 11 of the New York City Administrative Code makes available a summary tax foreclosure procedure whenever an outstanding tax lien has been unpaid for the statutorily defined period applicable to the type of property in question. N.Y.C. Administrative Code ("Admin. Code") § 11-404. Pursuant to this procedure, and following certain statutory requirements, a taxing authority may obtain a multi-property judgment authorizing the foreclosure of properties subject to delinquent real property and other municipal charges within a certain geographic area.

Under the Administrative Code, any property with a tax lien (or liens) that has been overdue for at least a year—or for three years in the case of an affordable housing cooperative, like three of the properties here—is subject to in rem foreclosure. N.Y.C. Admin Code §11-404. The statute requires the taxing authority to

4

include all delinquent properties in a borough or portion thereof in any in rem foreclosure action. N.Y.C. Admin Code §11-405.

Traditionally, the taxing authority takes title to the properties pursuant to the judgment. *See* New York Real Property Tax Law Article 11; Admin. Code § 11-412(b). But by amendments to the City's in rem law in 1996 (Local Law no. 37 § 5 (May 14, 1996) ("Local Law 37") and 1997 (Local Law no. 69 § 1 (Aug. 26, 1997), the City added an alternative to its traditional in rem tax foreclosure process. This alternative, the Third Party Transfer (TPT) Program, gave the City the ability to transfer foreclosed class one and class two residential properties to a qualified third party for use as affordable housing.

The TPT program was part of a "comprehensive reform of the City's tax collection procedures [to] enable the City to improve tax collection and to more effectively address the risk of abandonment of New York City housing stock."[1] In the traditional

---

[1] Testimony of Lilliam Barrios-Paoli, HPD Commissioner, April 22, 1996, available at https://on.nyc.gov/36DsVky at "274. Housing & Buildings – April 22" (last accessed January 23, 2020).

in rem procedure (also still available to the City), the sole option requires the City to take municipal title to the properties. Adding the TPT alternative continued to allow the City to preserve and add to its stock of affordable housing, while also mitigating a problem caused by traditional in rem foreclosure: the City had through in rem foreclosure become the landlord with the largest holdings in the five boroughs.[2] The TPT program enabled the City to allocate its resources toward community development, rather than property management and maintenance, and to ensure that most of the City's affordable housing stock remains privately owned by responsible parties (R317-18).

The TPT program—like in rem foreclosure in general—is a key tool in the City's enforcement of tax liens. And it is the only tool available to enforce liens against affordable housing cooperatives (like three of the properties here) or statutorily "distressed" properties (like at least one more): these types of

---

[2] *See* "Comment: The Warranty of Habitability as Applied to New York City In rem Housing: A Premature Promise: City of New York v. Rodriguez," 50 Brooklyn L. Rev. 1103, 1105-06 and n22.

properties may not be included in tax lien sales, the City's other enforcement mechanism, no matter how intransigently their owners react—or fail to react—to enforcement attempts. N.Y.C. Admin. Code §§ 11-401.1(a); 11-319(b)(10).

### B. The statutory procedure for notifying owners and interested parties of an in rem foreclosure action

The Administrative Code sets forth the mechanics for notifying interested parties that an in rem foreclosure action has been initiated. Nearly 30 years ago, the Court of Appeals reviewed these notice provisions and squarely held that they satisfy due process. *ISCA Enterprises v. City of New York*, 77 N.Y.2d 688, 701-02 (1991).

An in rem action is commenced by the filing of duplicate lists of delinquent taxes in the office of the clerk of the county in which the parcels are located. Admin Code § 11-405. Publication of a notice of foreclosure must be made at least once a week for six successive weeks in the City Record and in two newspapers published and circulated within the relevant county. Admin. Code § 11-406(a). In addition, the Commissioner of Finance must post

the notice at its office, the county courthouse, and several other locations. Admin. Code § 11-406(d). And finally, the Commissioner must mail a copy of the notice to all owners, mortgagees, and lienors who have requested notice to be sent to a specified address. Admin. Code § 11-406(c). Where an owner has not specified an address, the Commissioner must mail the notice to the name and address, if any, listed on the latest annual record of assessed valuations. Admin. Code § 11-406(c).

The statute affords interested parties ample opportunity to come forward, address their delinquencies, and prevent foreclosure. If the interested party timely serves a verified answer, that filing serves to sever the action as to any parcel in which the defendant has pleaded an interest. Admin. Code § 11-409(a). In an answer, an interested party may assert substantial equity over the City's lien, and demand additional time to pay the taxes. Admin. Code § 11-409(d).

If no answer is interposed, and the property is not redeemed, as described in the following paragraph, the court, after satisfying itself that the City has complied with all procedural requirements,

8

is directed to enter final judgment authorizing the award of possession of the parcels listed. Admin. Code § 11-412.1. The judgment must also contain a direction to the Commissioner of Finance to prepare, execute and record a deed conveying title to all affected parcels to the City, or to a third party deemed qualified and designated by the Commissioner of HPD. *Id.*

For four months following the entry of such judgment, an interested party retains the right to redeem the property by paying the delinquent charges in full, or entering into an installment payment agreement as provided by the statute. Admin. Code § 11-412.1(d). Upon payment in full, the Commissioner of Finance is required to direct the Corporation Counsel to discontinue the in rem foreclosure as to that property; however, in the event of any default of the payment of either the quarterly installments or the current taxes, all payments made under the installment agreement may be forfeited, and the foreclosure action is reinstated. Admin Code. § 11-412.1(d).

But, critically, once this four-month redemption period expires, no action to set aside such deed may be maintained.

9

Admin. Code § 11-412.1(h). The City retains sole discretion to release its interest in the property until it is transferred.

**C. This in rem foreclosure TPT action and the City's undisputed compliance with statutory notice provisions held to pass constitutional muster**

The City commenced this in rem foreclosure action in July 2015 against the properties at issue here, along with many others that have never been disputed and are not the subject of this or any other action (R243-44). In compliance with the statutory requirements, notices were published weekly for six successive weeks, and posted at the required locations (R245-46). Additionally, because none of the owners had requested that notices of foreclosure be sent to any specific address, each notice was mailed to the names and addresses in the assessment roll (R223, 546, 979, 1369, 1753, 2094-95). While the statute does not require it, the City's Department of Finance (DOF) took the additional precaution of sending the notices by certified mail (R256, 275-92).

The owners of the six properties at issue here failed to answer, and thus defaulted in the action (R412-25). As described in greater detail below, four of the owners took no action to redeem their properties until after the mandatory redemption period expired. The other two owners entered into (or had already entered into) installment agreements with DOF (for payment of tax arrears) and/or the Department of Environmental Protection (to pay water and sewer liens), but defaulted on their payments, thus subjecting their properties to foreclosure judgments.

On November 27, 2017—two-and-a-half years after the foreclosure action was commenced—the court granted the City a foreclosure judgment as to all six properties (R412-25). The judgment was entered on December 14, 2017, triggering the four-month mandatory redemption period, which expired on April 16, 2018 (R226). None of the owners redeemed their properties within that time.

About five months later, in September 2018, four of the six properties were transferred to a qualified not-for-profit third party, Neighborhood Restore Housing Development Fund

Corporation. The transfer was expected to encompass all six properties (along with multiple others), but the owners of 315 Harman Street and 463 Classon HDFC obtained temporary restraining orders from Supreme Court enjoining the transfer of their deeds, pending resolution of this action (R80-81, 496-97). The TROs were issued just before the transfer, after the expiry of the mandatory redemption period (R80-81, 496-97).

The details of each property's arrears and the events leading to the foreclosure on each property are summarized below.

### 1. 315 Harman Street

At the time the foreclosure action was commenced, the municipal arrears for this property were $801,141.52, dating back approximately eight years to September 2007 (R223). Nearly all the liens were the result of emergency repairs and other repair and maintenance performed by HPD,[3] as well as financial aid

---

[3] N.Y.C. Administrative Code § 27-2144 provides that expenses incurred by HPD for repair or elimination of any dangerous or unlawful conditions constitute valid liens against the property for which in rem foreclosure, including third party transfer, is available when delinquencies are not remedied.

12

liens for city funds expended on repairs made by the former administrator of the property, appointed pursuant to Article 7A of the NYS Real Property Actions and Proceedings Law (R225).[4]

DOF had no record of any request to receive notice of foreclosure to any specific address, and accordingly mailed notice to the name and address in the assessment roll (R223). The City followed the procedures set forth in Administrative Code § 11-401 and, although not required to do so, also sent a final warning notice on October 6, 2017—by which time the total amount of delinquent taxes and other charges had increased to $945,595.08—and a post-judgment notice on January 9, 2018 (R223-25).

The property owner took no action to redeem the property before the expiry of the mandatory redemption period (R226).

---

[4] In addition to the arrears, the property at 315 Harman had numerous serious housing code violations (R225). But the City inadvertently affixed the violations records for another property (463 Classon) to its opposition to 315 Harman's motion. Although the City later provided the court with the records pertaining to 315 Harman's violations, these are not part of the record on appeal, and a question remains whether the court received them (*see* R52). Regardless, the City does not (and need not) rely upon those violations in this appeal.

## 2. 463 Classon HDFC

At the time the foreclosure action was commenced, Classon's tax arrears were $79,463.57, dating back approximately 14 years to December 2001 (R545). This amount included delinquent real property taxes and other charges, including water and sewer liens (R547).

Again, DOF had no record of any request to receive notice of foreclosure to any specific address, and accordingly mailed notice to the name and address in the assessment roll (R546). The City followed the procedures set forth in Administrative Code 11-401 and, although not required to do so, also sent a final warning notice on October 6, 2017—by which time the total amount of delinquent arrears had increased to $161,962.24—and a post-judgment notice on January 9, 2018 (R546-47).

As of the date of the post-judgment notice, Classon HDFC had 109 outstanding housing code violations, 42 of which were classified as "immediately hazardous;" another 42 were classified as "hazardous," and the remaining 25 were "not hazardous" (R547).

14

The property owner took no action to redeem the property before the expiry of the mandatory redemption period (R547-48).

### 3. 19 Kingsland HDFC

At the time the foreclosure action was commenced, the municipal arrears for this property were $166,096.84, dating back to 2007 (R979, 1002-03). This amount included delinquent real property taxes and water and sewer liens (R1002-03).[5]

Because DOF had no record of any request to receive notice of foreclosure to any specific address, it mailed notice to the name and address in the assessment roll (R979). The City followed the procedures set forth in Administrative Code 11-401 and, although not required to do so, also sent a final warning notice on October 6, 2017—by which time the total amount of delinquent taxes and other charges had increased to $201,619,93—and a post-judgment notice on January 9, 2018 (R979-80).

---

[5] While Supreme Court asserted that it was "undisputed" that the water liens were "not the subject of this foreclosure action as originally filed" and were "tacked on" later (R58), there is simply no basis for this statement. Water charges become tax liens when unpaid, Admin. Code § 11-301, and DOF included all tax liens in the foreclosure action (R994-1003).

15

Kingsland never answered the foreclosure notice and subsequently asserted, as did the other owners in this action, that it never received notice of the action (R843). But a few months after the action was commenced, it did enter into payment agreements with both DOF and DEP. The DOF agreement required Kingsland to make regular quarterly installments, and warned that the agreement would be canceled and the property again subject to foreclosure judgment if Kingsland defaulted in timely payment (R982). But Kingsland made only sporadic and inconsistent payments, and, by the expiry of the redemption period, had only paid approximately $36,000 of the approximately $78,000 it owed under that installment agreement (R982-83).[6]

Likewise, Kingsland failed to comply with its agreement with DEP to pay its past due water and sewer charges—an agreement that itself replaced a long-defaulted 2006 payment agreement with DEP (R983-84). That agreement required monthly

---

[6] Kingsland made a few more payments after the expiry of the mandatory redemption period. Before title was transferred, the City held these payments in suspense in case Kingsland made current its defaulted payment agreements with DEP and DOF (R1160). Payments held in suspense at the time of title transfer are refunded to the former owner (*id.*; R1997)

payments of approximately $800 commencing immediately, but Kingsland did not make its first payment (in the amount of $1000) until almost two years later, in October 2017, and thereafter only made sporadic payments that did not honor the terms of the agreement (R984).

Accordingly, the four-month mandatory redemption period expired in April 2018 with the owner in default of the installment payment agreements, and the deed was transferred to Neighborhood Restore in September 2018 (R981).

### 4. 972 Rutland Road

At the time the foreclosure action was commenced, the municipal arrears for this property were $139,359.25 dating back to 2009 (R1368). This amount included delinquent real property taxes and other charges, including emergency repair liens and water and sewer liens (*id.*).

DOF had no record of any request to receive notice of foreclosure to any specific address, and accordingly mailed notice to the name and address in the assessment roll (R1369). In addition, DOF also mailed notices to the property owner at an

address listed on the assessment roll as the "real estate billing name and address" (R1369-70, 1450-69).

Although not required to do so, the City also sent a final warning notice to both addresses on October 6, 2017—by which time the total amount of delinquent taxes and other charges had increased to $193,010.79—and a post-judgment notice on January 9, 2018 (R1370-71). Nevertheless, no payments were made on the tax arrears or water and sewer charges at any point after July 2015 (R1371).

In her motion to vacate the foreclosure judgment, the owner alleged that she had intended to enter into an installment agreement to pay the arrears (R1346). She asserted that she sought to secure a loan in order to make her payments, but was unable to do so because although she held a deed to 972 Rutland Road, she was not listed on the assessment roll (R1608-09). But she only made these efforts after the mandatory redemption period had already expired, and never ultimately entered into a payment agreement (R1346).

18

Thus, the court granted the City the foreclosure judgment as to 972 Rutland Road (R1371-72). When the four-month mandatory redemption period expired in April 2018 without any action by the owner to redeem the property, the deed was transferred to Neighborhood Restore in September 2018 (R1372).

### 5.   25 MacDonough Street

At the time the foreclosure action was commenced, the municipal arrears for this property were $120,749.34, dating back to 2013 (R1752). This amount included delinquent real property taxes and other charges, such as emergency repair liens and water and sewer liens (*id.*).

Because DOF had no record of any request to receive notice of foreclosure to any specific address, it mailed notice to the name and address in the assessment roll, as well as to four other addresses associated with the property (R1753). By October 2017, when the City mailed out the non-mandatory final warning notices, the total amount of delinquent taxes and other lien charges had increased to $234,444.45 (R1755).

The owner never answered the foreclosure notice and subsequently asserted, as did the other owners in this action, that it never received notice of the action (R1626). However, the owner acknowledged that it had actual notice of the foreclosure action (R23).

In May 2016, about a year after the foreclosure action commenced, the owner entered into an installment agreement with DEP to pay its outstanding water and sewer liens; it also entered into an installment agreement with DOF in November 2017 to pay its delinquent taxes, shortly before the foreclosure judgment was granted (R1762-63). But the owner defaulted on both agreements. It made only one initial payment of $25,492.23 and none of the agreed-to follow-up quarterly payments towards the total $169,948.18 (plus interest) owed to DOF (R1841).[7] It also failed to pay $20,139.47 owed to DEP (R1762-64, 1853-54).

---

[7] Even after the mandatory redemption period expired, DOF advised the owner that it could bring the installment payment agreement up to date with certain payments, but the owner did not make any payments (R1763, 1842).

Thus, the court granted the City the foreclosure judgment as to 25 MacDonough (R1755-56). In September 2018, the deed was transferred to Neighborhood Restore (*id*).

### 6. 1055 Bergen HDFC

At the time the foreclosure action was commenced, the municipal arrears for 1055 Bergen HDFC were $250,482.98, dating back about eight years, to 2007 (R2093). This amount included delinquent real property taxes and other charges, such as emergency repair liens and water and sewer liens (*id.*).

Because DOF had no record of any request to receive notice of foreclosure at any specific address, it mailed notice to the names and addresses in the assessment roll (R2094-95). By the time the City sent the non-mandatory final warning notice on October 6, 2017, the total amount of delinquent taxes and other charges had increased to $378,185.69 (R2095). The City also mailed out a post-judgment notice on January 9, 2018 (R1370-71). Nevertheless, no payments were made on the tax arrears or water and sewer charges at any point after July 2015.

Thus, the court granted the City the foreclosure judgment as to 1055 Bergen HDFC (R547). The four-month mandatory redemption period expired in April 2018 without any action by the owner to redeem the property, and the deed was transferred to Neighborhood Restore in September 2018 (R2096). At the time of the deed transfer, the tax arrears and water and sewer liens together amounted to $435,352.27 (R2096).

### D. Supreme Court's order vacating the judgment of foreclosure and setting aside the property transfers

All six property owners moved by order to show cause for orders vacating their defaults and the judgment of foreclosure and restoring their titles (R80-83, 496-501, 840-41, 1336-37, 1619-20, 2035-36). Prior to the transfer date, two of the six successfully moved for preliminary injunctions blocking the transfers (R80-81, 496-97). In support of their motions, each of the six property owners primarily argued that they had not been adequately notified of the foreclosure action. They also raised various arguments challenging the underlying liens or asking permission to belatedly redeem their properties.

22

In response, the City demonstrated that it had complied with the statutory notice requirements; indeed, it remained undisputed that none of the owners had provided addresses for foreclosure notices that were different from those listed on the assessment rolls, where the notices had been sent (R223, 546, 979, 1369-70, 1753, 2094). Accordingly, and because the mandatory redemption period had expired, the City maintained that the owners no longer had the right to redeem the properties (R456-57, 790-91, 1166-67, 1576-77). Additionally, the City pointed out that valid defenses to an in rem foreclosure action, such as payment or exemption, Admin. Code § 11-409(b), were lacking here (R459, 792).

Supreme Court, Kings County (Partnow, J.) vacated the judgments of foreclosure and restored title of the properties to the prior owners (R7-78). For the four properties that had already been transferred to Neighborhood Restore, the court vacated the transfers. The court permanently enjoined the transfer of the other two properties (*id.*). In a wide-ranging decision, the court misread the plain language of the law, dismissed the significance

of binding precedent, and substituted its own notions of equity for the balance struck by the City Council between owners' rights and the public interest in tax enforcement and affordable housing.

First, while not expressly concluding that actual notice of foreclosure is required under the statute, the court nevertheless deemed it mandated as a matter of equity, contrary to precedent from this Court and the Court of Appeals (R23-24; 35-36; 51-53). Additionally, the court read into the statute a "mandatory prerequisite" that any property subject to TPT meet the definition of a "distressed" property, and concluded that because some of the properties were not distressed, their transfer was unauthorized and, moreover, was an unconstitutional taking (R37, 63, 76).

Next, without pointing to any evidence, the court asserted that the TPT program targeted minority-owned properties and unfairly frustrated owners' goals of "building intergenerational wealth" (R22). And based on the lien amounts compared to the value of some of the properties asserted by the various owners (which the court accepted without substantiation), the court also concluded that the transfers were "unconscionable" and

24

conscience-shocking, and found it "arbitrary and capricious" that the City had not exercised its discretion to accept late payments (R28, 63, 75).

## ARGUMENT

### POINT I

**THE PROPERTY OWNERS' MOTIONS TO VACATE THE FORECLOSURE WERE TIME-BARRED**

Supreme Court erred in concluding that the four-month mandatory redemption period does not act as a statute of limitations (R36). The expiry of the mandatory redemption period barred the owners' motions to vacate the foreclosures and set aside the deed transfers.

The Administrative Code specifically states that an action to set aside a deed may not be maintained unless commenced prior to expiration of the four-month period. N.Y.C. Admin. Code § 11-412.1(h). And both this Court and the First Department have repeatedly affirmed that an action to vacate a judgment of foreclosure commenced more than four months after entry of the judgment of foreclosure is time-barred. *Wilson v. Neighborhood Restore Hous.*, 129 A.D.3d 948, 949 (2d Dep't 2015); *O'Bryan v.*

25

*Stark*, 77 A.D.3d 494, 495 (1st Dep't 2010), *lv. denied* 17 N.Y.3d 704 (2011); *In Rem Tax Foreclosure Action No. 44*, 23 A.D.3d 290, 291 (1st Dep't 2005); *Matter of Tax Foreclosure Action No. 44, Borough of Bronx*, 2 A.D.3d 241, 242 (1st Dep't 2003).

These decisions flatly contradict Supreme Court's reasoning that the owners' motions were not time-barred simply because another provision of the Code permits the City, at its discretion, to release its own interest in a foreclosed property after the four-month period (R36, 43). The City's discretion to release a property after the four-month period is, barring illegality or fraud, "absolute," *King Holding Corp. v. City of N.Y.*, 24 A.D.3d 395, 396 (1st Dep't 2005). Supreme Court broke from clear and settled precedent in reading that discretionary provision to permit an action against the City to set aside a foreclosure judgment as arbitrary and capricious.

Nor do the owners' bare claims that they did not receive the notices allow them to evade the statutorily imposed limitations period for the claims they have raised here. While an owner who did not receive actual notice retains the narrow ability to

26

challenge the *constitutionality* of the statutory notice provisions themselves outside the four-month period (*see ISCA Enterprises*, 77 N.Y.2d at 698), the owners never raised any such challenge here and the lower court erred in concluding otherwise.

In any event, any challenge to the validity of the statutory notice provisions would fail: the Court of Appeals has expressly ruled that these precise notice provisions satisfy due process. *Id.* at 701-02. And the City established that it complied with the notice provisions. It published and posted the notices of foreclosure and mailed copies to all the owners at the addresses listed on the assessment rolls (R223, 255-56, 321-27, 642-72, 979, 1096-1111, 1450-1474, 1779-88, 1821, 2111-35). And the City even went further than necessary here, following up with additional mailings before and after the foreclosure was finalized, as is its practice (R223-25, 546-47, 979-80, 1370-71, 1755, 2095). Supreme Court's belief that it was inequitable to foreclose on the owners' properties without actual notice did not entitle the court to rewrite the statute or ignore controlling Court of Appeals precedent upholding it.

It was well within the City Council's province to devise an alternative to actual notice of an in rem foreclosure action. As the United States Supreme Court has held, "due process does not require that a property owner receive actual notice before the government may take his property." *Jones v. Flowers*, 547 U.S. 220, 226 (2006)(citing *Dusenbery v. United States*, 534 U.S. 161, 170 (2002). The statute gives owners an opportunity to register a chosen address for receipt of any foreclosure notice. Where an owner has not done so—as was the case across the board here— the statute reasonably specifies that DOF must mail a copy of the notice of foreclosure to the name and address appearing in the latest annual record of assessed valuations, after publication. Admin. Code § 11-406(c). And, as noted above, the Court of Appeals upheld these requirements as satisfying an owner's due process rights, by providing notice reasonably calculated to alert the owners of the proceeding without being unduly burdensome for the City. *ISCA Enterprises*, 77 N.Y.2d at 700-02.

While the owners here all denied receiving the notices, the courts have held that bare denial of receipt of notice, without any

explanation as to why such notice was not received, is insufficient to rebut the presumption of receipt. *City of New York v. Family House Real Estate Corp.*, 2 A.D.3d 241 (1st Dep't 2003); *In Re Vilca v. Village of Port Chester*, 255 A.D.2d 593 (2d Dep't 1998). A statutory presumption of regularity in favor of the City attaches upon the issue of a foreclosure notice, which is "conclusive" following the expiry of the mandatory redemption period. Admin. Code § 11-412.1(d), (h).

None of the owners did—or could—dispute that the City mailed the notices to the addresses that were listed on the assessment rolls.[8] Supreme Court nevertheless held that the City should have done more, like "ascertain[ ] … correct address[es]" based on other filings (R23) But the Court of Appeals expressly rejected any such requirement, noting the burden of individually searching the title records would impose a "very substantial burden" on the City. *ISCA Enterprises*, 77 N.Y.2d at 701-702.

---

[8] In addition, 25 MacDonough acknowledged that it received actual notice (R23), and both it 19 Kingsland entered into payment installment agreements after the foreclosure action commenced. These owners accordingly have no due process claim for the additional reason that they cannot dispute actual notice. *ISCA Enterprises*, 77 N.Y.2d at 697.

Accordingly, Supreme Court's invention of some vague "equitable" extra-statutory notice requirement was reversible error. Indeed, in *ISCA*, the Court of Appeals observed that it was not unreasonable to place "[s]ome responsibility for maintaining current records" on the owners, who "should be alerted to the need to update their records by a failure to receive timely billing notices." *ISCA Enterprises*, 77 N.Y.2d at 701. And because the statutory notice requirements were complied with, the owners did not—and could not—establish an "excusable default," and so the court's invocation of N.Y. CPLR 5015 does not pass muster either (R64).

Nor does Supreme Court's reliance on C.P.L.R. § 5015 to overcome the limitations period pass muster (R28). The Administrative Code contains its own specific notice provisions, which control here. *Weigner v. New York*, 852 F.2d 646, 652-53 (2d Cir. 1988) ("since the Administrative Code contains specific provisions regarding notice of tax foreclosure proceedings, the Real Property Tax Law and the CPLR do not apply"); *see also McCann v. Scaduto*, 71 N.Y.2d 164, 171 n.2 (1987).

30

Supreme Court also relied on a court's inherent authority to vacate judgments to promote substantial justice (R29). But this Court has made clear that vacatur on such grounds is available only where a movant presents *both* a reasonable excuse for its default and a meritorious defense. *See, e.g., Hairston v. Marcus Garvey Res. Rehab. Pavillion*, 163 A.D.3d 530, 531-32 (2d Dep't 2018); *Diaz v. Wyckoff Hgts. Med. Ctr.*, 148 A.D.3d 778, 779 (2d Dep't 2017); *Mathew v. Mathew*, 137 A.D.3d 1086, 1087 (2d Dep't 2016). The Court has further emphasized that vacatur is to be granted sparingly and only in circumstances that are unique or unusual. *Cox v. Marshall*, 161 A.D.3d 1140, 1141-1142 (2d Dep't 2018); *Kleynerman v. MJGC Home Care*, 153 A.D.3d 1246, 1247 (2d Dep't 2017). The movants' claims here that they did not receive actual notice fall far short under the Court's precedents: that circumstance, by definition, cannot constitute a reasonable excuse for a default, and does not qualify as unique or unusual, where the governing statute expressly does not require actual notice. Inherent authority may allow a court to address certain unforeseen and unusual situations, but it is not a license to

31

rewrite clear statutory provisions. Nor did the petitioners otherwise satisfy the Court's settled criteria for the exercise of inherent authority to vacate a default judgment.

In short, the City's compliance with the notice provisions started the clock on the owners' time to redeem their property from foreclosure. They did not timely do so, and should not have been permitted to challenge the foreclosure judgment in this action.

**POINT II**

**THE OWNERS HAD NO MERITORIOUS DEFENSE TO THE FORECLOSURES**

**A. Supreme Court misread the statute in concluding that only distressed properties are subject to in rem foreclosure.**

Insofar as the owners' challenges to the foreclosures were time-barred, this Court should reverse without delving further into the merits. But, at any rate, Supreme Court's merits ruling founders at the gate. The court interpreted the statutory scheme to preclude in rem foreclosure of any property that did not meet the statutory definition of "distressed"—including several of the

32

properties at issue here (R12-13, 25-27).[9] This misapprehension is contradicted by the plain language of the statute.

The Administrative Code allows the City to subject *any* class one or class two property "described in the list of delinquent taxes"—i.e., with a tax lien unpaid and due for the minimum statutory period—to in rem foreclosure and the TPT program. N.Y.C. Admin. Code § 11-412.1(b). The subdivision authorizing the City to do so does not require that the tax-delinquent property be distressed. *Id.*

Likewise, Administrative Code § 11-404, applicable to both traditional and modified *in rem* actions, provides that unpaid tax liens may be foreclosed, without reference to whether or not property is distressed. And Administrative Code § 11-405(a) provides that the list of delinquent taxes shall include "*all* parcels

---

[9] A distressed property is one that is subject to tax liens with a lien-to-value ratio of 15% or more, provided it also has five or more hazardous or immediately hazardous housing code violations per dwelling unit, or HPD liens for emergency repairs equal to or more than $1000. Admin. Code § 11-401.4. It is undisputed that several of the properties here were distressed: the court excluded only 19 Kingsland and 25 MacDonough based on this reasoning (R25-27, 60-62), although it also noted that "the City did not make any specific allegations" that 1055 Bergen was a distressed property (R31).

within a particular class, that are within a particular borough or section of a tax map" (emphasis added)—again with no mention of "distress." Moreover, § 11-405(a) (the "block pull-in" provision) expressly encompasses non-distressed properties: that provision *requires* the City to include *all* tax-delinquent properties of the same class on a block in the same in rem foreclosure action, once such a proceeding is commenced.

Nor was the TPT program designed to address distressed properties in particular, as Supreme Court presumed (R14). Rather, the TPT program focuses specifically on residential—class one and class two—properties: Administrative Code § 11-412.1(b)(1) authorizes in rem foreclosure of "any parcel of class one and class two real property" otherwise eligible for foreclosure. In contrast, the pre-existing general in rem provision, § 11-412, does not include the limiting reference to class one and two properties.

Ignoring this overall context, Supreme Court misread Administrative Code § 11-401.1(b) as limiting all in rem foreclosure actions to distressed properties alone (R61). But § 11-401.1 (b) merely provides that non-distressed properties may not

34

be subject to two specific later subdivisions that expressly apply only to distressed properties. And there is good reason why those two provisions, in particular, are limited to distressed properties: both address the City's particularly strong interest in ensuring that distressed properties are remediated by some means, even if not by foreclosure.

One of those subdivisions, Administrative Code § 11-412.1(j) specifies that if the City discontinues a foreclosure action against a distressed property, it is still required to evaluate the property for other programs that are designed to encourage the rehabilitation and preservation of existing housing, to monitor the status of the property, and to include it on a register of distressed properties. *Id.* This makes sense, since the City may need to remedy ongoing problems with distressed buildings even after a foreclosure is discontinued. The fact that this subdivision is specifically directed to distressed properties does not somehow exclude non-distressed properties from the entire statutory scheme, especially where the plain-language reading of § 11-412.1(b) applies to any tax-delinquent class one or two property.

The other specific subdivision, § 11-401.1(c) relating only to distressed properties provides that distressed properties *shall* be subject to in rem foreclosure or other rehabilitative action under certain circumstances. This provision, too, is aimed to ensuring that distressed properties are remediated. But the provision does not say that *only* distressed properties are subject to in rem foreclosure.

Again, nothing in this provision, itself aimed at distressed properties only, limits the application of the overall statutory scheme to distressed properties alone. On the contrary, it shows that where the City Council intended to circumscribe the reach of the statute in this fashion, it had the language to do so at its ready disposal and did not hesitate to use it. It also throws into sharp relief a fundamental precept of statutory construction: "[w]here a statute describes the particular situations in which it is to apply and no qualifying exception is added, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded." *Alonzo M. v. N.Y.C. Dept. of Probation*, 72 N.Y.2d 662, 665 (1988) (cleaned up).

36

It bears noting that, despite Supreme Court's faulty premise, the City did not bring the foreclosure action "on the basis that the properties at issue were distressed properties" (R12). Indeed, as Supreme Court noted at other points in the decision, the City never contended that all the properties were distressed (R17-18, 31, 60).

Supreme Court used its erroneous reading of the statute as requiring that a property be distressed to invent a distinction between this case and the Supreme Court's ruling in *Nelson v. City of New York*, 352 U.S. 103, 110 (1956). There, the United States Supreme Court held that it is constitutionally permissible for the City to retain a foreclosed property, or the entire proceeds of a tax sale—including any surplus—if the owner does not timely avail itself of the available actions to redeem it. *Id.* (analyzing the City's predecessor in rem law). Similarly, the Second Circuit has also held (citing *Nelson*) that the retention of any surplus from a tax auction is constitutional where, as here, due process is afforded (including the requisite notice discussed in Point I, *supra*). *Miner v. Clinton County*, 541 F.3d 464, 475 (2d Cir. 2008).

37

Supreme Court distinguished *Nelson* on the flawed premise that the TPT program does not authorize foreclosure of non-distressed properties (R38), and concluded that, therefore, the foreclosure here was an unlawful taking "without just compensation" (R37, 63, 76). But because that was error, *Nelson* controls, and the fact that the owners were not credited with any surplus does not render the foreclosure an unconstitutional taking.

In the same vein, the court's refrain that the transfers were "unconscionable" based on the lien-to-property-value ratio is not supported by the law (R28, 63). As an initial matter, the court was unmoved by the countervailing equitable consideration that each of these owners had allowed their properties to fall into tax-delinquent status and remain that way for many years, despite mounting charges and interest, at the expense of the public fisc. That aside, and accepting at face value the owners' bare assertions that the properties were worth far more than the liens, the statute provides a remedy: an owner of a property included in an in rem action may file an answer alleging substantial equity over the

City's liens, obtain additional time, sell the property, and pay the taxes with the proceeds, keeping the rest. N.Y.C. Admin. Code §11-409(d). None of the owners here did so.

Nor do the cases that Supreme Court cited in concluding the foreclosures were "inequitable" support the court's conclusions (R28). In *Matthew v. Thompson*, 65 A.D.3d 1095, 1097 (2d Dep't 2009), this Court plainly held that a former owner was *not* entitled to any surplus money recovered as the result of a foreclosure, where the owner neither redeemed her property nor interposed an answer within the relevant statutory period. And the 1962 trial-level case *Alben Affiliates v. Astoria Term*, 34 Misc. 2d 246, 248 (Sup. Ct. Queens Cty. 1962) concerned a private mortgage foreclosure and has no relevance—or precedential value—here.

Additionally, while Supreme Court unilaterally declared that the TPT program unfairly targeted minority-owned neighborhoods (R22), the record contains absolutely no evidence of that. Nor did the court analyze whether there were similarly situated properties owned by non-minorities that were not subject

to in rem foreclosure, or whether any alleged disproportionate effects on minorities were intentional rather than incidental.

Moreover, the court ignored the countervailing interest that the tenants and residents of these minority neighborhoods have in the City ensuring that their living quarters, which were allowed to fall into financial or physical disrepair, are maintained (and, when needed, rehabilitated) as affordable housing—not to mention the interests of the public at large in collecting tax revenue necessary to fund the City's many indispensable public services.[10] At a minimum, the right balancing of these interests is a question best reserved for legislators, who are answerable to the public through the political process—not the courts.

---

[10] Indeed, as one New York Times article annexed by the Kingsland Road property owner to its motion to vacate recounted, the City Council member overseeing the housing and buildings committee was surprised to learn that many residents of foreclosed properties supported the TPT program, because it would place their buildings' maintenance in responsible hands and improve their quality of life (R922).

**B. The owners' other arguments against the foreclosures are also unavailing.**

Because the City complied with the statutory notice requirements, the owners had no reasonable excuse for their default. Nor did they have any meritorious defense, although Supreme Court erroneously accepted a hodge-podge of different arguments made by the various owners in favor of their respective applications.

For example, the lower court found that the Bergen Street and Rutland Road owners "stood ready" to pay their arrears (R33, 46). But the court disregarded the undisputed fact that those owners had unpaid arrears dating back to 2007 and 2009 respectively, forgoing multiple opportunities to avoid foreclosure. They could have entered into and kept current with an installment payment plan (§11-412) or stayed the foreclosure and sold the property themselves (§11-409(d)), but instead the owners simply did nothing.

Nor, contrary to the court's analysis, was it "arbitrary and capricious" for the City to refuse these untimely payments (R66). That is not the standard for reviewing the City's action: the City's

discretion to accept payments after the mandatory redemption period is absolute, barring fraud or illegality—neither of which is alleged or present here. *King Holding Corp.,* 24 A.D.3d at 396.

Nothing in the Administrative Code compelled the City to set aside the foreclosure after the mandatory redemption period simply because the owners now represented that they were willing to pay the many thousands of dollars they had allowed to accumulate in arrears. Indeed, the First Department has rejected an owner's belatedly stated willingness to pay a tax lien as a basis for vacating a foreclosure judgment. *O'Bryan v. Stark,* 77 A.D.3d at 494.

The lower court also ruled that several owners had been misled by the City into believing that they were on the road to redeeming their properties—primarily because the City accepted installment payments or other fees past the mandatory redemption period (R24, 45, 63-64). But this Court rejected a far stronger argument in *Wilson,* 129 A.D.3d at 949, holding that the City was not equitably estopped from asserting that the mandatory redemption period had expired even when a City

42

official allegedly made express representations that the owner could still redeem the property.

As the Court held in *Wilson*, equitable estoppel is applied against a municipality performing a governmental function "only in the rarest of cases," and even erroneous advice by a governmental employee "will not give rise to an exception to the general rule." *Id.*

And here, there was no erroneous advice given. The City simply afforded the owners an additional opportunity to head off foreclosure that was not statutorily required, and the owners failed to make good on that opportunity. While Supreme Court held that accepting payments after the mandatory redemption period was "inconsistent" with the City's position that the properties could not be redeemed after the mandatory redemption period (R64), this is not so; while the City retained *discretion* to release its interest in the properties, it could no longer be *compelled* to do so. Moreover, the installment payments were made after the mandatory redemption period were refunded,

when it became evident that the owners would not redeem their properties before they were transferred (R1159-60).

Nor do the facts in this case align with *Emporium Management Corporation v. City of New York*, 121 A.D.3d 981, 984-85 (2d Dep't 2014). There, DOF allowed the owner to enter into an installment payment agreement after the foreclosure judgment had been entered, but then executed the property transfer and refused to accept the initial payment. *Id.* And because the City failed to inform the owner that it had unilaterally canceled the installment agreement, the owner lost its post-redemption window to seek discretionary relief from the City prior to transfer of the deed. *Id.* at 984.

That is very different from the facts here. The two owners with installment agreements entered into them before the judgment of foreclosure and then immediately defaulted on them. Then, when DOF continued to accept payments from the owner of 25 MacDonough after the mandatory redemption period expired, it expressly gave the owner a specific schedule that would bring it up to date and avoid a transfer—but the owner never made any

44

attempt to pay (R1842). That is starkly in contrast with the *Emporium* case, where the City abandoned the installment agreement without notice, and executed the deed transfer, all before the owner had a chance to make even the first timely payment. *Emporium Mgmt. Corp.,* 121 A.D.3d at 984-85.

The court here also appeared to give significant weight to the 315 Harman Street property owner's assertions that the emergency repairs causing the bulk of its tax liens were unwarranted (R49-50). But the owner never filed any written objections protesting the charges, and was long time-barred from challenging the liens, which dated back to 2008 and 2009 (R457-58). *See* N.Y.C. Admin. Code § 27-2129 (owners must object to HPD's statement of expenses for repairing dangerous or unlawful conditions before the charge becomes due and payable). The court's willingness to entertain such belated collateral attacks demonstrates an utter disregard of fundamental legal principles. *See Matter of Twenty First Point Co. v. Town of Guilderland,* 101 A.D.2d 407 (1st Dep't 1984), *aff'd* 64 N.Y.2d 954 (1985) (failure to timely pursue remedies precluded collateral attack in another

proceeding); *Tricarico v. County of Nassau*, 120 A.D.3d 658, 660 (2d Dep't 2014) (same, absent bona fide jurisdictional challenge to first judgment).

Finally, Supreme Court held that because deeds for 315 Harman Street and 463 Classon HDFC had not been transferred to Neighborhood Restore, the foreclosure judgment as to those properties should be permanently enjoined pursuant to Administrative Code § 11-412.1(h), which provides that the Commissioner of Finance must execute a deed to the City or a third party within eight months (plus a 45-day toll for City Council review), or otherwise discontinue the foreclosure action (R54-55, 78). But as the court acknowledged, the deed transfers as to those properties were delayed only because the court entered temporary restraining orders enjoining the transfers, not due to dilatory conduct by the City (R54-55, 80-81, 496-97). Accordingly, the court's restraining order tolled the City's time to execute the deed. *See Lubonty v U.S. Bank N.A.,* ___NY3d___, 2019 NY Slip Op. 08520 at *4 (2019) (duration of any stay must be excluded in

determining whether statute of limitations on foreclosure action had expired).

In any event, none of the arguments raised by the property owners can overcome the fact that, under this Court's well-established precedent, their applications were time-barred. Accordingly, Supreme Court erred in even reaching any of these arguments.

## CONCLUSION

This Court should reverse the order of the Supreme Court, reinstate the judgment of foreclosure, restore Neighborhood Restore's title as to 19 Kingsland HDFC, 972 Rutland Road, 25 MacDonough Street, and 1055 Bergen Street, and permit the City to transfer title to Neighborhood Restore as to 315 Harman and 463 Classon HDFC.

Dated:  New York, NY
         January 23, 2020

Respectfully submitted,

JAMES E. JOHNSON
*Corporation Counsel*
*of the City of New York*

By: _____
MELANIE T. WEST
Assistant Corporation Counsel

100 Church Street
New York, NY 10007
212-356-0842
mwest@law.nyc.gov

RICHARD DEARING
DEBORAH A. BRENNER
MELANIE T. WEST
   *of Counsel*

ADD-55

## PRINTING SPECIFICATIONS STATEMENT

This brief was prepared on a computer, using Century Schoolbook 14 pt. for the body (double-spaced) and Century Schoolbook 12 pt. for the footnotes (single-spaced). According to Microsoft Word 2010, the portions of the brief that must be included in a word count contain 8,371 words.